ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILLIPS–VAN HEUSEN CORP.              :

        Plaintiff                            :

v.                                      :

J. V. E. Co., Inc.                      :        CIVIL ACTION
                                        :        NO. 1: CV-00-0665
        Defendant                            :        (Judge Sylvia H. Rambo)

    and                                 :
                                        :
MITSUI O.S.K. LINES, LTD.;              :
DAMPSKIBSSELSKABET AF 1912              :
AKTIESELSKAB                            :

    and                                 :
                                        :
AKTIESELSKABET                          :
DAMPSKIBSSELSKABET SVENDBORG            :
trading as Maersk Line and Maersk Line, Inc. :

      Defendants/Third Party Plaintiffs   :

v.                                      :

KELLAWAY TRANSPORTATION, INC.,          :
KELLAWAY INTERMODAL &                   :
DISTRIBUTION SYSTEMS,                   :
KELLAWAY INTERMODAL                     :
SERVICES, INC. and KELLAWAY             :
TERMINAL SERVICES, INC.,                :
       Third Party Defendants               :

## <u>PLAINTIFF'S PROPOSED FINDINGS OF FACT</u>

## Preliminary Findings of Fact

### The Parties

1.    Phillips is a Delaware corporation with its principal place of business at Madison Avenue, New York, New York. (T. at 11; T. at 43 (l. 8); T. at 58 (l. 15-17)).

2.    Phillips is a seller of retail clothing, and has distribution and sales facilities at various locations around the country, including Reading, Pennsylvania.  It purchases the clothing from manufacturers around the world, including some in Indonesia and Pakistan.  (T. at 42; T at 44 (l. 6-8); T. at 53 (l. 20-24)).

3.    Mitsui is a foreign corporation which operates as a common carrier for hire by ocean and other intermodal forms of conveyance. Mitsui was the carrier of some of the container shipments at issue in this action. (T. at 11 (l. 7-19); T. at 12 (l. 11-14)).

4.    Maersk is a foreign corporation which operates as a common carrier for hire by ocean and other intermodal forms of conveyance.  Maersk was the carrier of some of the container shipments at issue in this action.  (T. at 12 (l. 11-14)).

5.    Kellaway is a Massachusetts corporation with a principal place of business in Randolph, Massachusetts.  Kellaway was hired by Mitsui and Maersk to transport the container shipments at issue herein from New Jersey to a container yard operated by Kellaway at 4390 Chambers Hill Road, Harrisburg, Pennsylvania, where they were to clear customs, pending their  delivery to Phillips' Reading, Pennsylvania facility. (T. at 12 (l. 20-22); T. at 340 (l. 17-25) - 341 (l. 2); T. at 345 (l. 18) - 346 (l. 1); T at 431 (l. 4-18); T. at 437 (l. 8-21)).

6.    Kellaway Intermodal and Distribution Systems, Inc. is a successor in interest to Kellaway Transportation Inc. and all other Kellaway entities that may be involved in this matter. (T. at 22 (l. 1-7)).

7.    At all material times, Mitsui and Maersk were bailees of the container shipments at issue herein and Kellaway was a sub-bailee of said container shipments.  (T. at 14 (l. 12-19); T. at 20 (l. 17-18 and l. 20);  21 (l. 21); T. at 22 (l. 8-10); T. at 65 (l. 8-17)).

8.    At all material times, Mitsui, Maersk, and Kellaway provided transportation services for the carriage and delivery of goods in and through the Commonwealth of Pennsylvania. (T. at 11, *et seq.*).

### The Mitsui Shipments

9.     In or about late February 1999, in anticipation of the summer season, Phillips received Purchase Orders from several of its retail customers for a quantity of sport shirts.  (T. at 59 (l. 2-25); T. at 129 (l. 4-24); T. at 130 (l. 6-22); T. at 140 (l. 1-23); T. at 141 (l. 4-24).

10.     On March 15, 1999, Phillips issued Purchase Order Nos. 02-002794, 02-002795, 02-002879, 02-00281, and 02-002881 to its manufacturer in Indonesia, P.T. Busana Rama Textile & Garment (Busana Rama), for the sport shirts that were ordered by Phillips' retail customers.  (Plaintiff's Exhibits, 2, 3, 4, and 105 (¶ 3)).

11.     On or before May 14, 1999, Mitsui supplied three 40' shipping containers and three Mitsui security seals to Busana Rama. (Plaintiff's Exhibit 105 (¶ 4)).

12.     On May 14-15, 1999, Busana Rama stuffed Mitsui Container No. MOLU 0112686 with a total of 384 cartons (9,191 units) of mens Izod shirts. When the loading was completed, the container doors were closed and sealed with Mitsui Seal No. M 577397.  (Plaintiff's Exhibit 105 (¶ 5)).

