

FILED
HARRISBURG

APR 1 1 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PHILLIPS-VAN HEUSEN CORP., | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| v. | : | NO. 1:CV00-0665 |
| | : | |
| J.V.E. Co., Inc. | : | |
| (a/k/a Japan Vehicle Equipment Co., | : | (Judge Sylvia H. Rambo) |
| U.S.A., Inc.) | : | |
| | : | |
| Defendant | : | |
| | : | |
| and | : | |
| | : | |
| MITSUI O.S.K. LINES LTD., | : | |
| | : | |
| Defendant/Third-Party | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| KELLAWAY INTERMODAL AND | : | |
| DISTRIBUTION SYSTEMS, INC., | : | |
| et al. | : | |
| | : | |
| Third-Party Defendants | : | |

0648374.01

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

**Finding of Fact**

1.     Phillips Van Heusen Corporation ("Phillips") was the consignee and owner of a consignment of men's woven shirts said to be shipped in four ocean shipping containers from Indonesia and Pakistan.  Pastore Test. at p. 48.

2.     Mitsui O.S.K. Lines Ltd. ("Mitsui") is a foreign corporation which operates as a carrier for hire by ocean and other intermodal forms of conveyance. Mitsui was the carrier of some of the container shipments at issue in this action. Mitsui Exhibit "B".

3.     Maersk is a foreign corporation which operates as a carrier for hire by ocean and other intermodal forms of conveyance.  Maersk was the carrier of some of the container shipments at issue in this action.  Maersk Exhibit "A".

4.     Kellaway Intermodal and Distribution Systems, Inc. ("Kellaway") is a corporation with a principal place of business in Randolph, Massachusetts. McLaughlin Test. at p. 316.   Kellaway provides intermodal services and was hired by Mitsui and Maersk to transport and care for the container shipments at issue herein, pending their final delivery.

0648374.01

5.    Kellaway Intermodal and Distribution Systems, Inc. is a successor of interest to Kellaway Transportation Inc. and all other Kellaway entities that may be involved in this matter.   Stipulation of Counsel at p. 312 and 313; McLaughlin Test. at p. 316.

6.    At all material times, Kellaway was a bailee of goods in its possession in the Commonwealth of Pennsylvania.  Opening statement of Kellaway counsel at p. 26.

**The Mitsui Shipments**

7.    On or before May 14, 1999, Mitsui supplied three 40' shipping containers and three Mitsui security seals to Busana Rama.

8.    On May 14-15, 1999, Busana Rama stuffed Mitsui  Container No. MOLU 0112686 with a total of 384 cartons (9,191 units) said to contain men's Izod shirts.  When the loading was completed, the container doors were closed and sealed with Mitsui Seal No. M 577397.  Pastore Test. at p. 49.

9.    On May 14-15, 1999, Busana Rama stuffed Mitsui  Container No. MOLU 0102585 with a total of 388 cartons (9,293 units) said to contain men's Izod shirts.  When the loading  was completed, the container doors were closed and sealed with Mitsui Seal No. M 577398.  Pastore Test. at p. 52.

0648374.01

3

10.     On May 14-15, 1999, Busana Rama stuffed Mitsui Container No. MOLU 0004465 with a total of 442 cartons (10,564 units) said to contain men's Izod shirts. When the loading was completed, the container doors were closed and sealed with Mitsui Seal No. M 577396. This container was delivered without incident. Pastore Test. at p. 56.

11.     On May 16, 1999, Mitsui issued Bill of Lading No. 460156264, Bill of Lading No. 460155893, and Bill of Lading No. 460156258, which govern the rights and obligations between Mitsui and plaintiff.  Id. at p. 49, 52 and 56.

12.     At no time did Mitsui view or inspect the contents of the containers at issue. Pastore Test. at p. 85 and 100.

13.     Container No. MOLU 0112686, bearing Mitsui Seal No. M 577397, Container No. MOLU 0102585, bearing Mitsui Seal No. M 577398, and Container No. MOLU 0004465,  bearing Mitsui Seal No. M 577396 were loaded aboard the M/V GURU BHUM at Jakarta, Indonesia. As is frequent in the container industry, the three containers with seals intact were transhipped to the M/V APL GARNET for ocean carriage from Singapore to the United States. Pastore Test. at p. 48-49.

