ORIGINAL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA
-----------------------------------------------------------------x
PHILLIPS-VAN HEUSEN CORP.,

                              Plaintiff,

          - against -

J.V.E. CO., INC.,

                            Defendant,

          - and -

MITSUI O.S.K. LINES LTD.;
DAMPSKIBSSELSKABET AF 1912
AKTIESELSKAB and AKTIESELSKABET
DAMPSKIBSSELSKABET SVENDBORG,
          Defendants/Third Party Plaintiffs,

          - against -

KELLAWAY TRANSPORTATION, INC.;
KELLAWAY INTERMODAL & DISTRIBUTION
SYSTEMS, KELLAWAY INTERMODAL
SERVICES, INC. and KELLAWAY TERMINAL
SERVICES, INC.,
          Third Party Defendants.
-----------------------------------------------------------------x

Civil Action No.: 1: CV-00-0665
(Hon. Sylvia H. Rambo)

FILED
HARRISBURG. PA

APR 1 1 2002

MARY E. D'ANDREA, CLERK
Per _____

## DAADS' (t/a MAERSK LINE) SECOND AMENDED

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (POST-TRIAL)

Defendant and Third Party Plaintiff Dampskibsselskabet AF 1912 Aktieselskab and

Aktieselskabet Dampskibsselskabet Svendborg t/a "Maersk Line," by and through its attorneys,

PBH: 148684.1



Palmer Biezup & Henderson LLP, hereby submits the following Second Amended Proposed Findings of Fact and Conclusions of Law (Post-Trial) in light of the evidence presented at trial on February 12 and 13, 2002:

**Proposed Findings of Fact**

1.     Plaintiff Phillips-Van Heusen Corp. (hereinafter "Plaintiff" or "PVH") contracted with Dampskibsselskabet AF 1912 Aktieselskab and Aktieselskabet Dampskibsselskabet Svendborg t/a "Maersk Line" (hereinafter "Maersk Line") for the transportation of ocean shipping container No. GSTU 2848676 from Karachi, Pakistan to the discharge port of Newark, New Jersey to the P.V.H. facility in Reading, Pennsylvania.

2.     In connection with the shipment, Maersk Line issued its Bill of Lading No. MAEU-YCG-J-05408, which governs the rights and obligations between Maersk Line and Plaintiff. (Maersk Line Exs. "A" and "B").

3.     The closed and sealed ocean shipping container No. GSTU 2848676 was loaded aboard the Maersk Line Vessel in Karachi, Pakistan with Seal No. 01100356 intact.

4.     At no time did Maersk Line or any of its agents view or inspect the contents of ocean shipping container No. GSTU 2848676. (Trial Transcript [Trial Trans.] p. 36, lines 1-6; p. 82, lines 14-21; p. 84, lines 15-22; p. 85, lines 13-24, pp. 86-87, lines 16-7).

5.     Maersk Line transported ocean shipping container No. GSTU 2848676 by ocean-going vessel from Karachi, Pakistan to the Sealand Terminal in the Port of Newark, New Jersey where the container was discharged from the M/V DRAGORE MAERSK on or about June 15, 1999.

6.    On June 15, 1999 Maersk Line issued a work/delivery order to Kellaway Transportation Inc. to transport ocean shipping container No. GSTU 2848676 by truck from the Sealand Terminal in Newark, New Jersey to Harrisburg, Pennsylvania, for delivery/interchange to a second trucking company, GPS Transportation, for on-carriage to the ultimate destination in Reading, Pennsylvania (Maersk Line Ex. "C"; Trial Trans. p. 23, lines 2-5)). Plaintiff PVH's warehouse facility is located in Reading, Pennsylvania.

7.    The Uniform Intermodal Interchange and Facilities Access Agreement ("UIIA") is a standard, uniform agreement governing the rights and liabilities of certain intermodal carriers. (Trial Trans. p. 356 line 12 - 357 line 7).

8.    Both Maersk Line and Kellaway Transportation Inc. are signatories to the UIIA and their respective rights and obligations are governed by the version of the UIIA that was in effect at the time of the underlying incident (Maersk Line Ex. "T"; Trial Trans. p. 311-314).

9.    On June 17, 1999 at the Sealand Terminal in Newark, New Jersey, Maersk Line delivered ocean shipping container No. GSTU 2848676 with Seal No. 01100356 intact to Kellaway Transportation, Inc.'s driver. Kellaway Transportation entered the terminal at 8:17 a.m. on June 17, 1999 and left the terminal with sealed ocean shipping container No. GSTU 2848676 at 9:44 a.m. on June 17, 1999. At that time the container was on a chassis for land transport. (Maersk Line Ex. "E").

10.    Kellaway Transportation carried ocean shipping container No. GSTU 2848676 to its facility at Chambers Hill Road in Harrisburg, Pennsylvania on June 17, 1999. (Trial Trans. p. 356, lines 1-4).

11.    Kellaway Transportation, Inc. did not deliver and interchange ocean shipping container No. GSTU 2848676 to GPS Transportation, Inc. in Harrisburg, Pennsylvania. (Trial Trans. pp. 384-390).

12.    Kellaway has alleged that ocean shipping container No. GSTU 2848676 and  two other ocean shipping containers, ("the Mitsui Containers"), were stolen by unknown third parties from its Harrisburg, Pennsylvania container yard located at 4390 Chambers Hill Road sometime between 6:00 p.m. on Friday, June 18, 1999 and 4:30 p.m. on Sunday, June 20, 1999. (Plaintiff's Exhibit II P-93).

