ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYVANIA

PHILLIPS - VAN HEUSEN CORP.        :        CIVIL ACTION
                                   :
           v.                      :        No. 1:00-cv-691
                                   :                665
DAMPSKIBSSELSKABET AF 1912         :
AKTIESELSKAB AND AKTIESELSKABET    :
50 Esplanaden DK-1908              :
Copenhagen K., Denmark             :
trading as Maersk Line and Maersk Line, Inc.    :

FILED
HARRISBURG, PA

APR 1 1 2002

MARY E. D'ANDREA, CLERK
Per _____

**DEFENDANT MAERSK LINE'S POST-TRIAL BRIEF**

        Defendant Dampskibsselskabet AF 1912 Aktieselskab and Aktieselskabet (hereinafter

"Maersk Line"), by and through its undersigned attorneys, submits the following Post-Trial Brief

in support of its request for judgment in favor of Maersk Line and against Plaintiff Phillips-Van

Heusen Corporation (PVH) and against Third-Party Defendant Kellaway.

## I.    JURISDICTION AND NATURE OF CASE

        This is a non-jury action filed by shipper PVH against Maersk Line for the loss of a cargo

of cotton polo shirts allegedly shipped from Karachi, Pakistan to Reading, Pa.  Plaintiff has

alleged subject matter jurisdiction based on 28 U.S.C. § 1332 admiralty and maritime

jurisdiction.  Plaintiff also made a F.R.C.P. 9 (h) designation in the Complaint.  Alternative bases

for subject matter jurisdiction are 28 U.S.C. § 1331 and 28 U.S.C. § 1332.  The lawsuit filed by

PVH against Maersk Line (Civil Action 00-cv-691) was consolidated for discovery and trial with

Civil Action 00-0665, a lawsuit filed by PVH against Mitsui O.S.K. Lines, Ltd.

PBH: 148988.1



## II.    __BACKGROUND__

Maersk Line was engaged by PVH to transport container # GSTU 284 867-6 (hereinafter "the container") from Karachi, Pakistan to the port of Newark, New Jersey, a distance of 7,200 miles, and then onto PVH's facility in Reading, Pennsylvania, a distance of 115 miles.

In Pakistan, before the container was loaded aboard the Maersk Line vessel for ocean transport to Newark, PVH and/or their agents stuffed and sealed the container. (VI 81-82; 85-87). Seal # 0110356 was placed on the container before it was delivered by PVH to the Maersk Line vessel. (VI 85-87). Once the container was loaded aboard the Maesk Line vessel on May 18, 1999, Maersk Line issued bill of lading MAEU-YCG-J-05408. (Maersk Line Exhibits "A" and "B"). The Maersk Line bill of lading is the contract between plaintiff PVH and Maersk Line that sets forth the governing terms and conditions of the shipment. (VI 85-87).

On or about June 15, 1999, the container was discharged from the DRAGOER MAERSK At the Port of Newark, New Jersey. The same day, a Maersk Work Order (Maersk Exhibit "C") was issued to Kellaway requesting Kellaway to transport the container from Newark to Kellaway's facility in Harrisburg and to interchange the container with GPS Transportation. GPS Transportation was to transport the container from Harrisburg to the PVH facility in Reading, Pennsylvania. The container was required to be transported through Harrisburg in order to clear Customs within 50 miles of the ultimate destination (VI 92). The container/cargo was supposed to be cleared by the U.S. Customs Office located at Harrisburg International Airport prior to being sent on to Reading. On or about June 17, Maersk Line delivered the container to Kellaway at the port of Newark, New Jersey. (Maersk Line Exhibit "E"). The

Kellaway driver entered the container terminal in Newark, New Jersey at 8:17 a.m. on June 17, 1999 and departed the terminal with the sealed container at 9:44 a.m. the same day (Maersk Line Exhibit "E").

Kellaway Transportation never interchanged the container with GPS Transportation as requested, but rather, claimed that the container was stolen while in Kellaway's possession sometime between 6:00 p.m. on Friday, June 18, 1999 and 4:30 p.m.on Sunday June 20, 1999. (VI 389-390 ).  On or about July 2, 1999 the empty container was reportedly  found at 2590 Baily Avenue, Bronx, New York

PVH filed the within action on or about April 11, 2000 claiming damages for loss of cargo allegedly carried in the container.

### III.    UNDER THE TERMS OF THE BILL OF LADING, PLAINTIFF'S CLAIM MUST BE BASED ON PENNSYLVANIA LAW OF BAILMENT AND SAID CLAIM IS LIMITED TO MAERSK LINE'S ALLEGED VICARIOUS LIABILITY FOR THE ACTS OR OMISSIONS OF KELLAWAY.