13.     On May 14-15, 1999, Busana Rama stuffed Mitsui  Container No. MOLU 0102585 with a total of 388 cartons (9,293 units) of mens Izod shirts.

When the loading was completed, the container doors were closed and sealed with Mitsui Seal No. M 577398. (Plaintiff's Exhibit 105 (¶ 6)).

14.    On May 14-15, 1999, Busana Rama stuffed Mitsui Container No. MOLU 0004465 with a total of 442 cartons (10,564 units) of mens Izod shirts. When the loading was completed, the container doors were closed and sealed with Mitsui Seal No. M 577396. (Plaintiff's Exhibit 105 (¶ 7)).

15.    Pursuant to Indonesian government regulations concerning export shipments, a surveyor witnessed the stuffing of Mitsui Container Nos. MOLU 0112686, MOLU 0102585, and MOLU 0004465, and then applied his own security seals to the doors of the containers. He issued Inspection Report No. 42.99.009709 certifying his activities. The Report indicates that SCI Seal Nos. 14831828, 14831805, and 14697985 were applied to the respective containers. (Plaintiff's Exhibits 25, 26, and 105 (¶ ¶ 2 and 8)).

16.    Subsequently, Mitsui Container Nos. MOLU 0112686, MOLU 0102585, and MOLU 0004465 were delivered to Mitsui for loading aboard the ocean carrier. No exceptions were taken with respect to the containers, as the security seals were found to be in place on the doors. (Plaintiff's Exhibit 105 (¶ 9)).

17.    On May 16, 1999, Mitsui issued Bill of Lading No. 460156264, Bill of Lading No. 460155893, and Bill of Lading No. 460156258, for the three container shipments that it received from Busana Rama.  These were Through Bills of Lading, indicating that Mitsui agreed to transport the container shipments from Indonesia to the United States, and deliver them to Phillips at Reading, Pennsylvania. (T. at 28 (l. 24) - 29 (l.17)).

18.    Mitsui Bill of Lading No. 460156264 acknowledged receipt of Container No. MOLU 0112686, bearing Mitsui Seal No. M 577397.  A total of 384 cartons of mens woven  shirts were being shipped in this Container. (T. at 48 (l. 11) - 49 (l. 12); Plaintiff's Exhibit 28).

19.    Mitsui Bill of Lading No. 460155893 acknowledged receipt of Container No. MOLU 0102585, bearing Mitsui Seal No. M 577398.  A total of 388 cartons of mens woven  shirts were being shipped in this Container. (T. at 52 (l. 4-17); Plaintiff's Exhibit 29).

20.    Mitsui Bill of Lading No. 460156258 acknowledged receipt of Container No. MOLU 0004465,  bearing Mitsui Seal No. M 577396.  A total of 442 cartons of mens woven shirts were being shipped in this Container.  (T. at 55 (l. 19) - 57 (l. 8); Plaintiff's Exhibit 30).

21.    On June 15, 1999, in response to Mitsui's work order, Kellaway's truck drivers picked up Container Nos. MOLU 0112686, MOLU 0102585, and MOLU 0004465 from the terminal at Kearny, New Jersey and transported them to the container yard operated by Kellaway at 4390 Chambers Hill Road, Harrisburg, Pennsylvania. No exceptions were taken by the drivers concerning the seals on the containers when they picked them up at the terminal. It was noted on the Trailer Receipt Delivery Inspection Reports that were issued that the original Mitsui security seals for the containers were in place.  (T. at 53 (l. 20) - 55 (l. 18); T. at 345 (l. 14) - 346 (l. 1); T at 431(l. 4-18); Plaintiff's Exhibits 35 and 37).

22.    When the Mitsui containers were received at Kellaway's container yard, an Equipment Interchange Receipt and Safety Inspection Report was prepared by Keith Walborn, the yard manager.  No exceptions were taken concerning the seals on the containers when they arrived at the container yard. The Report noted that both the Mitsui seals and the SCI seals were in place. (T. at 297 (l. 17) - 298 (9); T. at 436 (l. 21) - 437 (l. 7); Plaintiff's Exhibits 36 and 38).

**The Maersk Shipment**

23.    In or about late February 1999, in anticipation of the summer season, Phillips received Purchase Orders from several of its retail customers for a

quantity of sport shirts.  (T. at 59 (l. 4-10); T. at 88; T. at 139 (l. 6-7); T. at 188 (l. 1-2); T. at 217 (l. 15-17)).

24.    On February 23, 1999, Phillips issued Purchase Order No. 02-002718 to its manufacturer in Pakistan, D.S. Textile Limited (D.S. Textile), for the sport shirts that were ordered by Phillips' retail customers.  (T. at 59 (l. 4-10); Plaintiff's Exhibit 59).