14.     Mitsui charged ocean freight to Phillips on a lump sum basis per container, at the rate of $5,870.00 per container. Pastore Test. at p. 50. The ocean

0648374.01

4

freight was earned when the containers were delivered to Mitsui at the load port. Mitsui Exh. "B" and "C" at clause 11(1).

15.    Mitsui transported the three containers via ocean carriage from Indonesia to Long Beach, California, where they were then discharged onto rail cars and railed to Kearney, New Jersey.  Pastore Test. at p. 107.

16.    On June 15, 1999, Mitsui issued a delivery order to Kellaway Transportation, and Kellaway's truck drivers picked up Container Nos. MOLU 0112686, MOLU 0102585, and MOLU 0004465 from the terminal at Kearney, New Jersey and transported them to a container yard maintained by Kellaway at 4390 Chambers Hill Road, Harrisburg, Pennsylvania. The original Mitsui security seals and the original SCI security seals were both noted to be in place on the Containers when they were picked up from the terminal.  Kellaway Exhibits 16 and 27 (top page only).

17.    Every time a trucker went in or out of a terminal gate, it used a TIR or an EIR (Equipment Interchange Receipt).  The forms allow the equipment and containers to be checked in and externally inspected.   The fee involved, typically only $5.00 or $6.00 per tractor/trailer, includes only the administrative expenses of handling the paperwork.

0648374.01

5

18.    The cost for the trucking portion of the shipments was $265.00 per container for Maersk and $260.00 per container for Mitsui.  Maersk Exhibit "P" and Mitsui Exhibit "O".  (As for the admissibility of Mitsui "O", counsel for Kellaway asked Mitsui's witness, Mr. Patwardhan, whether he worked in the billing department and reviewed bills.  p. 473.  The answer, at p. 473-74, indicated he sometimes did review bills, and that he had produced Mitsui "O" at his deposition as relevant to the instant dispute (p. 476).  The re-direct relates to the cross-examination, notwithstanding Kellaway's incorrect assertion that a billing question is the same issue as the UIIA or a TIR, which topics were also being explored.  Regardless, the form merely establishes that Kellaway Transportation, a UIIA participant, invoiced Mitsui for three containers, at $260.00 per container.)

19.    When containers arrive at the Kellaway container yard, the security seals are inspected and it is noted if they are tampered with or missing.  No exceptions were taken with respect to the security seals on Mitsui Container Nos. MOLU 0112686, MOLU 0102585, and MOLU 0004465, as the security seals were found to be in place.

20.    Mitsui Container Nos. MOLU 0112686, MOLU 0102585, and MOLU 0004465 were released from bond by U.S. Customs and cleared for delivery on

0648374.01

June 16, 1999 and were released by the Steamship Lines on June 17. Pastore Test. at p. 115.

21.    This Court takes judicial notice that testimony provided by Mr. McLaughlin related to Customs issues, and cited as 19 C.F.R. § 19.47, is not relevant as that provision relates to container stations, and not container yards.

22.    Kellaway did not deliver ocean containers MOLU 0112686 and MOLU 0102585 to GPS Transportation in Harrisburg, Pennsylvania.

23.    The delivery of the Mitsui containers were not considered to be hot, but were "regular." Pastore Test. at p. 109.

24.    On Friday, June 18, 1999, at approximately 6:05 p.m., Keith Walborn, the manager of the Kellaway container yard facility, completed his work for the day and left the office. Dunn Test. at p. 258; Phillips Exhibit 93.

25.    At approximately noon on June 19, 1999, the owner of the business located next door to the Kellaway container yard facility observed that the gate to the container yard was open. He did not consider this to be a cause for alarm, because he assumed that one of the Kellaway drivers, who had access to the container yard was picking up a load or working on a tractor. Phillips Exhibit 93.

0648374.01

26. On Sunday, June 20, 1999, at approximately 5:30 p.m., Mr. Walborn was notified by a Kellaway driver who had gone to the container yard to pick up a container for delivery, that upon arrival, he found that the gate was open and that approximately nine containers had been broken into, including the one he was planning to deliver. Dunn Test. at p. 251 and p. 258; Phillips Exhibit 93.