13.    Kellaway has alleged that prior to the theft of ocean shipping container No. GSTU 2848676 from its Chambers Hill Road facility, Keith Walborn issued a "Kellaway Terminal Services, Inc." receipt to the Kellaway Transportation driver, acknowledging receipt of ocean shipping container No. GSTU 2848676 at the Kellaway facility at Chambers Hill Road on June 17, 1999. (Trial Trans. p. 388 line 15 - p. 389 line 16; Kellaway Ex. "K-5").

14.    Keith Walborn is an employee of Kellaway Transportation, so that ocean shipping container No. GSTU 2848676 was interchanged from one Kellaway Transportation employee to another Kellaway Transportation employee. (Trial Trans. pp. 389-390; Kellaway Ex. "K-5").

15.    Kellaway Trial Exhibit "K-5" is authentic only with regard to the first page. There were no terms and conditions on the reverse side of that form.

16.    The terms and conditions that Kellaway has included as the second page of its Trial Exhibit "K-5" are actually the terms and conditions on the reverse side of a different form and were

not a part of the front of the document submitted in "K-5". An exemplar of the form from which those terms and conditions were copied is Kellaway Trial Exhibit "K-1".

17.     The front of the exemplar of Kellaway Trial Exhibit "K-1" is a document issued by "Kellaway Intermodal & Distribution Services, Inc." The box in the lower right-hand corner of "K-1" states that it is "ISSUED SUBJECT TO ALL TERMS AND CONDITIONS INCLUDING LIMITATION OF LIABILITY ON REVERSE SIDE HEREOF, SAID TERMS AND CONDITIONS CONSTITUTE A CONTRACT TO WHICH STORER AGREES BY THE ACCEPTANCE OF THIS RECEIPT". K-1 is titled a "Non-negotiable Warehouse Receipt, Equipment Interchange Receipt and Safety Inspection Report." The terms and conditions on the reverse side of "K-1" refer to "Kellaway Intermodal & Distribution Systems, Inc." and refer to same as "warehouseman". The terms and conditions on the reverse side of "K-1" concern liability for warehouse storage services. (Kellaway Trial Exhibit "K-1").

18.     Kellaway traditionally had separate entities that provided warehousing services, as distinguished from container terminal services. (Trial Trans. p. 316, lines 12-15).

19.     The examplar form which is "K-1" relates to warehousing services which would be provided to third parties by Kellaway. (Kellaway Trial Exhibit "K-1").

20.     The face page of Kellaway Trial Exhibit "K-5" is a document created on a form issued by "Kellaway Terminal Services Incorporated". The face page of "K-5" does not contain any language referring to terms and conditions on the reverse side. The face page of "K-5" is titled "Equipment Interchange Receipt and Safety Inspection Report". (Kellaway Trial Exhibit "K-5").

21.     Kellaway essentially argues that the same terms and conditions that are on the reverse side of "K-1" were on the reverse side of "K-5". That argument flies in the face of logic because: (a) those terms and conditions do not refer to "Kellaway Terminal Services Incorporated", the company on the face of "K-5"; (b) there is no language on the face of "K-5" referring to and incorporating terms and conditions on the reverse side as there is on the face of "K-1"; and (c) the terms and conditions refer to liability for warehousing services, which is distinct from the terminal services provided by "Kellaway Terminal Services."

22.     The issue of the discrepancies between "K-1" and "K-5" were brought up by counsel for Maersk Line at a pretrial conference before the presiding District Court Judge. At that conference, the presiding District Court Judge indicated that the issue could be resolved either by bringing the original exhibit or by bringing an exemplar of the form that matches K-5.

23.     Kellaway failed to produce at trial either the original "K-5" or an exemplar of the form that supposedly contains the "Kellaway Terminals" entity on the face and the "Kellaway Intermodal" warehouse terms on the reverse side.

24.     In the normal course of business, the original of "K-5" would be filed at a Kellaway file room by the container number and the month of the transit. (Trial Trans. p. 482, lines 12-14).

25.     Kellaway has failed to explain why it was unable to provide an exemplar of the form that supposedly contains the "Kellaway Terminals" entity on the face and the "Kellaway Intermodal" warehouse terms on the reverse side.

26.     Kellaway never interchanged ocean shipping container No. GSTU 2848676 with GPS Transportation. (Trial Trans. p. 389 line 14 - p. 390 line 10).

27.     The only Kellaway entity that ever billed Maersk Line for any services related to ocean shipping container No. GSTU 2848676 is Kellaway Transportation.  (Maersk Line Ex. "P"; Trial Trans. p. 385, lines 7-23).

28.     PVH knew, even before ocean shipping container No. GSTU 2848676 left Pakistan that it would have to stop in Harrisburg to clear customs.  (Trial Trans. p. 92, lines 12-17).

29.     Prior to June of 1999, PVH had used the delivery trucker, GPS Transport, for non-"store/door" deliveries as its designated trucker.  (Trial Trans. p. 93, lines 5-8; p. 136, lines 3-9).

30.     Prior to June of 1999, PVH had used the Kellaway container yard located at Chambers Hill Road.  (Trial Trans. p. 112, lines 8-11; p. 325, lines 14-19).

31.     Prior to June of 1999, PVH did not have a problem with using the Kellaway container yard located at Chambers Hill Road.  (Trial Trans. p. 113, lines 16-18).

32.     Prior to June of 1999, PVH never criticized the security at the Kellaway container yard located at Chambers Hill Road.  (Trial Trans. p. 118, lines 1-24; p. 325, lines 14-19).

33.     Prior to June of 1999, PVH had experienced problems with stolen containers of clothing.  (Trial Trans. p. 96, lines 1-4).

34.     Plaintiff initiated the instant action on or about April 22, 2000 against Maersk Line, alleging monetary damages resulting from the disappearance of ocean shipping container No. GSTU 2848676.