Plaintiff's claim against Maersk is governed  by the terms and the conditions on the reverse side of Maersk Line's Bill of Lading # MAEU-YCG-J-05408, which  provides in relevant part as follows:

### CARRIER'S RESPONSIBILITY

The carrier [Maersk Line] undertakes responsibility from the place of receipt if named herein or from the port of loading to the port of discharge or the place of delivery if named herein as follows:

(1.)    If it can be proved that the loss or damage occurred while the goods were in the custody of an inland carrier the liability of the carrier and the limitations thereof shall be determined in accordance with the inland carrier's contract of carriage or tariffs,

or in the absence of such contract or tariff, in accordance with the
internal law of the state where the loss of damage occurred
provided that where such contract or tariff does not exist, the limit
shall be as set out in clause 6."

(Maersk Line Exhibits "A" and "B").

In accordance with the above provision, Maersk Line is entitled to rely upon any defense or

limitation of liability enjoyed by the inland carrier, Third-Party Defendant Kellaway in this

instance, pursuant to any contract or tariff which they prove applied to the inland portion of the

transportation. At trial, Kellaway did not present or submit any admissible evidence of a contract

or tariff that applied to the inland transportation mode. Accordingly, pursuant to paragraph 5 of

the Maersk bill of lading, the law of the State of Pennsylvania governs the rights and liabilities of

PVH and Maersk Line with respect to this shipment. (Maersk Line Exhibit "A" and "B").

Under Pennsylvania law, the shipment would be subject to the Pennsylvania law of

bailment. Bailment is defined as "a delivery of personalty for the accomplishment of some

purpose upon a contract, express or implied, that after the purpose has been fulfilled, it should be

re-delivered to the person who delivered it, or otherwise dealt with according to his directions."

Price vs. Brown, 545 Pa.216, 221, 680, A.2d 1149 (1996). In order to make a *prima facie* case

for breach of bailment under Pennsylvania law, plaintiff must show that the allegedly lost cargo

was delivered to Maersk Line and and/or its agents and that the cargo was not returned. Id. In the

event that plaintiff is able to make its *prima facie* case, which is denied, the burden would then

shift to Maersk Line under Pennsylvania Law to offer an explanation for the alleged failure to re-

deliver the shipment. Id. Since the bailment of the container was for the mutual benefit of

Maersk Line and PVH, Maersk Line would be held to a standard of "reasonable and ordinary care." Enka Co. vs. Wicaco Machine Corp., 686 F 2d 1050, 1053 (3rd cir. 1982).

It is uncontroverted that any alleged loss of the container occurred while the container was in the possession of Kellaway. In these circumstances, any liability that Maersk might have to plaintiff can only be based upon alleged vicarious liability for the alleged acts or omissions of Kellaway. It is plaintiff's burden in this matter to effectively prove a bailment case against Kellaway which would, in turn, result in Maersk recovering by way of full indemnity against Kellaway. Maersk Line was a true "middleman" with respect to the inland portion of transportation as it hired Kellaway, a major trucking concern, to carry the container to Harrisburg to clear Customs and interchange it with GPS Transportation. There is no allegation that Maersk Line itself did anything wrong as the container was interchanged by Maersk Line to Kellaway in Newark, New Jersey prior to any alleged loss. All liability allegations against Maersk Line arise from Maersk's contractual relationship with Kellaway.

In these circumstances, and under the terms and conditions of the bill of lading, Plaintiff PVH must meet the following burden of proof in its liability case: (1) prove that the cargo in question was in fact loaded into the subject container which was then sealed and delivered to Maersk Line and/or its agents; (2) prove that the cargo was not returned; and (3) prove that the alleged loss of the cargo was caused by the Kellaway's failure to exercise reasonable and ordinary care while it had possession and control of the container at its Harrisburg facility.

PVH has failed in its initial burden of proof that the cargo of 374 cartons of shirts were in fact loaded inside the container when the sealed container was delivered to Maersk Line at the

port of delivery.  Conclusory statements in an affidavit submitted by a third-party cannot satisfy

PVH's burden of proof.  See: <u>Bally, Inc. v. M/V ZIM AMERICA</u>, 22 F.3d 65 (2d Cir. 1994);

<u>Intercontinental Trading Co., Inc. v. M/V ZENITH SUN</u>, 684 F. Supp. 861 (E.D. Pa. 1998);

<u>Hams Express, Inc. v. Joseph Land & Co., Inc.</u>, 506 F. Supp. 209, 214 (E.D.Pa. 1980).

It is uncontroverted that the Maersk Line container was in the possession of Kellaway at

the time the container was stolen by unknown third parties.  At the time of the theft, the container

was located at Kellaway's facility at Chambers Hill Road in Harrisburg, Pnnsylvania.  Prior to

the theft, PVH had used the Kellaway facility and did not have a problem with containers being

temporarily stored there. (VII 112-113).  The Kellaway facility was "customs bonded." (VII 318-

319).  At the time of the theft, the Kellaway facility was enclosed by a fence with three strands of

barbed wire along the top and a single gate with a chain and lock. (VII 323).  There were no

security guards at the Kellaway facility including during the time when the facility was

unmanned on the weekends from the close of business Friday until Monday morning. (VII 255-

256; 265-266).  The facility did not normally operate on weekends. (VII 257).  All Kellaway

drivers, including non-employee independent owner/operators, had the key to the lock on the

gate and could access the gate when the facility was closed at night and on the weekends. (VII

268). Kellaway did not utilize fifth wheel or pin locks at the facility. (VII 256).  There were no

security cameras or motion detectors used at the Kellaway facility. (VII 255; 265).  Kellaway did

not position the containers in the yard at the time of the theft so as to block the container doors

and block in selected containers. (VII 266).  According to Kellaway, they met U.S. Customs'

minimum security requirements. (VII 400).