25.    On or before May 15, 1999, D.S. Clothing (PVT) Ltd. forwarded 378 cartons of 100% cotton polo shirts (12,096 units) to Mercantile Logistics, which stuffed them into Maersk Container No. GSTU 284867-6.  When the loading was completed, Maersk Seal No. 0110356 was applied to the container doors.  (T. at 80 (l. 10-14); T. at 81 (l. 9-14)).

26.    Pursuant to custom and usage for such export shipments, a surveyor witnessed the stuffing of Maersk Container No. GSTU 286867-6 at Qasim International Container Terminal.  He issued a Survey Report certifying that the goods were loaded into the container and that a security seal was applied to the doors.  (T. at 32 (l. 9-21); T. at 33 (l. 1-23); T. at 82 (l. 1-7); Plaintiff's Exhibits 66 and 66a).

27.    Subsequently, Maersk Container No. GSTU 284867-6 was delivered to Maersk for loading aboard the ocean carrier.  No exceptions were taken with

respect to the container, as the Maersk security seal was found to be in place on the doors.  (T. at 15 and T. at 36 (l. 5-6)).

28.    On May 18, 1999, Maersk issued Bill of Lading No. MAEUYCGJ 05408 for a container shipment that it received and agreed to transport from Pakistan to the United States, and deliver to Phillips at Reading, Pennsylvania.  (T. at 15; Plaintiff's Exhibit 67).

29.    Maersk Bill of Lading No. MAEUYCGJ 05408 acknowledged receipt of Container No. GSTU 2848676, bearing Maersk Seal No. 0110356.  A total of 378 cartons of men's cotton knit shirts were being shipped in this Container.  (T. at 15; Plaintiff's Exhibit 67).

30.    On June 17, 1999, in response to Maersk's work order, Kellaway's truck driver picked up Container No. GSTU2848676 from the terminal at Newark, New Jersey and transported it to a container yard maintained by Kellaway at 4390 Chambers Hill Road, Harrisburg, Pennsylvania.  No exceptions were taken by the driver concerning the seal on the container when he picked it up at the terminal. It was noted on the Trailer Receipt Delivery Inspection Report that was issued that the original Maersk security seal for the container was in place. (T. at 36 (l. 22-25); T. at 340 (l. 17) - 341 (l. 2); T. at 436 (l. 21) - 437 (l. 7); Plaintiff's Exhibits 69, 78, and 79).

31.     When the Maersk container was received at Kellaway's container yard, an Equipment Interchange Receipt and Safety Inspection Report was prepared by Keith Walborn, the yard manager.  No exceptions were taken concerning the seal on the container when it arrived at the container yard.  The Report noted the Maersk Seal No. 0110356 was in place. (T. at 298 (l. 11) - 299 (l. 13); T. at 437 (l. 1-7); Plaintiff's Exhibit 78).

**The Loss**

32.     Mitsui Container Nos. MOLU 0112686, MOLU 0102585, and MOLU 0004465 were released from bond by U.S. Customs on June 16, 1999, and released by the steamship line on June 17, 1999. (T. at 114 (l. 19) - 116 (l. 19); Plaintiff's Exhibits 42, 43 and 44).  Maersk Container No. GSTU2848676 was released from bond by U.S. Customs and released by the steamship line on June 18, 1999.  (T. at 115 (l. 19-24)).

33.     On Friday, June 18, 1999, at approximately 6:00 p.m., Keith Walborn, closed the container yard facility for the weekend.  He was the last person to leave the facility and he reportedly closed the gate and secured it with a chain and key lock.  (Plaintiff's Exhibit 93 (p. 1)).

34.     At approximately noon on Saturday, June 19, 1999, Mike McKillup, a worker from the business located next door to the Kellaway container yard

facility, was driving by the facility and observed that the gate to the container yard

was open. (Plaintiff's Exhibit 93 (p. 2)).

35.    On Sunday, June 20, 1999, at approximately 4:30 p.m., William

Gross, a Kellaway driver, arrived at the container yard to pick up a container for

delivery.  He observed that the gate was open and that approximately 9 containers

had been broken into, including the one he was planning to deliver.  He informed

Scott Decker, Kellaway's dispatcher, of the situation, who then notified Keith

Walborn. (Plaintiff's Exhibit 93 (p. 1-2)).

36.    Mr. Walborn attended at the Kellaway container yard facility to

investigate.  He found that the chain and lock for the gate were missing, and that

three containers had been stolen, using two tractors that were left at the container

yard, and another tractor that was located at an adjacent business.  The stolen

containers were Mitsui Container Nos. MOLU 0112686 and MOLU 0102585, and

Maersk Container No. GSTU2848676. (T. at 39 (l. 6-7); Plaintiff's Exhibit 93 (l.

1-7)).