27. Mr. Walborn attended at the Kellaway container yard facility to investigate. He found that the chain and lock for the gate were missing, and that three containers had been stolen, using two tractors that were at the container yard, and another tractor that was located at an adjacent business (not that of the neighbor who had observed the gate open on June 19). The stolen containers were Mitsui Container Nos. MOLU 0112686 and MOLU 0102585, and Maersk Container No. GSTU2848676. Id.

28. The Police and FBI were notified of the theft. Through further investigation, it was learned that on June 19, 1999, at approximately 7:00 a.m., one of the stolen tractors was found by the police in Bronx, New York, with the engine still running and the ignition punched out. It was connected to Mitsui Container No. MOLU 0112686, which was missing its contents. On June 24, 1999, one of the other stolen tractors was found at the Bronx Terminal Market in New York. On

0648374.01

8

July 2, 1999, the third stolen tractor was found in Bronx, New York, along with Maersk Container No. GSTU2848676, which was missing its contents. Id.

29.    The three containers were stolen from the Kellaway container yard facility between 6:00 p.m. on June 18, 1999 and the early morning on June 19, 1999. Id.

**Mitsui's Claim against Kellaway**

30.    On August 30, 2000, Mitsui filed a Third-Party Complaint against Kellaway pursuant to Rules 9(h) and 14 of the Federal Rules of Civil Procedure.

31.    On August 27, 2001, Mitsui tendered its defense of this action to Kellaway pursuant to the terms and conditions of the UIIA.  Mitsui Exhibit "N".

32.    Kellaway did not provide a defense or insurance for Mitsui, and Mitsui was forced to provide its own defense to the instant action.

33.    The UIIA is a standard uniform agreement governing the rights and liabilities of certain Intermodal carriers.  "The reason the UIIA came into existence "was because every Steamship Line used to have their own interchange agreement. As Inter-modal carriers, such as Kellaway, you would have to sign an individual agreement with every line in order to do business with them.  Many of the carriers-- the motor carriers have a difficult time complying with all of the demands and hold

0648374.01

9

harmless in these interchange agreements.  So a Committee was formed . . . with transportation leaders to try to come up with one semi-universal interchange agreement.  That is what this UIIA is.  They are an Association made [up] of Steamship Line, trucking companies and various other interested parties to try to come up with an interchange agreement that is somewhat as fair as possible that would encompass all the lines or as many of the lines that would participate in the agreement.  And then they could add their own addendums [sic] on the tail end of it, but to come up with a common platform for everyone to agree with to try to do business in the container hulling industry."  McLaughlin Test. at p. 356-57.

34.    Both Mitsui and Kellaway are signatories to the UIIA and their respective rights and obligations are governed by the UIIA in effect at the time of the incident.  Stipulation of Counsel.

35.    Kellaway leased the 4390 Chambers Hill Road location, where it operated its container yard facility, in December 1995.  The location was an open lot and was not being used as a container yard at the time.  Kellaway was responsible for making whatever improvements were  appropriate for purposes of operating a container yard.  It did not operate as a container yard until 1997 or 1998.  McLaughlin Test. at p. 317.

0648374.01

10

36.    The only improvement that Kellaway made was the installation of a chain link fence with barbed wire around the perimeter of the lot, with a gate in the front.  The gate was not electronically controlled.  When the facility was closed, only a chain and a key lock were used to secure the gate.  McLaughlin Test. at p. 321.  The reason more security was not added was because of cost.  McLaughlin Test. at p. 381.

37.    The normal business hours for the Kellaway container yard facility were 7:00 a.m. to 6:00 p.m., Monday through Friday.  All of the Kellaway drivers had the key to the lock on the gate, and could access the yard outside of normal business hours.  There was no control of who, when, and why drivers were at the facility. Dunn Test. at p. 268.

38.    Kellaway did not install any pedestal mounted security lights to illuminate the container yard.  The sole source of illumination was a flood light mounted on the rear of the building near the truck dock.  This light was inadequate to illuminate the container yard.  Dunn Testimony.