35.     Plaintiff has failed to prove its *prima facie* case against Maersk Line.

36.     The real costs incurred by PVH in getting the Maersk container to Reading, Pennsylvania are the invoice amount it paid for the goods, together with the duty and freight it paid

to have the goods shipped from Pakistan to Reading.  (p. 53, lines 10-15).

37.     The invoice value of the goods alleged to be inside ocean shipping container No. GSTU 2848676 is $56,851.20.  (Maersk Line Ex. "K"; Trial Trans. p. 61, lines 11-18; p. 74, lines 11-16).

38.     The total amount of freight and duties paid by PVH to ship ocean shipping container No. GSTU 2848676 from Pakistan to Reading, Pennsylvania was $15,728.50.  (Trial Trans. p. 68, lines 4-7).

39.     In 1999, shortly after the theft of ocean shipping container No. GSTU 2848676, the amount of profit PVH claimed it had lost when submitting its claim to its cargo insurer was a 30.2% markup above the invoice value of the goods.  (Maersk Line Ex. "K"; Trial Trans. pp. 75, line 2 - p. 76, line 6; p. 77, line 6-12).

40.     In 1999, shortly after the theft of ocean shipping container No. GSTU 2848676, PVH claimed when submitting its claim to its cargo insurer that the amount of its loss in relation to ocean shipping container No. GSTU 2848676 was $89,925.30.  (Maersk Line Ex. "K"; Trial Trans. pp. 74-76; p. 294, lines 5-12).

41.     When PVH filed the within lawsuit it claimed $89,925.30 as damages in its Complaint. (Trial Trans. p. 71, 77).

42.     PVH agreed to, and is bound by, the terms of the Maersk Line Bill of Lading.  (Trial Trans. p. 80, lines 1-4).

43.     Paragraph 7 of the terms on the reverse side of the Maersk Line Bill of Lading provides that Maersk Line will not be liable for any market or consequential damages. (Maersk

Line Ex. "B"; Trial Trans. p. 79, lines 10-25).

44.    Ocean shipping container No. GSTU 2848676 was not designated for rush delivery. (Trial Trans. p. 96, lines 12-14 and 20).

45.    No purchase order for an alleged resale of the goods carried in ocean shipping container No. GSTU 2848676 has been produced by Plaintiff to support its claim that the goods had been pre-sold to Ross Department Stores, however, one allegedly existed . (Trial Trans. p. 193, lines 16-21).

46.    Plaintiff has failed to produce the master contract it claims existed between PVH and Ross Department Stores in early 1999.  (Trial Trans. p. 196, lines 14-21).

47.    Plaintiff has failed to provide the contractual terms of sale of any alleged resale, including the terms of the alleged purchase order and the terms of the alleged master contract.  (Trial Trans. p. 83 line 9 - p. 84 line 5; p. 91, lines 8-20; p. 197, lines 4-18).

48.    PVH ships short sleeve golf-type shirts to its customers on a year-round basis.  (Trial Trans. p. 90, lines 16-19; p. 201, lines 12-15).

49.    The alleged shipment to Ross Department Stores would have been part of an ongoing program at that time where Ross Department Stores was purchasing 12,000 units per month from PVH over a five-month period.  (Trial Trans. p. 200 line 20 - p. 201 line 7).

50.    Plaintiff has failed to authenticate the documents it offers  with regard to the alleged resale to Ross Department Stores, because they cannot be connected in any way to the shipment. While Mr. Seigel testified that he obtained the information on the documents from PVH computer records, he failed to establish how the information was put onto the computer in 1999 and from what

source.  There was no testimony that the information was put on the computer in 1999 from a business document such as the purchase order or sales invoice.  Thus, while the computer records may be from PVH's system, the information contained on them is hearsay.  The records are nothing more than an accumulation of hearsay.  See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F.3d 627 (2nd Cir. 1994);

51.    Even if the documents offered by Plaintiff with regard to the alleged resale to Ross Department Stores are admitted into evidence, those documents (P-88 and P-103(c)) contain inconsistent style numbers which do not match the style numbers set forth on the Maersk Line Bill of Lading. (Maersk Line Exhibit "A", Trial Trans. p.- P. 192 line 1 - p. 193 line 8).

52.    The alleged order of Ross Department Stores was canceled in May of 1999, prior to the arrival of ocean shipping container No. GSTU 2848676 to the United States in June of 1999. (Trial Trans. p. 203 line 5 - p. 204 line 9).

53.    PVH never contacted Ross to see if it would accept the goods at a later date.  (Trial Trans. p. 209, lines 21-25 - P.99).

54.    PVH maintains inventory of clothing at its Chattanooga, Tennessee warehouse. (Trial Trans. p. 124 line 24 - P. 125 line 1).

55.    PVH has a salesperson in New York whose sole job is to dispose of canceled merchandise.  (Trial Trans. p. 205, lines 2-9).

56.    PVH has failed to offer any evidence that it did not have inventory available to cover the goods allegedly lost from ocean shipping container No. GSTU 2848676.  (Trial Trans. p. 125, lines 2-7; p. 134, lines 10-20; p. 205, lines 18-21).

57.     PVH has failed to offer any evidence of any attempt to mitigate its damages.  (Trial Trans. p. 99 line 9 - p. 100 line 2; p. 199, lines 4-7).

<u>ON MAERSK LINE'S THIRD-PARTY CLAIM AGAINST KELLAWAY</u>

58.     On July 17, 2000, Maersk Line tendered its defense of the instant action to Kellaway pursuant to the terms and conditions of the UIIA.  (Maersk Line Ex. "N"; Trial Trans. p. 308, lines 17-20).