In the event this Honorable Court finds that Kellaway failed to exercise reasonable care in providing security at its facility while it had possession of the container, then Maersk Line is entitled to be fully indemnified by Kellaway for any liability it might have to plaintiff together with counsel fees, expenses and costs.

## IV.    PLAINTIFF PVH HAS FAILED TO PROVE ITS DAMAGES

In the event plaintiffs are found to have made a *prima facie* case of bailment, which is denied by Maersk Line, then PVH has failed to prove its damages under the applicable law. PVH's damages claim changed just prior to the trial of this matter which resulted in the taking of the deposition of trial witness Robert Seigel on January 23, 2002.  Just prior to the January 23, 2002 deposition, computer documents were produced for the first time by PVH which, as PVH has admitted, are not linked to any specific shipment of cargo ( VI 191-193; 204-205) and are not records that were generated at the time of the subject shipment as business records.  The computer records prepared by PVH for the trial of this matter are inadmissible hearsay as they are not business records that were prepared in the ordinary course of business in connection with this particular shipment. See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F 3d 627, 632 (2d cir. 1994). The computer records prepared by PVH for the trial were prepared by PVH personnel who selected certain fields of information and the complete original tape was not introduced as evidence. (VI 207). Moreover, there is a failure of proof of authenticity and admissibility since the records constitute accumulations of hearsay within hearsay taken from other documents.  In the case at bar, PVH simply contends that the computer records as a whole

constitute business records.  There was no testimony concerning the hearsay documents, hard

copies or computer documents,  from which the data contained in the printouts was taken. Hence

Exhibits "P-103 (a)-(c)" constitute inadmissable multiple hearsay and should not be admitted as

evidence. Potamkin, supra.

When Plaintiff PVH filed its lawsuit following  the alleged loss, it claimed $89,925.30 as

damages in its Complaint. (VI 71, 77).  The $89,925.30 was also the claim amount PVH used in

submitting its claim to its own cargo insurance underwriter to obtain full reimbursement for all

losses relating to the shipment (VI 74-77).  The $89,925.30 claimed by PVH in its  insurance

claim and the Complaint included a 30.2% ($17,169.06) add-on for loss of profits. (Maersk Line

Exhibit "K").  PVH's claim figure of  $89,925.30 is based on the following items claimed by

PVH in its original statement of claim:

| | |
|---|---|
| Invoice Value: | $56,851.20 |
| Profit 30.2% | 17,169.06 |
| Freight: | 3,755.00 |
| Duty and Fees: | 12,156.04 |
| Total | $89,925.30 |

(Maersk Line Exhbit "K").

There has been no evidence offered by PVH to show how the 30.2% ($17,169.06) profit figure

was calculated.  Moreover, PVH has never produced a purchase order or sales contract relating to

the alleged sale of this shipment to Ross Department Stores.

## A.    **Vincent Pastore - PVH Director of Import Administration**

Mr. Vincent Pastore, the PVH Director of Import Administration, admitted that it

was PVH personnel, including himself, who prepared the Statement of Claim for $89,925.30

submitted to the underwriter in 1999. (VI 74-76) ( Maersk Line Exhibit "K").  The figures were accurate and double-checked when they were submitted by PVH in 1999. (VI 76).  Pastore was never advised by anyone at PVH prior to the filing of the within lawsuit that the claim for $89,925.30 was inaccurate in any way (VI 76-77).

The cargo which is the subject of PVH claim against Maersk is an alleged shipment of 378 cartons of cotton polo shirts purchased from D.S. Clothing Limited for a total of $56,851.20. (VI 61, 74).

PVH paid a total of $15,728.50 in freight and duty and fees. (VI 61, 68).  There was no testimony by Mr. Pastore as to the basis for the profit claim of $17,169.06 (30.2%). No documentary evidence was submitted by PVH with respect to the $17,169.06 claim for profit other than the PVH Statement of Claim. (Maersk Line Exhibit "K").

Pastore had no personal knowledge as to whether the goods were ever loaded into the container. (VI 82).  PVH claims that the container was stuffed by its own agent, "Merchantile" (VI 81-82).  PVH's agent also sealed the container and provided the description of the goods set forth on the bill of lading (VI 85-87).  The description was not accepted by Maersk Line and Maersk Line was under no responsibility whatsoever in respect of the description of the goods. (VI 86-87). (Maersk Line Exhibits "A" and "B").

PVH's Pastore testified that the purchase order between PVH and its ultimate customer was provided to someone through Pastore's department. (VI 91).  The terms and conditions of the purchase order were unknown to Pastore. (VI 91).  Pastore has never seen the master contract between PVH and the alleged ultimate customer, Ross Department Stores. (VI 91).  PVH's rights

with respect to the cancellation or replacement of shipments under the applicable contracts were unknown to Pastore. (VI 91).