37.    The Police and FBI were notified of the theft.  Through further

investigation, it was learned that on June 19, 1999, at approximately 7:00 a.m.,

one of the stolen tractors was found by the police in Bronx, New York, with the

engine still running and the ignition punched out.  It was connected to Mitsui

Container No. MOLU 0112686, which was missing its contents. On June 24, 1999, one of the other stolen tractors was found at the Bronx Terminal Market in New York. On July 2, 1999, the third stolen tractor was found in Bronx, New York, along with Maersk Container No. GSTU2848676, which was missing its contents. (Plaintiff's Exhibit 93 (l. 4-9)).

38.     The two Mitsui containers and the one Maersk container were stolen from the Kellaway container yard facility between 6:00 p.m. on Friday, June 18, 1999, and early Saturday, June 19, 1999. (Plaintiff's Exhibit 93).

39.     The third container that was loaded by Busana Rama, Mitsui Container No. MOLU 0004465, was not stolen and in due course, it was delivered to Phillips at its Reading facility. As a result, Phillips was able to complete the contracted sales of these sport shirts to its retail customers. (T. at 55 (l. 23); T. at 57 (l. 8); Plaintiff's Exhibit 30).

40.     As a result of the three containers being stolen, Phillips was unable to deliver the balance of the shirts that were ordered by its retail customers and it lost sales with a total value of $367,470.00. (T. at 215 (l. 21); T. at 217 (l. 4)).

### The Kellaway Container Yard

41.     Kellaway leased the 4390 Chambers Hill Road location, where it operated its container yard facility, in December 1995. The location was an open

lot and was not being used as a container yard at the time.  Kellaway was responsible for making whatever improvements were  appropriate for purposes of operating a container yard.  (T. at 321 (l. 1-10); Plaintiff's Exhibit 92).

42.    The only improvement that Kellaway made was the installation of a chain link fence around the perimeter of the lot, with a gate in the front.  The gate was not electronically controlled.  When the facility was closed, only a chain and a key lock was used to secure the gate.  (T. at 39 (l. 12-15) and T. at 39 (l. 16-18 and Plaintiff's Exhibits 93 and 96).

43.    During the evenings and on the weekends the Kellaway container yard was closed and unattended.  All of the Kellaway drivers had the key to the lock on the gate, however, and could access the yard outside of normal business hours.  There was no control of who, when, and why drivers were at the facility.  (T. at 39 (l. 16-18); T. at 268 (l. 6) - 269 (l. 2); T. at 396 (l. 22) - 397 (19).

44.    Although the container yard was unmanned at night and on the weekends, there was no detection and alarm system or camera system to monitor activities at the container yard during off hours, and there was no procedure in place for conducting periodic inspections during such time periods.  Prior to the thefts on June 18-19, 1999, no security guard was used to guard or patrol the

container yard facility during off hours.  (T. at 39 (l. 12-15); (T. at 255 (l. 17) -

256 (l. 3); T. at 257 (l. 18) - 258 (l. 1); T. at 265 (l. 10) - 266 (l. 13).

45.    Kellaway did not install any pedestal mounted security lights to

illuminate the container yard.  The sole source of illumination was a flood light

mounted on the rear of the building near the truck dock.  This light was inadequate

to illuminate the container yard and it could easily be rendered useless by removal

of the bulb. (T. at 39 (l. 8-11); T. at 273 (l. 11-23); Plaintiff's Exhibits 93 (p. 2)

and Plaintiff's Exhibit 96).

46.    The rear area of the Kellaway container yard facility was shielded by

brush and overgrowth along the fence line.  This enabled third persons to case the

operations at the  facility without being observed and facilitated undetected entry

into the yard.  During the investigation of the thefts that occurred on June 18-19,

1999, it was found that a hole had been cut in the fence at the rear of the container

yard.  This either was done either to gain access to the yard or to serve as a

diversion, to try to conceal the fact that access was gained by using the key to the

lock at the gate.  (Plaintiff's Exhibits 93 and 96; Kellaway's Exhibit K-56).

47.    Prior to June of 1999, Kellaway's management knew that containers

were being pilfered and stolen from container yards and terminals because it

directly had experienced such losses, and because such problems were public

knowledge in the industry.  (T. at 252 (l. 3-16); T at 423 (l. 14) - 424 (l. 14); T. at 436 (l. 3-11); Plaintiff's Exhibit 93 (page 9)).

48.    Prior to June of 1999, Kellaway knew about the various devices and practices that could be employed for security purposes to deter and detect pilferage and thefts at a container yard facility.  Kellaway used pedestal lighting, television monitors, detection and alarm systems, and security guards at other container yard facilities that it operated.  (T. at 419 (l. 10) - 422 (l. 20)).

49.    Prior to June of 1999, Mitsui and Maersk knew that containers were being pilfered and stolen from container yards and terminals because they had experienced such losses, and because such problems were public knowledge in the industry. (T. at 31 (l. 6-11)).