39.    Prior to June of 1999, Kellaway knew that containers were being pilfered and stolen from container yards and terminals because it directly had

0648374.01

experienced such losses, and because such problems were public knowledge in the industry.  McLaughlin Test. at p. 422-24.

40.    Prior to June of 1999, Kellaway knew about the various devices and practices that could be employed for security purposes to deter and detect pilferage and thefts at a container yard facility.  Kellaway used pedestal lighting, television monitors, detection and alarm systems, and security guards at other container yard facilities that it operated.  McLaughlin Test. at p. 418-24.

41.    On June 18, 1999, the security at the Kellaway container yard facility at 4390 Chambers Hill Road, Harrisburg, Pennsylvania was inadequate and did not meet industry standards.  The testimony of Mr. Dunn, Phillips' security expert in this case, also concluded that the security at Kellaway's container yard facility of was inadequate.

42.    Despite this testimony, plaintiff tendered no security expert to rebut these claims.

43.    Kellaway issued an invoice to Mitsui for $ $780.00 for its services, which invoice was paid in full.  Mitsui Exhibit "O".

44.    As to other evidentiary issues, the EIRs as submitted by Kellaway are not admissible.  Even larger than this evidentiary issue, however, is the fact that the

0648374.01

testimony of Kellaway bears on the issue of McLaughlin's credibility as a witness.

Kellaway Exhibits 1, 5, 16 and 27 are disputed by all parties but Kellaway.

Kellaway alleges that an EIR with the corporate name of Kellaway Transportation,

Incorporated on the front, with no indication to view an overleaf, in fact had an

overleaf using the name of a successor company Kellaway Intermodal and

Distribution System, Incorporated.[1]

Another form, Kellaway 1, had Kellaway Intermodal and Distribution

System, Incorporated as the corporate name.  Significantly, the top page says

"subject to all terms and conditions on the reverse side".  This overleaf is the same

one Kellaway alleges was part of Kellaway 5, 16 and 27, the EIRs at issue.

The issue was raised pre-trial, and during trial, and during pre-trial it

was suggested that an exemplar be produced.  It never was.  Kellaway was on

notice that these exhibits were contested, and McLaughlin's testimony simply is not

credible.  As noted, this issue was raised pre-trial, and Kellaway could have and

should have produced an exemplar, or a witness who could testify as to the dates of

the corporate existence of the various entities.  It did not.

---

[1]  The issue is pursued by Kellaway likely because it seeks a limitation of liability that is referenced on the overleaf.  However, aside from all the issues addressed above, the limitation is not valid under Pennsylvania because no notice of the provision was given to any other party.

0648374.01

13

Moreover, Kellaway listed Mr. Walborn as a witness, who was listed on the disputed EIRs (p. 371), but chose not to produce him at trial as a witness to authenticate the back of the contested documents.

This court finds that Kellaway Exhibits 5, 16 and 27 consist of one page, with no overleaf.

**Conclusions of Law**

45.    The court has jurisdiction over Phillips, Mitsui, Maersk and Kellaway.

46.    The bill of lading is the contract of carriage between Philips-Van Heusen Corp and Mitsui and its  provisions will determine liability between these two parties.  Mitsui Exhibits "B" and "C".

47.    Clause 29 of the Mitsui Bill of Lading is a US Clause Paramount, which provides in pertinent part that: "The Carrier shall be entitled to the benefits of the defenses and limitations in US COGSA, whether the loss or damage to the Goods occurs at sea or not." Mitsui Exhibits "B" and "C".

48.    Clause 6 (4)(b) of the Mitsui Bill of Lading provides that the terms of the Bill of Lading shall govern the relations between the Carrier (Mitsui) and the Merchant (Phillips) in respect of the Carriage, and pursuant to Clause 1, Carriage

0648374.01

14

"means the whole or any part of the operations and services undertaken by the Carrier in respect of the Goods under this Bill of Lading." Id.

49.    COGSA is applicable as a contract term between Phillips and Mitsui to the extent it does not conflict with Pennsylvania state law.

50.    Since the theft of the containers occurred while the property was in the temporary custody of Kellaway, Mitsui is exempted from liability by 46 U.S.C. § 1304(2) (q).