59.     Kellaway did not provide a defense or insurance for Maersk Line, and Maersk Line was forced to provide its own defense to the instant action.  (Trial Trans. p. 308, lines 17-20, pp. 391-396).

60.     On January 9, 2001 Maersk Line filed its third-party complaint against Kellaway pursuant to Rules 9(h) and 14(c) of the Federal Rules of Civil Procedure.

61.     The container yard where Kellaway claims ocean shipping container No. GSTU 2848676 was stolen is located at 4390 Chambers Hill Road, Harrisburg, Pa. and was leased by Kellaway Transportation from J.V.E. Co., Inc. by way of written lease. (Maersk Line Ex. "G"; Trial Trans. p. 387, lines 6-16).

62.     Kellaway marketed its container yard to the public as a U.S. Customs approved bonded facility with adequate security measures in place.(Trial Trans. pp.318-319).

63.     Kellaway reported that its driver, William Gross, discovered the break-in at the container yard on June 20, 1999 at 4:15 p.m.  (Plaintiff Exhibit P-93).

64.     In June of 1999 the Kellaway facility at Chambers Hill Road was customs bonded. (Trial Trans. p. 318, lines 20-22; p. 319, lines 19-21).

65.      The amount of security required by U.S. Customs to have bonded status was the same in Harrisburg as it was in other Kellaway container yards.  (Trial Trans. p. 322, lines 3-9).

66.      In June of 1999, the Kellaway facility at Chambers Hill Road was enclosed by a fence with three strands of barbed wire along the top and a single gate equipped with a chain and lock. (Trial Trans. p. 321, lines 7-10).

67.      The external lighting at the Chambers Hill facility in June of 1999 was at the back of the docking area where there are two sets of lights on each corner of the building.  (Trial. Trans. p. 323, lines 17-22).

68.      The lighting provided at the Chambers Hill facility in June of 1999 did not illuminate the entire container yard, nor the area from whence ocean shipping container No. GSTU 2848676 was stolen.  (Trial Trans. p. 265, lines 18-20).

69.      In June of 1999, the Kellaway facility at Chambers Hill Road did not operate on weekends.  (Trial Trans. p. 257, lines 18-21).

70.      In June of 1999, there were no security guards at the Kellaway facility at Chambers Hill Road, including when the facility was unmanned from close of business Friday until Monday morning.  (Trial Trans. p. 255 line 17 - 256 line 2; p. 265 line 24 - p. 266 line 3).

71.      All Kellaway drivers, including non-employee independent owner/operators, had the key to the lock on the gate and could access the yard outside of the normal business hours.  (Trial Trans. p. 268, lines 14-16).

72.      A fifth wheel lock or kingpin lock is a device that goes on the part of a chassis that would lock to the pin that comes down to hook it to the tractor.  (Trial Trans. p. 269, lines 4-6).

73.     Kellaway did not utilize fifth wheel or pin locks at its Chambers Hill facility in June of 1999.  (Trial Trans. p. 256, lines 23-25).

74.     The facility did not normally operate on weekends.  (Trial Trans. p. 257).

75.     There were no security cameras or motion detectors at the Kellaway facility at Chambers Hill Road in June of 1999.  (Trial Trans. p. 255, lines 22-24; p. 265, lines 21-23).

76.     Kellaway did not position the containers in the yard at the time of the theft so as to block the container doors and block-in selected containers. (Trial Trans. p. 266, lines 14-24).

77.     The contract between Kellaway and Maersk Line was the Intermodal Interchange and Facilities Access Agreement ("UIIA") which is administered by the Intermodal Association of North America, 7501 Greenway Center Drive, Suite 720, Greenbelt, Maryland 20770-6705. (Maersk Line Ex. "T"; Trial Trans. p. 311 line 17 - p. 313 line 11).

78.     Under the UIIA Agreement, paragraph VII of the Maersk Line Addendum and Paragraph 6(f) of the main agreement, Kellaway was required to procure insurance to cover Maersk Line for the claims which are the subject of this lawsuit.  In violation of the UIIA, Kellaway failed to procure said insurance to cover Maersk Line and now must indemnify, defend, and hold Maersk Line Harmless in connection with this lawsuit.  (Maersk Line Ex. "T").

79.     Under the UIIA, if plaintiff prevails because Kellaway's security is found by the Court to have been negligent in June of 1999, Kellaway must indemnify Maersk Line for any liability it might have to plaintiff, said liability being denied by Maersk Line, together with the cost of defending the claims made by plaintiff and the cost of enforcing the terms of the UIIA against

Kellaway. Such liability of Kellaway for failure to obtain insurance coverage for Maersk is not dependent upon the plaintiff prevailing.

80.    On or about July 2, 1999 Container No. GSTU 2848676 and a 1992 Freightliner tractor were found at 2590 Baily Avenue, Bronx, N.Y.  The container was empty.  Kellaway subsequently offered a $20,000 reward for information leading to the conviction of the persons responsible for the theft.  (Plaintiff's Exhibit P-93).

81.    At some time after the subject theft, Kellaway Terminal Services, Inc.; Kellaway Warehouse Services, Inc.; and Kellaway Transportation, Inc. was  merged into a single company called Kellaway Intermodal and Distribution Systems, Inc.  (Trial Trans. p. 316, lines 12-21).

82.    Kellaway has failed to show when the merger of the three entities into a single entity took place.  (Trial Trans. p. 353, lines 12-24).

83.    In 1993, when David McLaughlin, Chief Operating Officer of Kellaway was working for a different company in Allston, Massachusetts, the container yard maintained by that company had security cameras and a 24-hour security guard.