Pastore and PVH were fully aware before the container left Pakistan that it was going to temporarily stop in Harrisburg at the Kellaway facility to clear Customs. (VI 92). PVH was similarly aware that once the shipment cleared Customs at Kellaway it would be interchanged to GPS Transportation and brought to the PVH warehouse in Reading. (VI 92). PVH had previously used both Kellaway and GPS Transportation. (VI 92-93). Pastore admitted that PVH could have directed that the Kellaway Harrisburg facility not be used, however, PVH had no problem with the facility being used because they, PVH, had experienced no prior problems there. (VI 113).

The container in question was not designated by PVH as "hot" for immediate delivery. (VI 96). Short-sleeve cotton polo shirts are considered to be a year-round item. (VI 90). It was admitted by Pastore that it was possible for PVH to ship 378 cartons containing 12,000 cotton polo shirts via air freight if a shipment had to be expedited. (VI 97). Pastore had no knowledge of any steps taken by PVH to mitigate their losses or arrangements made by PVH to obtain a replacement shipment. (VI 99).

### B.    Robert Seigel, Former Manager for Customer Service for Izod

In an attempt to increase PVH's claim for lost profits, PVH's Robert Seigel, the former Manager for Customer Service for Izod, created computer documents which he admitted had no direct connection to the shipment which is the subject of PVH's claim. (VI 191-193, 204-

205) (Exhibit "P-103(a)-(c)").  The style number referenced in Exhibit P 103 (c), 4575267, does not match the style number set forth in the Maersk Line bill of lading, 4575270. (VI 190-193); (Exhibit "P-103(c);  and Maersk Line Exhibit "A"). The style number on the Maersk bill of lading does not match that set forth on P-88, the computer screen (Maersk Line Exhibit "A"; Exhibit P-88).

It was admitted by PVH's Seigel that he was unaware of the terms and conditions of the master contract between PVH and Ross and he did not know the terms and conditions of the purchase order between PVH and Ross. (VI 195-197).  It was not part of Robert Seigel's responsibility to determine whether Ross would accept a replacement shipment and Seigel did not know whether Ross would or would not accept a replacement shipment. (VI 198-199).  After the alleged loss of the container in June of 1999, PVH shipped other orders for the same type of cotton polo shirts to Ross pursuant to an ongoing 5-month program involving roughly 12,000 shirts per month. (VI 200).  According to Seigel's deposition testimony, the order in question was cancelled by Ross in May of 1999 prior to the alleged loss of June of 1999. (VI 203-204). PVH ships short-sleeve cotton polo shirts on a year-round basis. (VI 201).  Seigel could not link Exhibit P-88 to the Maersk shipment. (VI 204-205).  It was admitted by PVH's Seigel that Ross had the right to cancel shipments and Seigel did not know whether inventory was used to replace any part of the shipment. (VI 205-206; 125, 134).

PVH's attempt to increase its damages through newly created computer screens and computer records just prior to trial must be rejected by this Honorable Court because (1) the records are inadmissible accumulations of  hearsay which PVH admits have no direct link to the

subject shipment and which are based on accumulations of hearsay never produced with proposed Exhibit 103 (a)-(c); (2) the claim PVH actually submitted to its own cargo insurance underwriter shortly after the alleged loss is substantially less than that now claimed by PVH in the recently inflated claim; (3) PVH has failed to produce the master contract and purchase order with Ross Department Stores which PVH admits existed at least as a computer record; (4) all PVH witnesses admitted they do not know the terms and conditions of the applicable contracts between PVH and Ross; (5) all PVH witnesses admitted they do not know if Ross was ever approached by PVH to accept a replacement shipment; (6) all PVH witnesses admitted they had no knowledge concerning efforts made and steps taken by PVH to mitigate the alleged losses; (7) the style number on the inadmissible computer screens and records do not match the style number on the Maersk bill of lading; and (8) Ross had the right to cancel late orders and the subject order was, in fact, late.

It defies logic that PVH would not maximize its claim for lost profits based upon the actual purchase order and master contract between PVH and Ross at the time the claim was presented by PVH to its cargo insurer.  Certainly any purchase order and master contract should have been used to calculate the insurance claim and should have been retained by both PVH and the insurer in their respective claim files.  PVH has never produced the Ross purchase order, which, according to PVH's own witness, did in fact exist at the time of the loss. PVH's Seigel testified that the purchase order was a computer document that existed in 1999. (VI 152-153). Although PVH claims they kept their 1999 computer records on a tape, they never used the tape to printout the purchase order. They only used the tape to create the inadmissable printout for

trial.  Moreover, the fact that a record is kept or stored in a computer makes no difference. It still should have been retained and produced by PVH.  PVH has never produced the Ross master contract.  PVH has never presented the witnesses with knowledge concerning what steps, if any, were taken by PVH to approach Ross to accept replacement shipments.  The same missing witnesses would presumably have knowledge concerning whether Ross agreed to some other type of arrangement with PVH not involving the actual replacement of the shipment.  The missing contracts could contain provisions which allowed PVH to provide a replacement shipment. The missing contracts could contain other provisions whereby PVH could have made up any alleged loss through future shipment of other styles. The complete story will never be known which is indicative of PVH's complete failure of proof on the issue of damages.