50.    Prior to June of 1999, Mitsui and Maersk knew about the various devices and practices that could be employed for security purposes to deter and detect pilferage and thefts at  container yards and terminals.  Mitsui and Maersk used terminals and container yards that employed  pedestal lighting, television monitors, detection and alarm systems, and security guards to deter and detect pilferage and thefts.  (T. at 462 (l. 24) - 463 (l. 16); T. at 469 (l. 12) - 470 (l. 7)).

51.    Prior to the theft of the containers that occurred on June 18-19, 1999, neither Mitsui nor Maersk communicated in writing to Kellaway concerning their

security requirements for the protection of containers that they had contracted to deliver. (T. at 29 (l. 18); T. at 30 (l. 9-23); T. at 31 (l. 5); T. at 37 (l. 16-19).

52.     Plaintiff presented Mr. Arthur Dunn to testify as an expert in the area of cargo security.  He was duly qualified, having spent 33 years with the Conrail Police Department.  During his last 15 year s with Conrail, he was Chief of Investigation, Chief of Detectives, and he was involved in investigating cargo theft in the fifteen northeastern states.  During his tenure with Conrail, he estimated that he had been involved, directly or on a supervisory level, with approximately ten thousand investigations of container thefts.  This included thefts from terminals and container yards.  Prior to leaving Conrail in 1999, he investigated at least ten thefts from container yards in the Harrisburg area.  Mr. Dunn has attended and presented courses on cargo security and theft, and was an instructor at the FBI Academy on the subject of the Theft of Interstate Shipments. Since 1999, he has been in private practice as a security expert.  (T. at 223 (l. 17) - 227 (l. 19); T. at 230 (l. 2-12); T. at 233 (l. 1-9)).

53.     Mr. Dunn was hired by Phillips' insurance carrier to investigate the disappearance of the three container shipments from the Kellaway container yard, and he attended at the yard a few days after the theft.  He observed the facility, interviewed the Kellaway terminal manager, Keith Walborn, and spoke over the telephone with Walter Crocker, Kellaway's security manager.  He also spoke with

the local police and the FBI.  (T. at 248 (l. 3-25); T. at 249 (l. 20) - 250 (l. 10); T. at 251 (l. 1) - 252 (l. 2); T. at 260 (l. 11) - 261 (l. 7).

54.    During the time period in which the thefts occurred, there had been a rash of cargo container thefts taking place at terminals and container yards in the suburbs, outside the immediate port areas.  Mr. Dunn was involved in the investigation of some of these thefts, as was the FBI.  (T. at 251 (l. 22) - 252 (l. 16); Plaintiff's Exhibit 93 (p. 9)).

55.    Mr. Dunn evaluated the nature and extent of the security at the Kellaway container yard at the time of the theft and concluded that it was inadequate.  He noted that darkness is the ally of thieves and that one of the best deterrents to theft is to have the storage area well illuminated.  He found that there was a lack of adequate lighting at the Kellaway yard, particularly in the area where the containers were stored.  He stated that some type of overhead or pedestal lighting should have been placed in the yard area where the containers were stored.  He noted that the containers were parked at the backside of the yard, with the doors toward the fence, and that this allowed the thieves to operate in the dark to break into the containers without the risk of being seen.  The investigation revealed that  in addition to the three containers that were stolen, the bolt seals from at least ten other containers in the yard had been cut off.  Mr. Dunn commented that it was apparent that the thieves "shopped" the containers to

inspect the contents and decide which ones to steal, and that they were enabled to do this by the lack of lighting.  (T. at 255 (l. 13) - 256 (l. 5), (21) -257 (l. 1); T. at 265 (l. 10) - 266 (l. 18), (l. 25) - 267 (l. 2-11); T. at 273 (l. 11-20); T. at 286 (l. 7-17); T. at 289 (l. 4-10); T. at 295 (l. 16) - 296 (l. 22); Plaintiff's Exhibits 93 and 96; Kellaway's Exhibit K-56).

56.    In addition to the lighting deficiency, Mr. Dunn also stated that the security was inadequate at the Kellaway container yard because there were no security detection systems in place, despite the fact that the yard was unmanned during the evening hours and throughout the weekend.  There was no motion and/or sound detection system, or video camera system.  Furthermore, no security guard was in attendance during off hours, and no measures were taken to have the yard inspected periodically by a roving guard during such time periods.  (T. at 255 (l. 17) - 256 (l. 3); T. at 257 (l. 18) - 258 (l. 1); T. at 265 (l. 10) - 266 (l. 13).

57.    Mr. Dunn also stated that there were other measures that could have been implemented to deter theft at the Kellaway container yard, and that the security was inadequate from this standpoint.  He noted that fifth wheel locks could have been used to prevent or interfere with the connecting of a tractor to the container chassis.  The containers could have been positioned against each other, door end to door end, to inhibit entry unless the containers were moved.  He also found it to be significant that tractors were kept in the same yard with the

containers, rather than off site, as the availability of the tractors to hot wire was what made the entire theft possible. (T. at 255 (l. 17) - 256 (l. 5), (l. 21) - 257 (l. 1); T. at 265 (l. 10) - 266 (l. 24); T. at 269 (l. 3-12); T. at 288 (l. 2) - 289 (l. 19)).