51.    Section 4(2) (q) exempts the carrier from liability for damage or loss "arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier."

52.    A clean bill of lading with respect to a sealed container loaded by the shipper without the involvement, operation or inspection of the carrier does not establish a *prima facie* case of liability, the issuance of the clean bill of lading attests only to the apparent good order and condition of those parts open to inspection and visible. Bally Inc. v. M/V  ZIM AMERICA, 22 F.3d 65 (2d Cir. 1994).

53.    Plaintiff has failed to make out its *prima facie* case.

**Damages**

0648374.01

15

To the extent any damages may be proven:

54.    Plaintiff's Mitsui claim is alleged as follows:

| Container No. | MOLU0102585 | MOLU0102586 |
|---|---|---|
| Invoice Value | $63,935.84 | $63,234.08 |
| Profit 30.2% | 19,308.62 | 19,096.69 |
| Freight | 5,870.00 | 5,870.00 |
| Duty & Fees | 13,534.35 | 13,386.65 |
| | **$102,648.81** | **$101,587.42** |

The parties may contract to limit the liability of a carrier, "provided the language of the limitation is clear, the shipper is aware of the terms, and the shipper can change the terms by indicating the true value of the goods being shipped." New York Marine v. M/V MING PROSPERITY, 1996 AMC 1161, 1172 (S.D.NY 1996).

55.    Mitsui has not met these requirements with respect to liability provisions in the bill of lading.  First, the language of Clause 6(3) plainly requires adjustment according to the invoice value, and prohibits recovery of lost profits. Mitsui Exhibits "B" and "C."  Plaintiff may not recover any alleged resale value of the shirts, which includes lost profits, which are a form a consequential damages. Id. at 1173; 13 Pa.C.S.A. § 2712.

56.    Consequential damages are not recoverable in COGSA cases under any circumstances.  Mojica v. Authoridad de las Navieras de Puerto Rico, 1994 AMC 1316 (D. P.R. 1993).

0648374.01

16

57.    Likewise, Mitsui's bill of lading provides that the freight charges are not recoverable because of Clause 11(1), which states that freight charges are earned in full when the carrier receives the good at the load port, and may be retained even if the cargo is lost. MING PROSPERITY AT 1172.

58.    Next, the duty charges are precluded by Clause 6(3), as they are consequential damages as well. Plaintiff's argument that it is entitled to the fair market value of the goods is contrary to the contractual terms of the bill of lading, and will not be awarded because of lost profits (including duties), are clearly an indirect or special or consequential loss or damage not permitted under the Mitsui bill of lading. MING PROSPERITY, at fn15 1173 ("In addition lost profits are treated regularly as a type of 'consequential damage'. See e.g. Hudson Feather and Down Products, Inc. v. Lancer Clothing Corp,...(referring to lost profits and other consequential damages in reference to N.Y. Unif. Comm. Code...); Columbe v. New York Telephone Co. (referring to the 'recovery of consequential damages for apparent loss of profit' in tort action)).

59.    Moreover, the testimony is speculative as to how the profit appeared as a statement of claim in the first place: Mr. Pastore testified that "the only [figures] that I can verify were those of the invoice value, the freight and the

0648374.01

17

duty fees incorporated.  The 30.2% was not my portion to be placed into that particular figure at that time.  That is another department that takes part in that." Pastore Test. at p. 104.

60.    Mr. Pastore testified that he had no involvement as to knowing whether customers have been arranged to buy the goods.  Pastore Test.  at p. 105.

61.    Phillips failed to mitigate its claim for inventory related to the Mitsui containers.  Phillips maintains an inventory on the wholesale division for customers anticipated sales of shirts in the Chattanooga warehouse.  Pastore Test. at p.124-25; Aircraft Guar. Corp. v. Strato-Lift, Inc., 991 F.Supp 735 (E.D. Pa. 1998).

62.    Phillips had no testimony as to whether they investigated the existing inventories to make up the lost or stolen shirts.  Pastore Test. at p. 125.

63.    Additionally, the testimony of Mr. Seigel does not establish the lost value of the goods.  The original purchase orders were never produced by Phillips.