84.    In June of 1999, Kellaway had employees who were in charge of security for all Kellaway companies.  (Trial Trans. p. 375, lines 15-19).

85.    In June of 1999, Kellaway's customs bonded container yard facilities in Massachusetts and Rhode Island had 24-hour security.  (Trial Trans. p. 377, lines 16-19).

86.    Currently, all Kellaway customs bonded container yards have 24-hours security. (Trial Trans. p. 375, lines. 20-22).

87.    On June 21, 1999, Kellaway Transportation, Inc. issued an invoice to Maersk Line

in the amount of $265.00 for its services, which invoice was paid in full. ( Trial Trans. pp. 384-86; Maersk Line Exs. "P" and "S").

88.    The distance from Newark, New Jersey to Reading, Pennsylvania is approximately 115 miles.

89.    The distance from Karachi, Pakistan to Newark, New Jersey is approximately 7,200 miles.

**Proposed Conclusions of Law**

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, as it is a civil action within the Court's admiralty jurisdiction.

2.    For purposes of admiralty jurisdiction, the Maersk Line Bill of Lading is a "mixed" contract, as it contains both maritime and non-maritime obligations. See Berkshire Fashions, Inc. v. M.V. HAKUSAN II, 954 F.2d 874, 880 (3rd Cir. 1992).

3.    For purposes of admiralty jurisdiction, the land segment of the transportation from the Port of Newark, New Jersey to Reading, Pennsylvania--approximately 115 miles--is "incidental" to the ocean transit from Karachi, Pakistan--in excess of 7,200 miles. See Patria v. M/V SEALAND ATLANTIC, No. 00-3454, 2000 W.L. 815876 at * 1, 2000 A.M.C. 2473 (E.D.La. June 22, 2000) (175-mile land portion of transportation merely incidental to ocean voyage from England to El Salvador); Project Hope v. M/V IBN SINA, No. 97-3853, 2000 W.L. 297182 at *12 n. 6 (S.D.N.Y. Mar. 21, 2000) (land-based transport to ocean terminal was relatively short and, thus, incidental to transport from Virginia to Egypt); Joe Boxer v. Fritz Transport Int'l, 33 F. Supp.2d 851, 856 (C.D.Ca. 1998) (62-mile land-based transport merely incidental to transoceanic voyage).

4.      Alternatively, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), as it is a civil action where the matter in controversy exceeds the sum of $75,000.00 and it involves the citizens of a State and the citizens of a foreign state.

5.      Alternatively, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as it is an action arising under the federal common law of the United States.  Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53, 59 n. 2 (2d Cir. 2000).

6.      This Court has jurisdiction over Maersk Line's Third-Party Complaint as this is a civil action within the Court's admiralty jurisdiction.  28 U.S.C. § 1333; Marine Transportation Services Sea-Barge Group, Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1139 (11th Cir. 1994).

7.      This Court has supplemental jurisdiction over Maersk Line's Third-Party Complaint pursuant to 28 U.S.C. § 1367(a), as it is related to and forms part of the same controversy as Plaintiff's claim.  28 U.S.C. § 1367(a); Id.

8.      Plaintiff's claim against Maersk Line is governed by the terms and conditions of the contract of carriage, Maersk Line Bill of Lading No. MAEU-YCG-J-05408.

9.      Clause 5 of the terms and conditions on the reverse side of Maersk Line Bill of Lading No. MAEU-YCG-J-05408 provides in relevant part:

CARRIER'S RESPONSIBILITY

The Carrier [Maersk Line] undertakes responsibility from the place of receipt if named herein or from port of loading to the port of discharge or the place of delivery if named herein as follows:
1.  If it can be proved that the loss or damage occurred while the Goods were in custody of an inland carrier [Kellaway Transportation] the liability of the Carrier and the limitation thereof shall be determined in

accordance with the inland carrier's contract of carriage or tariffs, or in the absence of such contract or tariff, in accordance with the internal law of the state where the loss or damage occurred provided that where such contract or tariff does not exist the limit shall be as set out in Clause 6.

In accordance with the above provision, Maersk Line is entitled to rely upon any defense or limitation of liability enjoyed by Third-Party defendant Kellaway pursuant to contract or tariff. (Maersk Line Ex. "B").

10.    Kellaway has not come forward with a contract of carriage or tariff applicable to its carriage of ocean shipping container No. GSTU 2848676, pursuant to Clause 5 of the Maersk Line Bill of Lading and, therefore, the law of the State of Pennsylvania governs the rights and liabilities of Plaintiff and Maersk Line. (Maersk Line Ex. "B").

11.    The applicable law is the law of bailment.[1]

12.    Under Pennsylvania law, bailment is defined as "a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions." Price v. Brown, 545 Pa. 216, 221, 680 A.2d 1149 (1996).

13.    In order to make a *prima facie* case for breach of bailment, Plaintiff must show that the allegedly lost cargo was delivered to Maersk Line and/or its agents and that the cargo was not returned. Id.

14.    Plaintiff has failed to make a *prima facie* case of liability because it has failed to prove that Maersk Line received the merchandise in good order and condition at the port of loading.

---

[1] It is assumed that the applicable bailment law would be the law of the Commonwealth of Pennsylvania. However, Maersk Line notes that the basic elements of the federal common law of bailment are consistent with Pennsylvania bailment law. See Fireman's Fund Ins. Co. v. Panalpina, Inc., 153 F. Supp.2d 1339, 1343 (S.D.Fla. 2001).

15.    Alternatively, in the event that Plaintiff is able to make its *prima facie* case, the burden then shifts to Maersk Line to show offer an explanation for the failure to redeliver the shipment. Id.