Similarly, PVH failed to put on any proof of the actual basis for the $17,169.06 in profits claimed in its original statement of claim (Maersk Line Exhibit "K") and in its Complaint. Neither Pastore nor Seigel testified as to how the $17,169.06 was calculated.  It is the owner of the cargo that must carry the burden of proving damages resulting from cargo loss or damage. Pacol (Canada) Ltd. v. M/V MINERVA , 523 F. Supp. 579, 582 (S.D. N.Y. 1981).  Generally, damages for the loss of cargo are based upon the fair market value of the cargo at destination. Id "Courts have also used the invoice price of the cargo as an alternative reference point in determining value when the fair market value at destination was uncertain or not proved." Id at 523 F. Supp. at 582 citing: Itoh v. Hellenic Lines, Ltd. 470 F. Supp. 594, 598 (S.D. N.Y. 1979); Tatlow & Pledger, Ltd. v. Herman Forwarding Co., 456 F. Supp. 351 (S.D. N.Y. 1978). It is the

cargo claimant who has the burden of proving that the claimed amount was not realizable by the substitution of other goods. Pacol, supra 523 F. Supp. at 582.

Moreover, the applicable Maersk Line bill of lading at clause 7, sub-paragraph 2 excludes lost profits as an item of damage:

> "Save as otherwise provided herein, the carrier shall in no circumstances be liable for direct or indirect or consequential loss or damage arising from any other cause."
>
> (Maersk Line Exhibits "A" and "B").

Lost profits such as those now claimed by PVH are, by definition, consequential losses and damages specifically excluded by clause 7, sub-paragraph 2 of the bill of lading. See: Mojica v. Autoridad De Las Navieras De Puerto Rico, 1994 A.M.C. 1316, 1993 W.L. 724807 (D.P.R. 1993).

Since there has been a complete lack of proof by PVH with respect to fair market value at destination and lost profits, the maximum damages recoverable by PVH in this matter is the invoice value, $56,851.20, the entitlement to said recovery being specifically denied by Maersk Line.

## V.    MAERSK LINE IS ENTITLED TO FULL INDEMNITY FROM KELLAWAY BASED UPON BOTH THE UIIA AND THE APPLICABLE LAW

### 1.    The UIIA

Both Maersk and PVH were signatories to the Uniform Intermodal Interchange Agreement (UIIA). (Maersk Line Exhibit "T") (V II 311 - 313). The rights and liabilities of

Maersk Line and Kellaway in this matter are governed by said agreement. See Mack vs. Consolidated Rail Corp., 24 F. Supp. 2d 126, 128 (D. Mass. 1998); Clement vs. Consolidated Rail Corp., 1989 W.L. 145018 at *3 (D.N.J. 1989).  On June 17, 1999, Kellaway Transportation took possession of the container in the port of Newark, New Jersey in order to transport the container to Harrisburg, Pennsylvania where the container was to clear Customs and be interchanged  to GPS Transportation for transport to PVH's facility in Reading.   (Maersk Line Exhibits "C" and "E").  Kellaway Transportation took the container to Harrisburg, Pennsylvania for Customs clearance, however, Kellaway never interchanged the container with GPS Transportation.

(VII 389, 390).  According to Kellaway, the container was stolen while the container was in Kellaway's possession sometime between 6:00 p.m. Friday night, June 18, 1999 and 4:30 p.m. on Sunday, June 20, 1999.

Pursuant to the applicable UIIA Agreement, Kellaway agreed to defend, hold-harmless and fully indemnify Maersk Line against any loss, damage or liability, including reasonable attorneys' fees and costs arising out of Kellaway's negligence, acts or omissions during the time period in question.  The indemnity provision set forth in the UIIA Agreement at Section III. 7 (d) provides as follows:

> "**Indemnity**:  Motor Carrier agrees to defend, hold-harmless and fully indemnify Provider, Equipment Owner, and/or Facility Operator as their interests appear, against any and all loss, damage or liability, including reasonable attorneys' fees and costs incurred in the enforcement of this agreement, suffered by Provider, Equipment Owner, and/or Facility Operator arising out of Motor Carrier's negligent or intentional acts or omissions during an Interchange and/or presence on Facility Operator's premises."

(Maersk Line Exhibit "T," Section III.7 (d)).

The UIIA also specifically required Kellaway to provide a legal defense to Maersk Line at  Section III 7 (e):

> "Motor Carrier shall provide legal defense to Provider, Equipment
> Owner and/or Facility Operator for any claim arising against Motor
> Carrier under Section III. 7 .d."

(Maersk Line Exhibit "T," Section III. 7 (e)).