58.    Mr. Dunn stated that the same security standards should be followed for protecting containerized cargo from theft at both large and small container yards. He provided information about the costs of installing detection devices, as well as the cost for employing a security guard. (T. at 283 (l. 20) - 285 (l. 18)).

59.    Mr. McLaughlin, the chief operating officer and part owner of Kellaway, testified on behalf of Kellaway. Significantly, neither of the two Kellaway employees who were responsible for security, nor the manager of the Harrisburg container yard at the time of the theft were called to testify. Mr. McLaughlin stated that it was his view that the security at the Kellaway container yard was adequate because it had somehow been approved by Customs and that Kellaway was not required to do anything more than that. Even assuming that the that the Customs regulation referenced by counsel for Kellaway, 19CFR § 19.47, applies to container yards such as the one operated by Kellaway, the Court finds that the yard was "not properly secured against access by unauthorized persons". Moreover, the Court does not accept the position that approval by Customs satisfies Kellaway's obligation for the safekeeping of the containerized cargo kept at its yard. Mr. McLaughlin testified that Customs had never required Kellaway to

have anything more than a fence and a locked gate at any of its container yards,

yet he admitted that significant additional security measures were undertaken at

the yards other than the one at issue.   (T. at 317 (l. 21) - 328 (l. 9); T. at 321 (l. 4-

10); T. at 322 (l. 3-9); T. at 373 (l. 22) - 375 (l. 19); T. at 376 (l. 15) - 382 (l. 12);

T. at 416 (l. 21) - 418 (l. 4); T. at 419 (l. 10) - 424 (l.14); T. at 431 (l. 19) - 432 (l.

12)).

    60.    Mr. McLaughlin offered an explanation that the revenue received for

operating the container yard in Harrisburg was insufficient to justify the cost of

any additional security measures.  While maintaining that it would be too costly

for Kellaway to implement any additional security measures at the Harrisburg

yard, he admitted that he was not aware of any cost study that had been conducted

with respect to the installation of additional lighting for the yard, and or for other

security measures.  Regardless, the Court does not accept the position that it was

too costly for Kellaway to implement further security measures.  Having made the

decision to operate a container yard at Harrisburg, Kellaway had a duty to

implement appropriate security measures and it did not do so.  Mr. McLaughlin

stated that the Kellaway container yard at Randolph, Massachusetts operated at a

profit with extensive security in place and he provided no explanation why

Kellaway could not use some of this money to ensure that adequate security was

in place at the Harrisburg container yard.  Kellaway's apparent decision to treat

Harrisburg as a separate profit center cannot be given deference over its obligation to safeguard the containerized cargo it was accepting. ( T. at 418 (l. 12-25); T. at 419 (l. 5-9); T. at 426 (l. 13-25); T. at 429 (l. 24) - 430 (l. 3); T. at 447 (l. 18-22)).

61.    Mitsui and Maersk contracted with Kellaway to transport and care for Phillips' container shipments pending delivery to Phillips at Reading, Pennsylvania, and at all times material hereto, Kellaway was acting as an agent and/or servant of Mitsui and Maersk. (T. at 14 (l. 12-19).

62.    Mitsui and Maersk are responsible for the negligence of Kellaway in caring for and protecting Phillips' container shipments pending delivery to Phillips at Reading, Pennsylvania.

63.    The failure of Mitsui and Maersk to deliver to Phillips the three container shipments, constitutes a breach of their contracts of carriage and common law duties as bailees of the shipments.

64.    Clause 6 (4)(b) of the Mitsui Bill of Lading provides that the terms of the Bill of Lading shall govern the relations between the Carrier (Mitsui) and the Merchant (Phillips) in respect of the Carriage, and pursuant to Clause 1, Carriage "means the whole or any part of the operations and services undertaken by the Carrier in respect of the Goods under this Bill of Lading." (Plaintiff's Exhibits 28, 29, 30 and 31).

65.    Clause 4 of the Bill of Lading provided that Phillips shall not make a claim against any servant, agent, or subcontractor of Mitsui concerning liability in connection with the goods.  Pursuant to Clause 5 of the Bill of Lading, Mitsui was responsible for losses occurring between the time when it received the goods and the time of delivery, subject to certain defenses. (Plaintiff's Exhibits 28, 29, 30 and 31).