64.    The price for a particular line of goods is set when the line is offered.  Seigel Test. at p. 140.  However, there are also contract discounts that are apportioned at the end of a season, and Phillips presented no information on this point.  Id.

0648374.01

**The UIIA**

65.    Liability as between Mitsui and Kellaway is controlled by the Uniform Intermodal Interchange Agreement and Facilities Access Agreement ("UIIA"). Mitsui Exhibit "D".

66.    Both Mitsui and Kellaway are parties to the UIIA, administered by the Intermodal Association of North America.  Both parties agreed to be bound by the provisions of the Agreement with regard to their interchange of equipment and use of facilities.

67.    Based on the Uniform Intermodal Interchange Agreement and Facilities Access Agreement between Mitsui and Kellaway, Kellaway was an independent contractor.  Paragraph F(2) provides that no party or its agents is the employee or agent of any other party.

68.    Under the Agreement, Mitsui is considered a provider because through the Agreement it authorized delivery and/or receipt of physical possession of its Equipment with Kellaway a Motor carrier who was a party to the UIIA Agreement. Id.

69.    In accordance with Section F of the UIIA, Mitsui tendered the defense of Mitsui in this matter to Kellaway.  Mitsui Exhibit "N".  Kellaway as the motor

0648374.01

19

carrier is required to defend, hold harmless and fully indemnify Mitsui O.S.K.

Lines, Ltd. against any and all claims, suits, loss, damage or liability (including

reasonable attorney fees and costs incurred in the enforcement of the agreement)

arising out of or related to Kellaway's performance of the agreement.  This tender

was never accepted.

70.     Kellaway is not the agent or servant of Mitsui, but was an independent

contractor.

71.     An agency relationship results from the consent of one person that

another may act on his or her behalf.  See Lincoln Avenue Industrial Park v.

Norley, 677 A.2d 1219, 1222 (Pa. Super. (1996).

72.     Under Pennsylvania law, there are three basic elements of agency: (1)

the manifestation by the principal that the agent may act on its behalf; (2) the

agent's acceptance of that manifestation; and (3) an understanding by the principal

and agent that the principal is to be in control of the undertaking. See Goodway

Marketing, Inc. v. Faulkner Advertising Associates, Inc., 545 F. Supp. 263, 266-

267 (E.D. Pa. 1982).

73.     An agency relationship does not require a writing to be in effect;

rather, it arises whenever a person authorizes another expressly **or by implication**

0648374.01

to act as his or her agent.  See Lincoln Ave., 677 A.2d at 1222; see also Ortiz v.

Duff-Norton Co., 975 F. SUPP. 713, 719-720 (E.D. Pa. 1997).

74.    In addition to express authority and implied authority (actual

authority), an agency relationship can also be established by apparent authority

when the principal holds a person out as an agent by words or conduct; the principal

is then estopped from denying the agency relationship. See Turner Hydraulics, Inc.

v. Susquehanna Construction Corp., 606 A.2d 532,  535 (Pa. Super. 1992); see also

SEI Corp. v. Norton & Co., 631 F. SUPP. 497, 501 (E.D. Pa. 1986).

75.    A third party relying on an agency relationship need only use

reasonable diligence to ascertain the agent's authority to act on behalf of the

principal. See Bolus v. United Penn Bank, 525 A.2d 1215, 1222 (Pa. Super. 1987),

appeal denied, 541 A.2d 1138 (Pa. 1988); Constitution Bank v. DiMarco, 836 F.

SUPP. 304, 307 (E.D. PA. 1993), aff'd., 27 F.3d 556 (3d Cir. 1994).

76.    Here, the evidence shows that Kellaway was not the agent of Mitsui

but was an independent contractor.  The UIIA  specifically states that no party or its

agent is the employee or agent of any other party.  Each party maintains its status as

an independent contractor.

0648374.01

21

77.    Additionally, the intervening and superseding act of defendant Kellaway in failing to adequately secure its facility is the proximate cause of plaintiff's loss in any event, not any of the alleged actions and/or omissions of Mitsui.  Black's Law Dictionary 95 (6th ed.1991).

78.    Whether the provisions of a contract are clear and ambiguous is a matter of law and must be determined by the court.  See 12th Street Gym, Inc. v. General Star Indemnity Co., 93 F.3d 1158, 1165 (3d Cir. 1996).