16.    It is undisputed that the sealed container in question was stolen by unknown third parties while in the possession of Kellaway Transportation. Thus, the burden shifts back to Plaintiff to show that Maersk Line's agent Kellaway Transportation was negligent. Id.

17.    The bailment of the container was for the mutual benefit of Maersk Line and Plaintiff and so Maersk Line is held to a standard of "reasonable and ordinary care." American Enka Co. v. Wicaco Machine Corp., 686 F.2d 1050, 1053 (3d Cir. 1982).

18.    Plaintiff has failed to show that Maersk Line or its agent were negligent.

19.    Alternatively, in the event that Plaintiff's claims are subject to the Carriage of Goods By Sea Act ("COGSA"), 46 U.S.C. 1300 et seq., as alleged in Plaintiff's Complaint, then Plaintiff's claims are barred and defendant Maersk Line is exonerated from any liability pursuant to 46 U.S.C. 1304(2)(q) due to the absence of actual fault and privity by Maersk Line. 46 U.S.C. §1304(2)(q); U.N./F.A.O. World Food Programme v. M.V. Tay, 1997 A.M.C. 2535, 1997 W.L. 714901 (S.D.Tex. 1997).

20.    Maersk Line's liability to Plaintiff as a common carrier is not governed by the Pennsylvania Public Utilities Code, 66 Pa.C.S. Sec. 101, et seq., because the transportation of the container was not from one point in the Commonwealth to another point in the Commonwealth. Pennsylvania Public Utilities Code, 66 Pa.C.S. §2304.

21.     In order to make a *prima facie* case Maersk Line, Plaintiff is required to prove that the allegedly lost cargo was actually loaded inside ocean shipping container No. GSTU 2848676 and sealed, prior to being delivered to Maersk Line by PVH.  <u>Bally Inc. v. M/V Zim America</u>, 22 F.3d 65 (2d Cir. 1994); <u>Intercontinental Trading Co. Inc. v. M/V Zenith Sun</u>, 684 F. Supp. 861 (E.D.Pa. 1988); <u>Hams Express, Inc. v. Joseph Land & Co., Inc.</u>, 506 F. Supp. 209, 214 (E.D.Pa. 1980).

22.     Plaintiff has failed to make a *prima facie* case of liability because it has failed to prove that Maersk Line received the merchandise in good order and condition at the port of loading.

23.     Alternatively, in the event that Maersk Line is found liable to Plaintiff for the negligence of its agent, Kellaway, the quantum of Plaintiff's damages is based upon Plaintiff's actual loss. <u>First National Bank & Trust Co. of Newtown</u>, 797 F. Supp. at 1273.

24.     Plaintiff's actual loss was the amount it paid for the textiles claimed, plus customs duty and freight paid.  (Maersk Line Exs. "K"-"M").

25.     Where a plaintiff fails to prove fair market value, as here, courts use the invoice price of the cargo as an alternative reference point. <u>Pacol (Canada) Ltd. v. M/V MINERVA</u>, 523 F. Supp. 510, 513 (S.D.N.Y. 1981) (<u>citing</u> <u>Itoh v. Hellenic Lines, Ltd.</u>, 470 F. Supp. 594, 598 (S.D.N.Y.)); <u>Tatlow & Pledger, Ltd. v. Herman Forwarding Co.</u>, 456 F. Supp. 351 (S.D.N.Y. 1978).

26.     Lost profits even as those claimed by PVH are, by definition, consequential losses and damages excluded by the applicable Maersk Line Bill of Lading at clause 7, sub-paragraph 2. <u>See</u> <u>Majica v. Autoridad De Las Navieras De Puerto Rico</u>, 1994 A.M.C. 1316, 1993 W.L. 724807 (D.P.R. 1993).

27. Plaintiff had a duty to mitigate its losses, and any recovery should be reduced by its unreasonable failure to mitigate. See Marathon Pipeline Co. v. M/V SEA LEVEL II, 806 F.2d 58 (5th Cir. 1986).

28. Consequential damages are not recoverable under the applicable maritime law. Majica v. Authoridad de las Puerto Rico, 1994 AMC. 1316 (D.P.R. 1993).

29. Plaintiff could have replaced the goods it alleges were lost, and, thus, its damages are limited to the manufacturing cost of the goods. Pacol (Canada) Ltd. v. M/V MINERVA, 523 F. Supp. 579, 582 (1981 S.D.N.Y.); H. Daroff & Sons, Inc. v. Strickland Transportation Co., Inc., 284 F. Supp. 510, 513 (E.D.Pa. 1968).

30. Plaintiff has failed to produce the alleged purchase orders or contracts of sale for the shirts to its alleged buyer in the United States, Ross Department Stores, and thus, a negative inference must be made that the terms and conditions of the purchase order and/or master contract of sale would have permitted Plaintiff to ship the goods to Ross Department Stores at a later time and so Plaintiff is precluded from recovering an amount above the price it paid for the allegedly lost merchandise.

31. Any liability of Maersk Line to Plaintiff, which is denied, is coextensive with Kellaway's liability to Maersk Line, since any liability of Maersk Line to Plaintiff would have to be predicated upon a showing that Kellaway, as agent of Maersk Line, was negligent. Maersk is a true middleman in this case whose liability can only be triggered by the acts or omissions of Kellaway.

<u>ON MAERSK LINE'S THIRD-PARTY CLAIM AGAINST KELLAWAY</u>

     32.     The rights and liabilities between Maersk Line and Kellaway are governed

by the Uniform Intermodal Interchange and Facilities Access Agreement ("UIIA") in effect

between Kellaway and Maersk Line in June of 1999. <u>See</u> <u>Mack v. Consolidated Rail Corp.</u>, 24

F. Supp.2d 126, 128 (D.Mass. 1998); <u>Harco National Ins. Co. v. Bobac Trucking, Inc.</u>, No. 93-

01295, 1995 W.L. 482330 at *6 (N.D.Cal. Aug. 4, 1995); <u>Clement v. Consolidated Rail Corp.</u>,

No. 88-3793, 1989 W.L. 145018 at *3 (D.N.J. Nov. 9, 1989). (Maersk Line Ex. "T").