Plaintiff PVH has alleged that the loss of the container was caused by Kellaway's negligent failure to provide adequate security while the container was in Kellaway's care, custody and control.  It is uncontroverted that any alleged loss occurred while the container was in the possession of Kellaway. In these circumstances, any liability that Maersk might have to plaintiff, said liability being denied,  can only be based upon vicarious liability for the alleged negligent acts of Kellaway.  In the event this Court finds that Kellaway negligently provided inadequate security at its Harrisburg facility which resulted in the theft of the containers, Maersk Line will be entitled to full indemnity from Kellaway under the UIIA for any liability that Maersk Line may have to plaintiffs, together with counsel fees and expenses.

In the case of Clement vs. Consolidated Rail Corporation, 1989 W.L. 145018  D. N.J. 1989) ocean carrier American President Lines, Inc. ("APL") was found to be entitled to full indemnification from inland carrier Conrail under the UIIA. The Clement case involved an indemnity claim filed by APL against Conrail for death claims filed against APL by a decedent's estate. The decedent was killed when he struck an APL chassis in Conrail's possession at a Conrail terminal while operating a pick-up truck.  The chassis involved in Clement was

interchanged the day before the accident by APL to its trucker who, in turn, interchanged the equipment to Conrail at the Conrail terminal where the chassis was to have eventually been placed on a railcar for transportation by Conrail. The Court found that at the time of the accident the chassis had been interchanged to Conrail notwithstanding the fact that the chassis was being stored at the Conrail terminal at the time of the accident. The Court stated the following with respect to when an interchange of equipment occurs under the UIIA:

> "The transfer of equipment from carrier or mode of transportation to another is referred to as an interchange. An interchange occurs when one carrier gives possession of its equipment to another for use in the transportation of cargo."

> Id at 1989 W.L. 135018 *2.

In the case at bar, similar to the situation in Clement, the possession of the container had not yet been transferred from one carrier or mode of transportation (Kellaway) to another (GPS Transportation). Accordingly, the loss occurred during the "interchange period" for which Kellaway was responsible under the UIIA. This is supported by Kellaway's own document (Exhibit K-5) which indicates that one Kellaway transportation employee turned the container over to a second Kellaway transportation employee (VI 387, 389). It was conceded by Kellaway's McLaughlin that Kellaway's own "Pro Bill" (Maersk Line Exhibit "P") also only references "Kellaway Transportation, Inc." (VII 383-387). Moreover, the container remained in the possession of Kellaway Transportation at the facility leased by Kellaway Transportation. (VII 384-387, 389-390). The Interchange Period is defined by the UIIA as: "The period, commencing upon interchange to Motor Carrier and concluding upon interchange to Provider." (Maersk Line Exhibit "T," Section II. I.). In this case, the "Provider" would be Maersk Line or its designated

trucker, GPS Transportation. The possession of the container was never transferred to Maersk Line or GPS. At the time of the alleged loss, it was Kellaway Transportation who had exclusive possession, custody and control of the container. In these circumstances, Maersk Line is entitled to full indemnity including counsel fees and expenses in the event of a finding that Kellaway was negligent while caring for the container.

Under the Maersk Line Addendum to the UIIA and Section III (7)(f)(1-4) Kellaway was required to provide insurance to cover its indemnity obligations under the UIIA. (Maersk Line Exhibit "T"). Additionally, the Maersk Line Addendum to the UIIA specifically required Kellaway to obtain Motor Truck Cargo Insurance covering all risks of loss or damage to cargo in an amount not less than fifty-thousand dollars ($50,000) per occurrence with said policy naming Maersk Line as an additional insured. (Maersk Line Exhibit "T"). Despite the fact that the defense of this matter was tendered to Kellaway, (Maersk Line Exhibit "N") neither Kellaway nor any insurance company acting on behalf of Kellaway, has provided a defense or an agreement to indemnify Maersk Line pursuant to the terms of an insurance policy as required by the Maersk Line Addendum to the UIIA. Kellaway C.O.O. McLaughlin admitted in his trial testimony that insurance naming Maersk Line as an additional insured should have been obtained by Kellaway. (VII 391-396). In these circumstances, Kellaway breached the UIIA requirement to provide insurance and should be required to (1) indemnify Maersk Line for any liability it might have in this matter to plaintiff and (2) pay for all defense costs and expenses, including counsel fees, just as if the required insurance policy was in effect. Kellaway's liability to Maersk for breach of its insurance obligations under the UIIA Addendum is not dependent upon the

plaintiff prevailing in this matter. (Maersk Line Exhibit "T," Maersk Line Addendum pages 504 through 506).

> **2.** **Maersk Line Indemnity Under the Applicable Law**

Any liability that Maersk Line might have to plaintiff, said liability being denied, can only be based upon vicarious liability for the alleged acts or omissions of Kellaway. It is undisputed that Kellaway refused to take over Maersk Line's defense. In this matter there is no allegation by PVH that Maersk Line itself was negligent. All allegations against Maersk Line are based entirely on its contractual relationship with Kellaway. The claims against Maersk Line were triggered by the loss of the container by Kellaway while said container was in Kellaway's possession. In these circumstances, Maersk Line would be entitled to full indemnity plus counsel fees and expenses based upon the general rule allowing indemnity for secondarily/vicariously liable parties under the Third Circuit case of SPM CORPORATION vs. M. V. MING MOON, 22 F. 3d 523, 526 (3rd cir. 1994). Alternatively, Maersk Line is entitled to full indemnity from Kellaway based upon Kellaway's breach of its warranty of workmanlike service. See: Compania Sud Americana de Vapores v. ITO Corp. of Baltimore, 940 F. Supp. 855, 863 (D.MD 1996).