66.    Clause 29 of the Mitsui Bill of Lading is a US Clause Paramount, which provides in pertinent part that: "The Carrier shall be entitled to the benefits of the defenses and limitations in US COGSA, whether the loss or damage to the Goods occurs at sea or not." It also is provided in Clause 29, that Mitsui's liability shall not exceed $500 per package, unless a higher value is declared in writing on the Bill of Lading. (Plaintiff's Exhibits 28, 29, 30 and 31).

67.    The Maersk Bill of Lading does not address the factual scenario in the instant case.  This is not a case of delayed delivery or damage to the goods. (Plaintiff's Exhibit 67 - Reverse Side).

68.    Phillips performed all conditions precedent to the delivery of its shipments by Mitsui and Maersk. (T. at 53 (l. 10-19); T. at 54 (l. 18); T. at 55 (l. 4); T. at 64 (l. 15) and T. at 65 (l. 17).

**The Damages**

69.    Phillips orders the production of its garments from independent companies in the Far East and Middle East, and with respect to the shirts at issue in this matter, they were ordered from mills in Indonesia and Pakistan.  (T. at 44 (l. 3-11).

70.    Phillips only orders the production of garments that it has pre-sold to its retail customers. This process involves a presentation by Phillips of the clothes that it has designed at Spring and Fall previews which are attended by its retail customers.  The garments are offered at a price that has been fixed by Phillips, based upon the manufacturing cost, the transportation cost, the duty and associated costs, and the desired profit margin.  The retail customers thereafter place orders with Phillips for the quantity of garments that they desire by style, color, size, etc. If the retail customers do not wish to order a particular garment at the established price, Phillips simply does not have the garment manufactured.  (T. at 58 (l. 21); T. at 59 (l. 25); T. at 138 (l. 9); T. at 140 (l. 16); T. at 187 (l. 23); T. at 188 (l. 2) and T. at 206 (l. 12-21).

71.    Once Phillips has received orders from its retail customers, it places orders with the foreign mills.  The lead time between ordering the garments and their delivery to Phillips in the United States is in the range of 4-5 months.  The importation of garments is closely regulated due to foreign export quota

restrictions and the imposition of domestic custom's duties. (T. at 45 (l. 19); T. at 46 (l. 2); T. at 61 (l. 18); T. at 68 (l. 4-7); T. at 143 (l. 3-10) and Exhibit T. at 71).

72.   Because Phillips only orders garments that it has pre-sold, it does not have an inventory of garments on hand to use as a replacement if a shipment is lost or damaged, or if a retail customer sells out and wants to have an additional quantity of garments to sell. In order to replace the specially ordered garments, the entire ordering and production process would have to be initiated again, with the attendant lead time of 4-5 months. This assumes that the material to construct the shirts was available, that the mills were available and not otherwise engaged on the garments ordered for the next season, and that the retail purchaser still would want the particular style of garment 4-5 months after the original delivery date. Common sense dictates that it was not possible for Phillips to reasonably mitigate the losses flowing from the non-delivery of the shirts shipped in the three stolen containers. (T. at 130 (l. 6); T. at 131 (l. 23); T. at 154 (l. 11); T. at 155 (l. 18); T. at 157 (l. 7-20); T. at 188 (l. 1-4); T. at 189 (l. 13-19); and Plaintiff's Exhibits 49, 50, and 51).

73.   The FOB value of the shirts shipped in Mitsui Container No. MOLU 0112686 was $63,234.00. The ocean freight for this shipment was $5,870.00 and the duty was $13,314.15. (T. at 47 (l. 20); T. at 51 (l. 3); Plaintiff's Exhibits 13, 28 and 39).

74.    The FOB value of the shirts shipped in Mitsui Container No. MOLU 010258 was $63,935.84.  The ocean freight for this shipment was $5,870.00 and the duty was $13,461.85. (T. at 51 (l. 7); T. at 53 (l. 9); and Plaintiff's Exhibits 22, 29 and 40).

75.    The FOB value of the shirts shipped in Maersk Container No. GSTU2848676 was $56,851.20.  The ocean freight for this shipment was $3,870.00 and the duty was $12,035.04.  (T. at 159 (l. 6-12); T. at 180 (l. 1); T. at 181 (l. 1-13)).

76.    Phillips prepared a Statement of Claim that it presented to its insurance carrier with respect to this cargo loss.  This listed the costs incurred in getting the shirts to the point of delivery to Phillips in the United States (i.e., production, transportation, and duty), as well as a 30.2% mark up for profit. Although Phillips was paid by its insurance carrier on this basis, this was dictated by the terms of the insurance policy in place and this does not limit Phillips in proving the actual fair market value of the shirts.  (T. at 71 (l. 24); T. at 76 (l. 21); T. at 102 (l. 21) - 104 (l. 17); T. at 123 (l. 12) - 124 (l. 17); T. at 127 (l. 14) - 128 (l. 3).