79.    Under the UIIA, Kellaway as the motor carrier is required to defend, hold harmless and fully indemnify Mitsui O.S.K. Lines, Ltd. against any and all claims, suits, loss, damage or liability (including reasonable attorney fees and costs incurred in the enforcement of the agreement) arising out of or related to Kellaway's performance of the agreement.

80.    This tender of defense was never accepted.  Therefore, Kellaway breached its agreement to defend.

81.    Additionally, if Mitsui is found liable to the plaintiff, then Kellaway has a duty to indemnify Mitsui for the entire amount.

**Bailment**

0648374.01

82.    In addition to contractual liability under the UIIA, Mitsui also has a bailment claim against Kellaway.

83.    Kellaway, which performed the trucking and terminal services aspects of the carriage, was not a party to the bill of lading.  Thus, any claim against Kellaway is not based upon federal law, but rather must be determined under the common law liability for tortious conduct under state law.  Tokio Marine v. M/V ZIM TOKYO, 1994 A.M.C. 374, 380 (S.D.N.Y. 1993).

84.    Under Pennsylvania law, to succeed on a cause of action for breach of bailment agreement, the bailor must establish that the goods have been delivered to the bailee, that the bailor has made a demand for return of the bailed goods, and that the bailee has failed to return those goods upon demand.  See Price v. Brown, 680 A.2d 1149, 1152 (Pa. 1996); American Enka Co. v. Wicaco Machine Corp., 686 F.2d 1050, 1053 (3d Cir. 1982).

85.    However, under Pennsylvania law, a bailee is not the insurer of the personalty, absent an express agreement, and will not be held liable for loss or damage to the personalty unless there is evidence that the bailee departed from the appropriate standard of care. See American Enka Co., 686 F.2d at 1053.

0648374.01

23

86.     Where the evidence does not disclose a lack of due care, the burden of proof shifts back to the bailor who must prove that the bailee was negligent.  Price, 680 A.2d at 1152.

87.     In the present case, Mitsui was the bailor, and Kellaway was the bailee and was one of mutual benefit.

88.     In this case, Mitsui has met its burden of proof that Kellaway failed to return the containers upon Mitsui's demand thus breaching a bailment agreement.

89.     The proximate cause of the theft of the three containers from the Kellaway facility was not due to the entry on the premises by thieves, but was due to a lack of effective security measures which made the theft a foreseeable act in light of all the attendant circumstances.

90.     Tokio Marine v. M/V ZIM TOKYO, 1994 A.M.C. 374, 380 (S.D.N.Y. 1993), and 1995 A.M.C. 2263 (S.D. N.Y. 1995).

Respectfully submitted,

RAWLE & HENDERSON LLP

By: _Ann-Michele G. Higgins_
Ann-Michele G. Higgins
Charles W. McCammon
Attorneys for defendant/third party plaintiff
Mitsui O.S.K. Lines, Ltd.

0648374.01

24

The Widener Building
One South Penn Square
Philadelphia, PA 19107
(215) 575-4000

0648374.01

## CERTIFICATE OF SERVICE

I hereby certify that on this date, a copy of the foregoing Finding of Facts and Conclusions of Law of defendant Mitsui O.S.K. Lines Ltd. directed to third party defendant was served on all counsel of record via first class mail and addressed to as follows:

> George R. Zacharkow, Esquire
> Mattioni, Ltd.
> 399 Market Street
> Second Floor
> Philadelphia, PA 19106-2138
>
> Patrick J. Keenan, Esquire
> The Curtis Center, Suite 1150
> Independence Square West
> Philadelphia, PA 19106
>
> William E. Ecenbarger, Jr., Esquire
> Palmer, Biezup and Henderson
> 956 Public Ledger building
> 620 Chestnut Street
> Philadelphia, PA 19106
>
> Carl H. Delacato, Jr., Esquire
> Hecker, Brown, Sherry & Johnson
> 1700 Two Logan Square
> 18th & Arch Streets
> Philadelphia, PA 19103

Charles W. McCammon, Esquire
Ann-Michele G. Higgins, Esquire

Date: April 11, 2002