     33.     Pursuant to the applicable UIIA, Kellaway agreed to hold harmless and fully

indemnify Maersk Line against any liability suffered by Maersk Line arising out of Kellaway's

negligent acts or omissions during the "Interchange Period" as defined by the UIIA. <u>See</u> <u>Mack v.</u>

<u>Consolidated Rail Corp.</u>, 24 F. Supp.2d 126, 128 (D.Mass. 1998); <u>Harco National Ins. Co. v.</u>

<u>Bobac Trucking, Inc.</u>, No. 93-01295, 1995 W.L. 482330 at *6 (N.D.Cal. Aug. 4, 1995). (Maersk

Line Ex. "T").

     34.     Pursuant to the applicable UIIA, Kellaway agreed to provide legal defense to

Maersk Line for any claim brought against Maersk Line. (Maersk Line Ex. "T,"Section III

.7(e)).

     35.     Pursuant to the applicable UIIA, Kellaway agreed to pay any and all legal costs,

including attorneys fees, incurred by Maersk Line in enforcing the terms of the UIIA against

Kellaway. (Maersk Line Ex. "T," III .7 (d)).

36.    The UIIA defines "Interchange Period" as "The period, commencing upon Interchange to Motor Carrier [Kellaway] and concluding upon Interchange to Provider [Maersk Line]."  (Maersk Line Ex. "T").

37.    The theft of ocean shipping container No. GSTU 2848676 occurred during the "Interchange Period" and prior to Kellaway interchanging said container to the next inland carrier, GPS Transportation. (Maersk Line Ex. "Q").

38.    In the event the plaintiff establishes liability against Maersk Line, which is denied, then Kellaway was negligent in failing to provide adequate security for ocean shipping container No. GSTU 2848676 at its Chambers Hill Road terminal facility.  See Groupe Chegaray/V. de Chalus v. P&O Containers, 251 F.3d 1359 (11th Cir. 2001); Tokio Marine Management, Inc. v. M/V "ZIM TOKYO", 1995 A.M.C. 2263 (S.D.N.Y. 1995); The English Whipple Sailyard, Ltd. v. The Yawl ARDENT, 459 F. Supp. 866 (W.D.Pa. 1978).

39.    Kellaway breached the UIIA by failing to provide a defense for Maersk Line and is liable to Maersk Line for the costs incurred by Maersk Line in defending the present action and in enforcing the UIIA agreement against Kellaway, including all attorneys' fees incurred by Maersk Line.  See Clement v. Consolidated Rail Corp.,1989 Wil.145018 (D.N.J. 1989); Mack v. Consolidated Rail Corp., 24 F. Supp.2d 126, 128 (D.Mass. 1998); Harco National Ins. Co. v. Bobac Trucking, Inc., No. 93-01295, 1995 W.L. 482330 at *6 (N.D.Cal. Aug. 4, 1995).

40.    In the event that Maersk Line is found liable to Plaintiff, said liability being denied,  pursuant to the UIIA, Maersk Line is entitled to full indemnity from Kellaway for any amounts paid to Plaintiff.

41.     Pursuant to the UIIA, Kellaway agreed to provide insurance coverage for the benefit of Maersk Line covering, *inter alia*, the claims which are the subject of this lawsuit and any liabilities incurred by Maersk Line.  (Maersk Line Ex. "T," Maersk Addendum).

42.     Kellaway breached the UIIA by failing to procure  insurance coverage for the benefit of Maersk Line and is liable to Maersk Line for the costs incurred by Maersk Line in defending the present action and in enforcing the UIIA agreement against Kellaway, including all attorneys' fees incurred by Maersk Line and any liability Maersk Line might have, said liability being denied. Such liability by Kellaway is not dependent upon the plaintiff prevailing.

43.     Alternatively, even if the UIIA is not controlling, Kellaway must indemnify Maersk Line under common law principles of indemnity for negligence and breach of bailment.

44.     Although the Carmack Amendment to the Interstate Commerce Act usually governs interstate truck carriage, the Carmack Amendment does not apply to overland interstate truck carriage that is part of an international import shipment where the carriage is governed by a through bill of lading and no separate bill of lading has been issued by the truck carrier for the domestic portion of the transportation.  Tokio Marine & Fire Ins. Co., Ltd. v. Nippon Yusen Kaisha, 25 F. Supp.2d 1071, 1081 (C.D.Ca. 1997); New York Marine & General Ins. Co. v. S/S "MING PROSPERITY", 920 F. Supp. 416, 425 (S.D.N.Y. 1996); Kenny's Auto Parts, Inc. v. Baker, 478 F. Supp. 461, 464 (E.D.Pa. 1979).

45.     The rights and liabilities between Maersk Line and Kellaway are governed by common law principles of bailment and negligence.  See SPM Corp. v. M/V "MING MOON", 1994 A.M.C. 1758, 1762 (3d Cir. 1994); Marine & Fire Ins. Co., Ltd. v. Nippon Yusen Kaisha,

25 F. Supp.2d 1071, 1081-82 (C.D.Ca. 1997); Compania Sud Americana de Vapores, S.A. v. I.T.O. Corp. of Baltimore, 940 F. Supp. 855, 863 (D.Md. 1996).