## VI.    KELLAWAY'S PROPOSED EXHIBIT "K-5" IS NOT AN AUTHENTIC VERSION OF THE DOCUMENT AND IS INADMISSABLE

At the trial of this matter Kellaway attempted to introduce a version of K-5 which had photocopied onto the reverse side alleged terms and conditions which did not match up with the front of the document and appeared to come from an alleged "exemplar" marked by Kellaway as Exhibit "K-1." The alleged exemplar (Exhibit K-1) is in fact not a blank example of form used

to issue K-5. (See generally: VII 342-344, 362-371). Maersk Line's objection to this exhibit was brought to the Court's attention at the Pretrial Conference, held on January 8, 2002 and the Court indicated that if Kellaway planned to use the reverse side of K-5 they should produce a blank copy of K-5. This was never done.

The purported reverse side of K-5 clearly is not part of the original document as the company names are different and the forms are clearly for different purposes, one for entry of the container into the Kellaway terminal (front of K-5) and the other for warehousing (the alleged reverse side of K-5 and reverse side of K-1). It was admitted by Kellaway's McLaughlin that the company name that appears on the front of K-5 is "Kellaway Terminal Services, Incorporated" whereas the front and back of the blank form K-1 and the purported reverse side of K-5 refer to "Kellaway Intermodal & Distribution Systems, Inc." (VI 363-366). The purported and inadmissible reverse side of K-5 does not mention Kellaway Terminal Services, Inc., the company named on the front. (Exhibit "K-5"). McLaughlin admitted that the front of the blank form Exhibit K-1 specifically states in bold letters in the lower right-hand corner: **"ISSUED SUBJECT TO ALL TERMS AND CONDITIONS INCLUDING LIMITATION OF LIABILITY ON REVERSE SIDE HEREOF, SAID TERMS AND CONDITIONS CONSTITUTE A CONTRACT TO WHICH STORER AGREES BY ACCEPTANCE OF THIS RECEIPT."** The front page of Exhibit K-5 contains no such language. Instead, K-5 states in the lower right- hand corner: **"I HEREBY CERTIFY THAT ON THE DATE STATED ABOVE, THE PERSON WHO MADE THE INSPECTION COVERED BY THIS REPORT WAS COMPETENT AND QUALIFIED TO MAKE SUCH INSPECTION**

**AND WAS DULY AUTHORIZED TO MAKE SUCH INSPECTION AND TO TAKE POSSESSION OF SUCH EQUIPMENT AS A REPRESENTATIVE OF THE ACQUIRING CARRIER."** There is no reference anywhere on K-5 to any terms and conditions on the reverse side. (VII 367). There is no question that the title at the top of K-5, "Equipment Interchange Receipt and Surety Inspection Report," is different from that at the top of K-1 which is entitled: "Non-Negotiable Warehouse Receipt, Equipment Interchange Receipt and Safety Inspection Report. (Compare: Exhibit K-5 to Exhibit K-1.) The K-1 alleged exemplar also has designations of "CARRIER COPY," "STEAMSHIP LINE COPY" and "INVOICE COPY" on the front in the lower right-hand corner. No such designations are on the front of K-5. If K-5 is truly like K-1, which is denied, then Mr. McLaughlin should have the original carbon copy of K-5 in his records which has not been produced.

Although at trial McLaughlin claimed someone sent the "TIR" to the "steamship company," at his deposition McLaughlin testified that the "TIRs and the Pro would go to the file room to be filed away by the six-digit container number and by the month the move was done." (VII 480-482). It was admitted by McLaughlin at trial that he did not know for a fact whether the TIR (K-5) was ever sent to Maersk Line. (VII 365-368). It was also admitted by McLaughlin that he had never personally seen the actual reverse side of K-5 (VI 368). McLaughlin also admitted that he did not make the photocopy of the purported reverse side of K-5 that Kellaway was attempting to introduce and had no idea what document it came from. (VII 373). The circumstances under which the duplex copy of K-5 was made have still not been explained by Kellaway. Particularly revealing is the fact that McLaughlin and Kellaway did not produce a

blank copy of the business form used when the front of K-5 was actually issued. (VII 366). The alleged K-1 "examplar" is clearly <u>not</u> the K-5 form. It is clear from an examination of the front of K-5, the purported reverse side of K-5, and K-1, that the purported reverse side of K-5 could not have been part of the authentic document. In these circumstances, the reverse side of K-5 should be ruled inadmissable because it has not been authenticated, it constitutes inadmissable hearsay, is irrelevant, and its probative value outweighed by its prejudicial effect.