77.    The price at which Phillips had contracted to sell the shirts to its retail customers is the appropriate measure of fair market value.  The entries in the Phillips computer system for 1999 disclose that the selling price for shirt styles

4577150 and 45677150 were $13.50 per unit (shirt). This is corroborated by the value of the lost sales in the Phillips Cancellation Analysis reports. Also, Mr. Seigel testified about his personal knowledge of this selling price. (T. at 143 (l. 15) - 159 (l. 5);Plaintiff's Exhibits 49, 50, 103A, and 103B).

78.    The entries in the Phillips computer system for 1999 disclose that the selling price for shirt style 4575267 was $9.75 per unit (shirt). This is corroborated by the value of the lost sales in the Phillips Cancellation Analysis report. Mr. Seigel also testified about his personal knowledge of this selling price. (T. at 159 (l. 9) - 160 (l. 2); T. at 179 (l. 23) - 181 (l. 13); Plaintiff's Exhibits 51, 88, and 103C).

79.    The fair market value of the 9,191 sport shirts that were shipped in Mitsui Container No. MOLU 0112686 was $124,078.50 (9,191 x $13.50) at the time that they should have been delivered to Phillips at Reading, Pennsylvania. (T. at 160 (l. 1) - 161 (l. 12); Plaintiff's Exhibits 28 and 49).

80.    The fair market value of the 9,293 sport shirts that were shipped in Mitsui Container No. MOLU 0102585 was $125,455.50 (9,293 x $13.50) at the time that they should have been delivered to Phillips at Reading, Pennsylvania. (T. at 161 (l. 13) - 162 (l. 12); Plaintiff's Exhibits 29 and 50).

81.    The total fair market value of the sport shirts in the non-delivered Mitsui container shipments is $249,534.00.

82.    The fair market value of the 12,096 sport shirts that were shipped in Maersk Container No. GSTU2848676 was $117,936.00 (12,096 x $9.75) at the time that they should have been delivered to Phillips at Reading, Pennsylvania.

**Ultimate Findings of Fact**

83.    On June 18, 1999, the security at Kellaway's Harrisburg container yard was inadequate and did not meet the standards applied to other container yards operated by Kellaway and others in the industry.  (T. at 423 (l. 14) - 424 (l. 14).

84.    Neither the Defendants, nor the Third Party Defendant, introduced any testimony from a security expert and, therefore, the testimony of Plaintiff's expert, Mr. Dunn, is unrebutted.  The Court finds that Mr. Dunn was well qualified and that he made reasonable points about the inadequacy of the security at the Kellaway yard at the time of the theft.

85.    Notably, Kellaway had experienced cargo theft at its various other container yards and, thereafter, it elected to implement additional security at those yards.  The fact that these yards were in states other than Pennsylvania (Massachusetts, Rhode Island, and New Jersey) does not eliminate the need to have proper security in place at the yard in Harrisburg.  Rather, it stresses the importance of having proper security in place, as container yards operated by Kellaway, were targeted.  The fact that the theft at issue was the first one at the

Harrisburg container yard does not serve to exculpate Kellaway.  This is not a dog bite case, and Kellaway is not entitled to one free bite (loss).

86.    Mitsui contracted to deliver Container No. MOLU 0112686 and Container No. MOLU 0102585 to Phillips at Reading, Pennsylvania and it is responsible for the non-delivery of these containers.  (T. at 128 (l. 4-20); Plaintiff's Exhibits 28 and 29).

87.    When the two Mitsui containers disappeared, they actually held the goods described in the Bills of Lading issued by Mitsui. (T. at 436 (l. 21) - 437 (l. 7); Plaintiff's Exhibits 105, 13, 22, 28, 29, 30, 36, and 38).

88.    Maersk  contracted to deliver Container No. GSTU2848676 to Phillips at Reading, Pennsylvania and it is responsible for the non-delivery of the container.  (Plaintiff's Exhibit 67).

89.    When the Maersk container disappeared, it actually held the goods described in the Bill of Lading issued by Maersk.  (Plaintiff's Exhibits 66, 66a, and 67).

90.    Phillips sustained losses in the amount of $249,534.00 for the Mitsui shipments and $117,936.00 for the Maersk shipment.

91.    Phillips' damages were caused by Mitsui's and Maersk's breach of their duties as common carriers and bailees.

92.    Phillips is entitled to prejudgment interest from June 21, 1999.

MATTIONI, LTD.

January 5, 2002                    BY:

GEORGE R. ZACHARKOW
399 Market Street, Second Floor
Philadelphia, PA 19106
(215) 629-1600
Attorney for Plaintiffs - Van
Heusen Corporation


**HECKER BROWN SHERRY and JOHNSON**

BY:

CARL H. DELACATO, JR.
1700 Two Logan Square - 17th & Arch Streets
Philadelphia, PA 19103-2769
(215) 665-0400
Attorney for Plaintiff Phillips - Van
Heusen Corporation