46.     Under Pennsylvania law, bailment is defined as "a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it." Price v. Brown, 545 Pa. 216, 221, 680 A.2d 1149 (1996).

47.     The contract between Maersk Line and Kellaway with regard to ocean shipping container No. GSTU 2848676 was a bailment under Pennsylvania law subject to the terms and conditions of the UIIA.

48.     The bailment was for the mutual benefit of Maersk Line and Kellaway, and thus Kellaway was required to exercise reasonable and ordinary care with regard to ocean shipping container No. GSTU 2848676. American Enka Co. v. Wicaco Machine Corp., 686, F.2d 1050, 1053 (3d Cir. 1982).

49.     In the event plaintiff establishes liability against Maersk Line, which is denied, Maersk Line has made a *prima facie* case of breach of bailment against Kellaway because Mersk Line delivered ocean shipping container No. GSTU 2848676 to Kellaway, and Kellaway never returned ocean shipping container No. GSTU 2848676 to Maersk Line or GPS Transportation. Price v. Brown, 545 Pa. 216, 221-222, 680 A.2d 1149, 1152 (1996).

50.     It is undisputed that ocean shipping container No. GSTU 2848676 was stolen by third parties and, in the event that plaintiff prevails against Maersk Line then Maersk Line, in

turn, is entitled to full indemnity from Kellaway for Kellaway's failure to provide adequate security for ocean shipping container No. GSTU 2848676 at its Chambers Hill Road terminal facility, see Groupe Chegaray/V. de Chalus v. P&O Containers, 251 F.3d 1359 (11th Cir. 2001); Tokio Marine Management, Inc. v. M/V "ZIM TOKYO", 1995 A.M.C. 2263 (S.D.N.Y. 1995); The English Whipple Sailyard, Ltd. v. The Yawl ARDENT, 459 F. Supp. 866 (W.D.Pa. 1978).

51.    Maersk Line and Kellaway's contract for services contained an implied warranty of workmanlike performance, warranting that Kellaway would perform its duties under the contract in a workmanlike manner.  See, e.g., Compania Sud Americana de Vapores, S.A. v. I.T.O. Corp. of Baltimore, 940 F. Supp. 855, 866 (D.Md. 1996) (citing cases).

52.    No showing of negligence is required to establish a breach of the implied warranty of workmanlike service.  Id.

53.    In the event of a finding of liability against Maersk Line, which is denied, then Kellaway breached its implied warranty of workmanlike service by failing to redeliver ocean shipping container No. GSTU 2848676 to Maersk Line, and thus, is liable to Maersk Line for full indemnity.  Id.; New York Marine & General Ins. Co. v. S/S "MING PROSPERITY", 920 F. Supp. 416, 426 (S.D.N.Y. 1996).

54.    As regards Kellaway Trial Exhibit "K-5", only the face page is admitted into evidence.  There is a genuine dispute as to the authenticity of "K-5" with regard to whether it contained terms and conditions on the reverse side, and Kellaway has failed to provide the original document or an exemplar of the form.  Fed. Rs. Ev. 1002 and 1003.

55.     Kellaway Exhibit "K-5" is inadmissible because the reverse side is not an authentic part of the document and is irrelevant to this matter

56.     Alternatively, in the unlikely event that the alleged reverse side of Kellaway Trial Exhibit "K-5" is admitted into evidence, it does not apply to Maersk Line of Plaintiff. Pennsylvania statutory law on warehouseman requires that any warehouse receipt limiting liability be signed by the party to be bound and that the party has an opportunity to increase the warehouseman's liability by declaring a higher value.  13 Pa. C. S. A. §7204(b); Adams v. Ryan & Christie Storage, Inc., 563 F. Supp. 409, 410-11 (E.D.Pa. 1983). The proposed K-5 was issued by one employee of Kellaway Transportation, Inc., to another and there is no evidence that Maersk Line ever received it, let alone accepted the alleged terms.

57.     Alternatively, in the unlikely event that the Court enforces the alleged $1,000.00 limitation against Maersk Line, Maersk Line may enforce the same limitation as against PVH, pursuant to the terms of the Maersk Line Bill of Lading providing that the contract of the sub-contractor will govern the liability of Maersk Line to PVH.  (Maersk Line Ex. "A" and "B").

Dated: April 11, 2002
      Philadelphia, Pennsylvania

PALMER BIEZUP & HENDERSON LLP

By: _____

        Richard Q. Whelan (ID # 35688)
        William E. Ecenbarger, Jr.
        Attorneys for Defendant and Third
        Party Plaintiff Maersk Line
        620 Chestnut Street, 956 Public Ledger Building
        Philadelphia, PA 19106-3409
            (215) 625-9900

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that service of a true and correct copies of Defendant/Third-Party Plaintiff DAADS' (t/a Maersk Line) Memorandum of Law On Entitlement To An Award of Attorneys' Fees, Second Amended Findings of Fact and Conclusions of Law and Post-Trial Brief was made to the below-listed counsel on April 11, 2002 via Hand Delivery.

George R. Zacharkow, Esquire
Mattioni Ltd.
399 Market Street, 2nd Floor
Philadelphia, PA 19106

Carl H. Delacato, Esquire
Hecker, Brown, Sherry & Johnson
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103

Ann-Michele G. Higgins, Esquire
Rawle & Henderson LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107

Patrick J. Keenan, Esquire
Duffy & Keenan
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, PA 19106

PALMER BIEZUP & HENDERSON LLP

By: _____

William E. Ecenbarger, Jr.
Attorneys for DAADS t/a Maersk Line
620 Chestnut Street
956 Public Ledger Building
Philadelphia, PA 19106-3409
(215) 625-9900

PBH: 145518.1

13