Although the purported reverse side of K-5 is clearly not part of the actual document and inadmissable, it would have no application to this case and is, therefore, irrelevant. First, the alleged terms on the purported reverse side of K-5 only reference limitations and terms applicable to a company by the name of "Kellaway Intermodal & Distribution Systems, Inc." This specifically named company had no involvement with the container and is not referenced at all on the front of K-5. In fact, McLaughlin himself admitted that an employee of Kellaway Transportation, Inc. issued the front of K-5 to another employee of Kellaway Transportation, Inc. (VII 386-389). There is absolutely no evidence whatsoever that Kellaway Intermodal Distribution Systems, Inc. was ever involved on June 17, 1999 when the front of K-5 was issued. Second, there is no evidence that K-5 was issued to Maersk Line on June 17, 1999 and, accordingly, it would have been impossible for Maersk Line to agree to any alleged terms and conditions. The document is signed by a Kellaway Transportation, Inc. employee. (VII 389). Third, the terms and conditions clearly pertain to warehousing and all of the paragraphs refer to "warehouseman". (K-1 terms and conditions.) There is no evidence that the subject container or its alleged contacts ever entered the warehouse at the Kellaway facility. The only evidence is

that the container stayed in the container yard. Fourth, the terms of the UIIA govern the rights and liabilities of Maersk Line and Kellaway. Fifth, there is no evidence that Maersk Line every received, let alone accepted, the alleged terms. Finally, the alleged terms cannot be enforced as a matter of law because the facts establish that they were never presented to or accepted by Maersk Line. (See: <u>Adams v. Ryan & Christie Storage, Inc.</u>, 563 F. Supp. 409, 410-11 (E.D. Pa. 1983); 13 Pa. C.S.A. § 7204. In the event that the alleged terms are somehow found to apply, which is denied, then Maersk Line's liability to plaintiff PVH would similarly be limited by the terms pursuant to paragraph 5 of the Maersk Line Bill of Lading. (Maersk Line Exhibits "A" and "B").

## VII.    CONCLUSION

Under the terms of the Maersk Line bill of lading, plaintiff's claim must be based upon Pennsylvania state law on bailment. It is uncontroverted that any loss of the container occurred while the container was in the possession of Kellaway. Hence, it is plaintiff's burden to effectively prove a bailment case against Kellaway. Maersk Line was a true middleman, as there is no allegation that Maersk Line itself did anything wrong prior to the container being placed into the possession of Kellaway, who was supposed to interchange the container with GPS Transportation. All liability allegations against Maersk Line arise out of Maersk Line's contractual relationship with Kellaway. In the event this Honorable Court finds that Kellaway failed to exercise reasonable care at its facility while it had possession of the container, then Maersk Line is entitled to be fully indemnified by Kellaway for any liability it might have to plaintiff together with counsel fees, expenses and costs. Maersk Line is entitled to full

PBH: 148988.1

indemnification from Kellaway based upon the UIIA and the applicable law allowing such indemnity for defendants that are held secondarily/vacariously liable.

Kellaway must fully indemnify Maersk Line for both defense costs and counsel fees and expenses because it failed to obtain and provide insurance coverage for Maersk Line.  Such liability by Kellaway to Maersk Line is not dependent upon the plaintiff prevailing.  Maersk Line is entitled to be reimbursed for its full defense just as if the proper insurance had been obtained for Maersk Line by Kellaway.

Plaintiff's claim for damages must be limited to the invoice value of the shipment because plaintiff failed to prove fair market value and failed to produce the purchase order. Moreover, the Maersk Line bill of lading excludes a claim for consequential damages such as lost profits.

Kellaway's Exhibit "K-5" is inadmissible because, inter alia, it is not an authentic document.

Respectfully submitted,

PALMER-BIEZUP & HENDERSON LLP

By: _____
Richard Q. Whelan - I.D. #35688
Attorney for Third-Party Defendants
956 Public Ledger Building
620 Chestnut Street
Philadelphia, PA 19106
(215) 625-9900

Dated:  April 11, 2002

PBH: 148988.1

-24-

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that service of a true and correct copies of Defendant/Third-Party Plaintiff DAADS' (t/a Maersk Line) Memorandum of Law On Entitlement To An Award of Attorneys' Fees, Second Amended Findings of Fact and Conclusions of Law and Post-Trial Brief was made to the below-listed counsel on April 11, 2002 via Hand Delivery.

George R. Zacharkow, Esquire
Mattioni Ltd.
399 Market Street, 2nd Floor
Philadelphia, PA 19106

Carl H. Delacato, Esquire
Hecker, Brown, Sherry & Johnson
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103

Ann-Michele G. Higgins, Esquire
Rawle & Henderson LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107

Patrick J. Keenan, Esquire
Duffy & Keenan
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, PA 19106

PALMER BIEZUP & HENDERSON LLP

By: _____
        William E. Ecenbarger, Jr.
        Attorneys for DAADS t/a Maersk Line
        620 Chestnut Street
        956 Public Ledger Building
        Philadelphia, PA 19106-3409
        (215) 625-9900

PBH: 145518.1

13