IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILLIPS-VAN HEUSEN CORP.,             :        CIVIL ACTION NO.:1:CV00-0665
            Plaintiff,                 :
    vs.                                :
                                       :
MITSUI O.S.K. LINES LTD.,              :
            Defendant/Third-Party Plaintiff,   :
    v.                                 :
KELLAWAY INTERMODAL & DISTRIBUTION     :
SYSTEMS, INC.,                         :
            Third-Party Defendant.     :

## SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF THIRD-PARTY DEFENDANT, KELLAWAY

Third-party defendant, Kellaway Intermodal & Distribution Systems, Inc. ("Kellaway"),

respectfully requests that this Honorable Court enter the following findings of facts and conclusions

of law:

## I.    FINDINGS OF FACTS

1.    Phillips-Van Heusen Corporation ("PVH") is a Delaware corporation.  (N.T., p. 43).

2.    PVH is a seller of retail clothing, and has distribution and sales facilities at various

locations around the country, including Reading, Pa.  It purchases the clothing from manufacturers

around the world, including some in Indonesia and Pakistan.  (N.T., p. 43-44, 53-54, 98).

3.    Mitsui O.S.K. Lines, Ltd. ("Mitsui") is a foreign corporation which operates as a

common carrier for hirer by ocean and other intermodal forms of conveyance.  Mitsui was the carrier

of some of the container shipments at issue in this action.  (N.T., p. 53).

4.      Maersk is a foreign corporation which operates as a common carrier for hirer by ocean and other intermodal forms of conveyance. Maersk was the carrier of one of the container shipments at issue in this action. (N.T., p. 53).

5.      Kellaway is a corporation with a principal place of business in Randolph, Massachusetts. (N.T., p. 441).

6.      Kellaway has several operating divisions, including a terminal operator, air freight operator, intermodal operator, logistics company and warehousing. (N.T., p. 316).

7.      On December 1, 1995, Kellaway began to operate a container yard at 4390 Chambershill Road, Harrisburg, Pa. (N.T., p. 387, 455-456).

**A.      The Transport Of The Subject Containers**

8.      In 1999, PVH sought to transport four containers of shirts from overseas manufacturers to its warehouse in Reading, Pa. (N.T., p. 48, 52-58, 495; plaintiff's exhibits 28-30, 67).

9.      PVH knew that the transported goods would need to clear United States Customs in Harrisburg, Pennsylvania before being delivered to its warehouse in Reading, Pa. (N.T., p. 92, 114).

10.      There were two reasons why the goods needed to clear customs in Harrisburg and not in Reading. First, the goods needed to clear customs in a customs bonded container yard, and PVH's warehouse in Reading was not a bonded customs facility. Second, the container yard must be within fifty miles of a United States Customs office, and there is a customs office in Harrisburg but not in Reading. (N.T., p. 87-88, 112).

11.      PVH arranged for the shipment of the containers through Merchantile Logistics. (N.T., p. 110).

12.    PVH designated its warehouse in Reading as the point of final destination.  (N.T., p. 94).

13.    In 1999, Merchantile Logistics had standard operating procedures that it followed with respect to PVH.  (N.T., p. 110).

14.    Under those standard operating procedures, Kellaway's container yard in Harrisburg, Pennsylvania was a designated container yard for goods needing to clear customs in the Harrisburg area.  (N.T., p. 113).

15.    PVH also had annual shipping agreements with various steamship companies including Mitsui and Maersk.  (N.T., p. 53).

16.    Through Merchantile Logistics, PVH contracted with Mitsui and Maersk to ship the involved containers from overseas to PVH's warehouse in Reading.  (N.T., p. 48, 52-56, 64, 485; plaintiff's exhibits 28-30, 67).

17.    This is referred to as a "store to door delivery."  (N.T., p. 55, 64).

18.    On May 16, 1999, Mitsui issued bill of lading number 460156264, bill of lading number 460155893 and bill of lading number 460156258 to PVH, for three container shipments that it received from Busana Rama.  These bills of lading indicated that Mitsui agreed to transport the container shipments from Indonesia to the United States, and deliver them to PVH's warehouse in Reading, Pennsylvania.  (N.T., p. 48, 52-56, 495; plaintiff's exhibits 28-30).

19.    Mitsui bill of lading number 460156264 acknowledged receipt of container number MOLU 0112686.  (Id.)

20.    Mitsui bill of lading number 460155893 acknowledged receipt of container number MOLU 0102585.  (Id.)

-3-

21.     Mitsui bill of lading number 460156258 acknowledged receipt of container number MOLU 0004465.  (Id.)

22.     On May 18, 1999, Maersk issued bill of lading number MAEUYCGJ 05408 for a container shipment that it received and agreed to transport from Pakistan to the United States, and deliver to PVH's warehouse in Reading, Pa.  (N.T., p. 58, 495; plaintiff's exhibit 67).

23.     Maersk bill of lading number MAEUYCGJ 05408 acknowledged receipt of container number GSTU 2848676.  (Id.)

24.     The Mitsui containers were transported by steamship from Indonesia to Long Beach, California, and then by rail to Kearny, New Jersey.  (N.T., p. 107; plaintiff's exhibits 32 and 33).

25.     The Maersk container was transported by steamship from Pakistan to Newark, New Jersey.  (Plaintiff's exhibit 68).

26.     On June 9, 1999, Mitsui issued a work order to Kellaway that requested Kellaway to transport, by truck, container numbers MOLU 010258, MOLU 000446 and MOLU 011268 from Kearny, New Jersey to Kellaway's container yard in Harrisburg, Pennsylvania.  (N.T., p. 345-346, 505; Kellaway's exhibit K-13).

27.     On June 15, 1999, Maersk issued a work/delivery order to Kellaway requesting Kellaway to deliver, by truck, container number GSTU 2848676 from Sea-Land's terminal in Newark, New Jersey to Kellaway's container yard in Harrisburg, Pa.  (N.T., p. 340; Kellaway's exhibit K-2).

28.     The decision to use Kellaway's container yard in Harrisburg so that the goods could clear customs was made by Mitsui and Maersk, not Kellaway.  (N.T., p. 112, 437, 463).

-4-

29.     On June 15, 1999, Kellaway picked up container numbers MOLU 0112686, MOLU 0102585 and MOLU 0004465 from the terminal at Kearny, New Jersey and transported them to its container yard at 4390 Chambershill Road, Harrisburg, Pa. (N.T., p.347-348, 355; Kellaway exhibits K-16 and K-27).

30.     On June 17, 1999, Kellaway picked up container number GSTU2848676 from the terminal at Newark, New Jersey and transported it to its container yard at 4390 Chambershill Road, Harrisburg, Pa. Maersk was charged $265 for the hauling of the container. (N.T., p. 341, 344-345, 385; Kellaway exhibit K-5).

31.     On June 15, 1999, Kellaway issued an Equipment Interchange Receipt and Safety Inspection Report to Mitsui for container number MOLU 0102585. (N.T., p. 344-345, 352, 354, 358-360, 461; Kellaway exhibit K-16; plaintiff's exhibit 38).

32.     On June 15, 1999, Kellaway issued an Equipment Interchange Receipt and Safety Inspection Report to Mitsui for container number MOLU 0112686. (N.T., p. 344-345, 355-356, 358-360, 461; Kellaway exhibit K-27; plaintiff's exhibit 36).

33.     On June 17, 1999, Kellaway issued an Equipment Interchange Receipt and Safety Inspection Report to Maersk for container number GSTU2848676. (N.T., p. 341, 344-345, 354, 358-360; Kellaway exhibit K-5; plaintiff's exhibit 78).

34.     As part of its normal business operations, Kellaway sends the original Equipment Interchange Receipt and Safety Inspection Report to the steamship company with its bill, and it only retains a copy. (N.T., p. 332, 345, 440).

35.     Kellaway exhibits K-5, K-16 and K-27 are true and correct copies of the Equipment Interchange Receipt and Safety Inspection Reports issued by Kellaway to Mitsui and Maersk for the involved containers. (N.T., p. 354).

36.     Neither Mitsui nor Maersk presented any testimony that they did not receive exhibits K-5, K-16 or K-27, or that those exhibits were inconsistent with the Equipment Interchange Receipt and Safety Inspections Reports they did receive for the involved containers.

37.     The interchange occurs the minute the truck arrives at the container yard. (N.T., p. 332, 358-360).

38.     In 1999, Kellaway did not charge for storage of containers at its container yard in Harrisburg. (N.T., p. 331).

39.     Kellaway did charge an interchange fee for inspecting the equipment and reporting any damage to the containers at the time of the interchange. (N.T., p. 331).

40.     In 1999, Kellaway's interchange charge ranged from $4.00 to $7.00 per container. (N.T., p. 331).

41.     Once the Mitsui and Maersk containers arrived at Kellaway's container yard in Harrisburg, Kellaway was not responsible for obtaining customs clearance for the containers. (N.T., p. 114).

42.     Once the containers cleared customs, Kellaway was not responsible for transporting the containers from the container yard to PVH's warehouse in Reading, Pa. (N.T., p. 116-117).

43.     Once the containers cleared customs, they were to be transported by GPS Transport from the Harrisburg container yard to PVH's warehouse in Reading. (N.T., p. 116-117).

44.     GPS Transport was hired by Mitsui and Maersk. (N.T., p. 71).

-6-

45.    Normally, PVH requires an appointment to be made before a container can be delivered to its Reading warehouse.  (N.T., p. 96).

46.    GPS Transport was responsible for setting up the appointment to deliver the containers from the Harrisburg container yard to the Reading warehouse.  (N.T., p. 97).

47.    Mitsui container numbers MOLU010258, MOLU011268 and MOLU0004465 were cleared by United States Custom on June 16, 1999.

48.    Maersk container number GSTU2848676 was cleared by United States Customs prior to June 18, 1999.  (N.T., p. 114).

**B.    Kellaway's Container Yard In Harrisburg, Pennsylvania**

49.    Kellaway's container yard in Harrisburg was rectangular in shape and was about 7,000 to 8,000 square feet.  In 1999, three Kellaway employees worked at the container yard: a dispatcher, office clerk and terminal manager.   (N.T., p. 317-318, 441).

50.    In the industry, the container yard was considered small. (N.T., p. 283, 461).

51.    Kellaway container yard had a perimeter fence, three strands of barbed wire along the top of the fence, a gate that was lockable with a chain and lock, and lights.  (N.T., p. 321, 325, 268, 272-273).

52.    There were sets of lights on the two corners of the loading dock that shined from the building into the container yard.   (N.T., p. 273, 323, 325).

53.    The container yard was a customs bonded yard. (N.T., p. 317-318).

54.    Prior to its Harrisburg container yard receiving the status of a customs bonded facility, United States Customs required a particular type of security at the yard.   (N.T., p. 318-321).

55.     Kellaway's container yard met or exceeded the requirements set forth by the United States Customs service in order to obtain a bond for that facility.   (N.T., p. 317-318).

56.     If required by United States Customs, Kellaway would have installed additional security.   (N.T., p. 321).

57.     Prior to June 1999, PVH had visited Kellaway's container yard in Harrisburg.  (N.T., p. 325).

58.     Prior to June 1999, PVH had used Kellaway's Harrisburg container yard for non-store to door deliveries.   (N.T., p. 92, 94, 326).

59.     Prior to June 1999, PVH never criticized the level or type of security at Kellaway's container yard in Harrisburg.   (N.T., p. 117-118, 329-330).

60.     Kellaway never represented to PVH that additional security would be added to the Harrisburg container yard.   (N.T., p. 327).

61.     Prior to June 1999, PVH never requested that additional security be added to Kellaway's container yard.   (N.T., p. 326, 329).

62.     PVH had knowledge regarding the operation of container yards since it had several of its own container yards throughout the country.   (N.T., p. 118-121).

63.     PVH believes that it has taken reasonable measures to secure containers in its own container yards.   (N.T., p. 119).

64.     PVH has a container yard in Schuylkill Haven, Pennsylvania, at which containers are kept overnight.   (N.T., p. 119, 122-123).

65.     Security at that container yard is limited to a fence without barbed wire. (N.T., p. 123).

-8-

66.     Containers are also kept overnight at PVH's Reading container yard.  (N.T., p. 121-122).

67.     PVH's Reading container yard does not even have a perimeter fence, nor are there any employees at that yard on weekends.  (N.T., p. 122, 214).

68.     PVH never had any prior problems with shipments that had been handled by Kellaway.  (N.T.,p. 274-275).

69.     Prior to June 1999, Manohar Patwardhan of Mitsui had been to Kellaway's container yard in Harrisburg on three or four occasions.  (N.T., p. 462).

70.     Mr. Patwardhan was the Regional Equipment Control Manager at Mitsui since 1991, and he was responsible for reviewing Mitsui's use of container yard facilities.  (N.T. , p. 460).

71.     On his first visit, Mr. Patwardhan spent three or four hours at Kellaway's container yard.  (N.T., p. 462).

72.     Mr. Patwardhan had seen the fence at the container yard, and it met with the requirements of Mitsui.  (N.T., p. 463).

73.     He understood that the container yard did not have security cameras.  (N.T., p. 463).

74.     He had no knowledge of the container yard having 24 hour security guards.  (N.T., p. 463).

75.     Prior to June 1999, Mitsui never criticized the level or type of security at Kellaway's Harrisburg container yard.  (N.T., p. 329-330).

76.     Prior to June 1990, Kellaway never represented to Mitsui that it would provide additional security at its Harrisburg container yard.  (N.T., p. 332-333).

77.    Prior to June 1999, Maersk never criticized the level or type of security at Kellaway's Harrisburg container yard.   (N.T., p. 329-330).

78.    Prior to June 1990, Kellaway never represented to Maersk that it would provide additional security at its Harrisburg container yard.   (N.T., p. 332-333).

79.    Kellaway performs a criminal history check on all drivers that it hires, and Kellaway does not hire drivers that do not meet the standards of the United States Customs. (N.T., p. 408).

C.    **Kellaway Had No Notice Of Criminal Activity In The Harrisburg Area**

80.    Kellaway had no notice of criminal activity targeting container yards in the Harrisburg area.   (N.T., p. 334, 463).

81.    Generally, cargo thefts are rare.   (N.T., p. 213).

82.    Although Kellaway had sustained cargo thefts at some of its other facilities, those facilities were in Massachusetts, Rhode Island and New Jersey.   (N.T., p. 447-448).

83.    Kellaway began to operate its container yard in Harrisburg in 1995.   (N.T., p. 448-449).

84.    Between 1995 and June 1999, Kellaway did not have any cargo thefts at its Harrisburg container yard.    (N.T., p. 449).

85.    The container thefts that are the subject of this action were the largest cargo thefts in Swatara Township in at least 20 years.   (N.T., p. 275).

86.    Prior to the thefts, Kellaway did not know the value of the goods inside the three stolen containers.   (N.T., p. 433).

-10-

**D.**      **The Container Thefts**

87.      Container numbers MOLU0112686, MOLU0102585 and GSTU2848676 were stolen from Kellaway's container yard in Harrisburg sometime between 6:00 p.m. on Friday, June 18, 1999, and about 4:50 p.m. on Sunday, June 20, 1999.   (Kellaway exhibit K-49).

88.      The container yard was secured by a Kellaway employee at 6:00 p.m. on June 18, 1999 for the weekend.   (Kellaway exhibit K-49).

89.      The containers were discovered missing by a truck driver who was picking up a container at the container yard on June 20, 1999.   (N.T., p. 258, 247; Kellaway exhibit K-49).

90.      The theft was organized and planned.  (N.T., p. 286).

91.      The thieves had tools, knew how to hot wire and operate tractor-trailers, and knew beforehand where they intended to take the stolen containers.  (N.T., p. 287).

92.      The chain and lock to the container yard gate were removed.   (Kellaway exhibit K-49).

93.      The thieves also made a "V" shaped cut through the fence measuring about 2 feet by 2 feet.   (N.T., p. 275; Kellaway exhibit K-49).

94.      The thieves also cut the bolt seals on the back doors of about ten containers.   (N.T., p. 277-278; Kellaway exhibit K-49).

95.      The thieves also punched out the ignitions and hot wired two tractors at the Kellaway container yard, and another tractor at the nearby terminal of Timeway Trucking.  (N.T., p. 276-278).

96.      The thieves knew how to operate the tractors and hook them up to the three stolen containers.   (N.T., p. 287).

97.     The thieves drove the three tractors and containers to New York, which is approximately 214 miles from the Harrisburg container yard.   (N.T., p. 278).

**E.     The Security At Kellaway's Container Yard Was Reasonable And Not The Proximate Cause Of PVH's Damages.**

98.     PVH has not asserted any direct claims against Kellaway.

99.     Mitsui and Maersk have asserted third-party claims against Kellaway.

100.    Neither Mitsui nor Maersk presented any evidence that the security at Kellaway's container yard was unreasonable and the proximate cause of the container thefts.

101.    PVH presented the expert testimony of Arthur Dunn.

102.    Mr. Dunn conceded that container thefts can occur at container yards that have reasonable security.  (N.T., p. 233, 291-292).

103.    Mr. Dunn was retained by PVH's insurer, Atlantic Mutual Insurance Company, to investigate the container thefts.   (N.T., p. 248).

104.    Atlantic Mutual Insurance Company is the real party in interest, as they have made an insurance payment to PVH for the container thefts.   (N.T., p. 123-124).

105.    Mr. Dunn has worked for Atlantic Mutual in at least 20 other losses.  (N.T., p. 271).

106.    Mr. Dunn claims that the security at Kellaway's container yard was unreasonable for the following reasons:

- The containers were parked too close to the fences which would enable a would-be thief to actually use the fence to get on a container.   (N.T., p. 265).
- Insufficient lighting.   (N.T., p. 265).
- The absence of security cameras and motion detectors.   (N.T., p. 265).
- The absence of 24 hour a day security guards.   (N.T., p. 265).
- Containers not being placed back to back.   (N.T., p. 266).
- The absence of kingpin locks on the containers.   (N.T., p. 266).

-12-

107.    As for the location of the containers next to the fence, there is no evidence that the thieves needed to get <u>on</u> a container or use the fence for that purpose.

108.    The thieves entered the container yard by cutting the fence as well as the lock and chain on the gate.    (Kellaway exhibit K-49).

109.    They entered the containers by cutting the bolt seals on the container doors.  (N.T., p. 277-278; Kellaway exhibit K-49).

110.    As for the alleged insufficient lighting, plaintiffs and third-party plaintiffs did not present any demonstrative evidence of insufficient lighting.

111.    PVH's expert, Mr. Dunn, could have photographed or videotaped the container yard during his inspection in order to show that the lights were insufficient at that time, but he did not do so.

112.    Instead, the evidence showed that Kellaway had two sets of lights that projected into the container yard at the time of theft.   (N.T., p. 273, 323, 325).

113.    As for the use of cameras and motion detectors, these are not the standard of care for a small container yard in a low crime area.

114.    PVH and Mitsui knew that the container yard did not have cameras and motion detectors, and Kellaway never represented to any of the parties that it had or would provide such security.   (N.T., p. 92, 94, 325-327, 332-333, 462-463).

115.    Even large container yards do not use cameras.   (N.T., p. 339).

116.    Mr. Dunn testified that he had worked for the Conrail Police Department, and that Conrail's Beacon Park container yard in Boston was within his jurisdiction.  (N.T., p. 228-229, 289).

-13-

117.    Mr. Dunn testified that Conrail prides itself in having "very secure yards".  (N.T., p. 233).

118.    The Beacon Park container yard was about 50 acres, and it was not fence nor did it have closed circuit cameras.  (N.T., p. 337-339).

119.    As for the use of 24 hour security guards, this is not the standard of care for a small container yard in a low crime area.

120.    PVH does not use 24 hour security guards at its container yards in Schuylkill Haven or Reading.  (N.T., p. 123, 214).

121.    PVH and Mitsui also knew that Kellaway's container yard did not have 24 hour security, and Kellaway never represented to any of the parties that it had or would provide such security. (N.T., p. 92, 94, 325-327, 332-333, 462-463).

122.    As for the placement of containers back to back, this would not have prevented the thefts in such a small container yard.  (N.T., p. 335).

123.    The thieves stole three tractors.  If the containers were back to back, the thieves could have simply used the tractors to pull the containers away from each other.   (N.T., p. 288-289, 335).

124.    Since Kellaway did not know the value of the containers, it would not have known whether to block in these containers or use them to block in some of the other containers in the yard. (N.T., p. 433).

125.    As for the use of kingpin locks, this would not have prevented the thefts.  (N.T., p. 288, 334-335).

126.    Thieves know that kingpin locks are sometimes used on containers, and they can be removed with a sledge hammer.  (N.T., p. 288, 334, 335).

-14-

127.    This theft was organized and planned, and the thieves brought tools with them. The use of kingpin locks would not have prevented the theft.   (N.T., p. 287).

128.    Kellaway had proper and adequate security at its Harrisburg container yard in June 1999.  (N.T., p. 400).

129.    Kellaway would "absolutely not" have been able to operate the Harrisburg container yard profitably if it implemented all of the security measures suggested by PVH's expert.  (N.T., p. 441-442, 436).

130.    Kellaway's Harrisburg container yard only generated gross revenues of $300,000. (N.T., p. 457).

131.    Kellaway had to close the container yard because it was unprofitable.  (N.T., p. 441).

132.    Kellaway is able to provide such additional security measures (guards, cameras, and sensors) in its very large facility in Randolph, Massachusetts due to the volume of business it does there.  (N.T., p. 441, 447).

**F.    The Uniform Intermodal Interchange Agreement Does Not Apply to This Loss**

133.    At the time of the container thefts, Kellaway was a signatory to the Uniform Intermodal Interchange Agreement ("UIIA").  (N.T., p. 357).

134.    Kellaway signed the UIIA in 1990.   (N.T., p. 360-361).

135.    Mitsui exhibit "D " is a copy of the UIIA with a purported addendum.  (N.T., p. 471).

136.    The copy of the addendum is incomplete.   At least 514 pages are missing from the addendum.  (N.T., p. 471).

137.    Mitsui could not explain the content of those missing pages.  (N.T., p. 471).

-15-

138.    Kellaway never receive a copy of the addendum to the UIIA with Mitsui.   (N.T., p. 361-362, 472).

139.    The UIIA provides:

d.    Indemnity.  Motor Carrier agrees to defend, hold harmless, and fully indemnify Provider, Equipment Owner, and/or Facility Owner, as their interests appear, against any and all loss, damage or liability, including reasonable attorneys fees and costs incurred in the enforcement of this Agreement, suffered by Provider, Equipment Owner and/or Facility Operator <u>arising out of Motor Carrier's negligent or intentional acts or omissions during an Interchange Period</u> and/or presence on Facility Operator's premises.

(Maersk exhibit "I"; Mitsui exhibit "D").  Uniform Intermodal Interchange Agreement, 2/1/96 at III(7)(d) (emphasis added).

140.    Under the UIIA, Kellaway can only be held liable for losses arising out of its negligence or intentional acts during an Interchange Period.    "Interchange Period" is defined as "[t]he period, commencing upon Interchange to Motor Carrier and Concluding upon Interchange to Provide." (Maersk exhibit "I", section III (7)(d) and II(I).

141.    The stolen containers were interchanged at the Harrisburg container yard before they were stolen. (N.T., p. 356, 358-360).

142.    Since the containers were interchanged before being stolen, the UIIA does not apply here.

143.    Since Kellaway was not negligent, the UIIA does not apply here.

144.    Per the terms of the UIIA, Kellaway obtained cargo insurance that covered the stolen containers during hauling, and Maersk and Mitsui were named as additional insureds. (N.T., p. 391-392, 447).

-16-

145.    However, the cargo insurance would not apply to this loss since the containers were interchanged and no longer being hauled at the time of the theft. (N.T., p. 447).

**G.    Claimed Damages Of PVH**

146.    In its complaint, PVH claimed that the damages it sustained due to the theft of Maersk container number GSTU2848676 was $86,925.30.    (N.T., p. 71).

147.    The invoice value of the goods in that Maersk container was $56,851.20 according to a statement of claim submitted by PVH to its cargo insurer, Atlantic Mutual Insurance Company. (N.T., p. 74; Maersk exhibit "K").

148.    In its complaint, PVH claims that the damages it sustained due to the theft of Mitsui container numbers MOLU0102585 and MOLU0112686 total $204,236.23.    (N.T., p. 76; Maersk exhibit "K").

149.    The invoice value of the goods in those Mitsui containers totaled $127,169.92 according to a statement of claim submitted by PVH to its cargo insurer, Atlantic Mutual Insurance Company.  (N.T., p. 76; Maersk exhibit "K").

150.    In calculating its damages in the statement of claim submitted to its cargo insurer, Mitsui added a profit figure of 30.2% to the invoice values, and PVH believed that figure to be accurate.  (N.T., p. 75-76).

151.    In preparing that figure, PVH was attempting to collect as much as it could under its cargo insurance policy with Atlantic Mutual Insurance Company.    (N.T., p. 123-124).

152.    PVH's business records show that the total units of shirts in the stolen containers was 9,180; the total value of those shirts was $130,448.00; and the total costs of those shirts was $92,718.00. (N.T., p. 170).

153.   The containers were being sent from the overseas manufacturers to PVH's Reading warehouse by regular delivery.   (N.T., p. 109).

154.   The shirts in those containers were not seasonal.   (N.T., p. 90, 106, 201).

155.   PVH did not take any steps to mitigate its losses.   (N.T., p. 99, 212).

156.   The stolen shirts are made by different companies throughout the world. (N.T., p. 98).

157.   PVH did not contact any factories in order to determine whether the lost shipments could be replaced.   (N.T., p. 99).

158.   PVH did not contact any of its intended purchasers to determine whether they would be willing to place an order for a substitute shipment of the stolen shirts.   (N.T., p. 209).

159.   PVH does not know whether its intended purchasers actually submitted orders to PVH that were intended to substitute for the stolen shirts.   (N.T., p. 99-100, 205, 212-213).

160.   PVH admits that it does not know if it lost money as a result of having the orders for the stolen shirts cancelled.   (N.T., p. 171).

## II.   CONCLUSIONS OF LAW

161.   Under all of the evidence and the applicable law, defendant Kellaway Intermodal & Distribution Systems, Inc. is not liable.

### A.   The UIIA

162.   Defendants Mitsui and Maersk claim that Kellaway is liable to them under the Uniform Intermodal Interchange Agreement. The agreement provides:

> d.   Indemnity.   Motor Carrier agrees to defend, hold harmless, and fully indemnify Provider, Equipment Owner, and/or Facility Owner, as their interests appear, against any and all loss, damage or liability, including reasonable attorneys fees and costs incurred

-18-

in the enforcement of this Agreement, suffered by Provider, Equipment Owner and/or Facility Operator <u>arising out of Motor Carrier's negligent or intentional acts or omissions during an Interchange Period</u> and/or presence on Facility Operator's premises.

(Maersk exhibit "T"; Mitsui exhibit "D"), Uniform Intermodal Interchange Agreement, 2/1/96 at III(7)(d) (emphasis added).

163.   Under the Uniform Intermodal Interchange Agreement, Kellaway can only be held liable for losses arising out of its negligent or intentional acts during an Interchange Period.  An "Interchange Period" is as defined as "[t]he period, commencing upon Interchange to Motor Carrier [i.e., Kellaway] and Concluding upon Interchange to Provider [Mitsui and Maersk]."  *See* Uniform Intermodal Interchange Agreement, 2/1/96 at III(7)(d) and II(I).

164.   Kellaway issued Equipment Interchange Receipts to Mitsui on June 15, 1999, and an Equipment Interchange Receipt to Maersk on June 17, 1999 for the three stolen containers. Therefore, as of June 15, 1999, the Interchange Period between Kellaway and Mitsui had concluded, and as of June 17, 1999, the Interchange Period between Kellaway and Maersk had concluded. (N.T., p. 332, 344-345, 352, 354-356, 358-360, 461; Kellaway exhibits K-5, K-16 and K-27). Uniform Intermodal Interchange Agreement, 2/1/96 at II(I).  *See also*, Equipment Interchange Receipt and Safety Inspection Report at ¶1.

165.   Upon issuance of the Interchange Receipts on June 15, 1999 to Mitsui and on June 17, 1999 to Maersk, Kellaway became a warehouseman.  (Kellaway exhibits K-5, K-16, and K-27, Equipment Interchange Receipt and Safety Inspection Report at ¶1).

166.   The Equipment Interchange Receipt issued by Kellaway to Mitsui and Maersk provides as follows:

-19-

> The warehouseman [i.e. Kellaway] shall not be liable for any loss, damage or destruction to goods, however caused unless such loss, damage or destruction resulted from the warehouseman's failure to exercise such care in regard to the good as a reasonably careful man would exercise under the circumstances.

(Kellaway exhibits K-5, K-16 and K-27, Equipment Interchange Receipt and Safety Inspection Report at ¶4).

167.    Under the Uniform Intermodal Interchange Agreement and/or under the Interchange Receipt, Kellaway can only be held liable if it was negligent. (Maersk exhibit "T", Mitsui exhibit "D"; Kellaway exhibits K-5, K-16 and K-27). *See* Uniform Intermodal Interchange Agreement, 2/1/96 at III(7)(d). *See also*, Equipment Interchange Receipt and Safety Inspection Report at ¶4.

168.    Kellaway was not negligent.

**B.    <u>Bailment Principles</u>**

169.    In addition to the Equipment Interchange Receipt, the relationship Kellaway had with Mitsui and Maersk is guided by the Pennsylvania common law regarding bailments.

170.    Under Pennsylvania law, a "bailment is a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to [its] directions or kept until [it] reclaims it." <u>Buckley v. Exodus Transit & Storage Corp.</u>, 744 A.2d 298, 306 (Pa. Super. 1999).

171.    A bailor [i.e. Mitsui and Maersk] establishes a case for the value of unreturned bailed property by showing their delivery of goods to the bailee [i.e. Kellaway] and the bailee's failure to redeliver the goods upon the bailor's demand. <u>Moss v. Bailey Sales and Service, Inc.</u>, 123 A.2d 425, 426 (Pa. 1956).

172.    In order to be relieved from liability, it then becomes the bailee's [i.e. Kellaway's] burden to show that the goods were lost and the manner in which they were lost - i.e., theft. Moss v. Bailey Sales and Service, Inc., 123 A.2d 425, 426-27 (Pa. 1956), *quoting* Schell v. Miller North Broad Storage Co., 16 A.2d 680, 683-84 (Pa. Super. 1940).

173.    Once the bailee [i.e. Kellaway] establishes this, the burden of going forward with evidence to prove that the loss was due to the bailee's negligence is upon the bailor [i.e., Mitsui and Maersk]. Moss v. Bailey Sales and Service, Inc., 123 A.2d 425, 426, 428 (Pa. 1956) (citations omitted).

174.    As a bailee, Kellaway was required to exercise ordinary diligence and was responsible for ordinary negligence. Lear, Inc. v. Eddy, 749 A.2d 971, 974 (Pa. Super. 2000).

175.    Where it makes sense for a bailee to take any care at all, the care that should be taken will depend upon the circumstances, considering the risks, the precautions available, and the costs of such precautions. Ferrick Excavation v. Senger Trucking, 484 A.2d 744, 750 (Pa. 1984).

176.    A warehouseman is only liable for damages for loss of or injury to the goods in its custody caused by its failure to exercise such care in regard to them as a reasonable careful person would exercise under like circumstances, but unless otherwise agreed, it is not liable for damages which could not have been avoided by the exercise of such care. 13 Pa. C.S.A. §7204(a).

177.    There is no presumption or inference that Kellaway was negligent arising from the mere fact that the property was stolen while in its possession. Moss v. Bailey Sales and Service, Inc., 123 A.2d 425, 428 (Pa. 1956) (citations omitted).

-21-

178.    Mitsui and Maersk have also made allegations regarding the security that was provided at Kellaway's facility.  Under Pennsylvania law, there is no general duty of a land owner to protect its property against criminal intrusion.  Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984).

179.    If a land owner voluntarily offers a program to protect the premises, the land owner must perform the task in a reasonable manner.  Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984).

180.    Parties such as Mitsui and Maersk may rely upon a program of protection only within the reasonable expectations of the program, and they may not expect more than is offered.  Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984).

181.    A land owner is not and cannot be expected to defeat all criminal intentions.  Feld v. Merriam, 485 A.2d 742, 747 (Pa. 1984).

182.    Kellaway breached no duty to Mitsui or Maersk, and Kellaway was not negligent. As was previously stated, Kellaway's container yard had reasonable security in relation to its size and location, and the other parties were aware of the security at the yard and did not object prior to the theft in June 1999.  Kellaway never represented that the security was other than what existed in June 1999.

183.    In the alternative, should this Court conclude that Kellaway did not act in a reasonably prudent manner, Kellaway's conduct was not a "substantial contributing factor" to Mitsui and Maersk's damages because the harm would have been sustained even in the absence of Kellaway's conduct.  Witner v. Von Hintz, 263 A.2d 889, 894 (Pa. 1970); Ford v. Jeffries, 379 A.2d 111 (Pa. 1977); Majors v. Brodhead Hotel, 205 A.2d 873, 877 (Pa. 1965); Henry v. McCrudden, 575 A.2d 666, 669 (Pa. Commw. 1990), appeal denied 585 A.2d 470 (Pa. 1990).

184.    Mitsui and Maersk have not and cannot prove that Kellaway's conduct, in relation to the alleged damages, was "so significant and important a cause that [Kellaway] should be legally responsible". Novack v. Jeannette District Memorial Hospital, 600 A.2d 616, 618 (Pa. Super. 1991). Therefore, Mitsui and Maersk cannot recover from Kellaway.

185.    Mitsui and Maersk have not and cannot establish by a preponderance of the evidence that the injuries allegedly sustained by them were caused as a result of the negligence of Kellaway and/or that Kellaway's negligence was the proximate cause of their injuries.

186.    Kellaway exercised ordinary care in this matter, and judgment should be entered in favor of Kellaway.

**C.    Damages**

187.    No damages will be presumed.  Damages must be proved by legally sufficient evidence and must be shown to have arisen out of a defendant's negligence. Maxwell v. Schafer, 112 A.2d 69, 73 (Pa. 1955).

188.    Mitsui and Maersk  have the burden of establishing damages by a preponderance of the evidence.

189.    The Equipment Interchange Receipt issued by Kellaway to Mitsui and Maersk limits liability as follows:

> The liability of the warehouseman [i.e. Kellaway] as to each container or trailer
> stored is limited to the actual value of the contents of said container or trailer but not
> to exceed one hundred times the amount of the daily warehouse/yard storage rate for
> each such container or trailer stored or ONE THOUSAND ($1000) DOLLARS,
> whichever is less. In no event shall the liability of the warehouseman [i.e. Kellaway]
> exceed the actual value of the goods nor include any loss of profit or collateral or
> consequential damages.

-23-

(Kellaway exhibits K-5, K-16, and K-27, Equipment Interchange Receipt and Safety Inspection Report at ¶3). Therefore, even if this Court concludes that Kellaway is liable to either Mitsui or Maersk, neither Mitsui or Maersk may recover more than $1,000 for the contents in each of the stolen containers.

190.    Mitsui and Maersk are not entitled to recover for any economic losses such as lost profits, unexpectedly expended services, or labor costs. Constar, Inc. v. Nat'l. Distribution Centers, Inc., 101 F.Supp.2d 319, 322 (E.D. Pa. 2000) (Holding that the economic loss doctrine "prohibits recovery in tort for economic losses to which the party's entitlement 'flows only from a contract.'" Id. at 322 (citations omitted). "The economic loss doctrine permits recovery in negligence only for damage to property or injury to person." Id.)

191.    Damages that are uncertain, contingent or speculative are not recoverable. Weinglass v. Gibson, 155 A. 439, 440 (Pa. 1931).

192.    Plaintiff had a duty to mitigate damages, and plaintiff cannot recover for lost profits or other damages that it failed to mitigate. Northeastern Vending Co. v. P.D.O., Inc., 414 Pa. Super. 200, 204, 606 A.2d 936, 938 (1992).

193.    Plaintiff is not entitled to alleged lost profits for the stolen goods.

WHEREFORE, this Honorable Court is respectfully requested to enter judgment in favor of additional defendant, Kellaway Intermodal & Distribution Systems, and against third-party plaintiffs.

Respectfully submitted,
DUFFY & KEENAN

BY: _____
PATRICK J. KEENAN, ESQUIRE
Attorney for Third-Party Defendant
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, Pa. 19106
(215) 238-8700

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILLIPS-VAN HEUSEN CORP.,      :    CIVIL ACTION NO.: 3:CV00-0665
      Plaintiff,      :

vs.      :
      :
MITSUI O.S.K. LINES LTD.,      :
      Defendant/Third-Party Plaintiff,      :

v.      :
KELLAWAY INTERMODAL & DISTRIBUTION :
SYSTEMS, INC.,      :
      Third-Party Defendant.      :

### CERTIFICATE OF SERVICE

I, PATRICK J. KEENAN, ESQUIRE, do hereby certify that I have served a copy of the attached Supplemental Proposed Findings of Fact and Conclusions of Law of Third-Party Defendant, Kellaway, by first class mail, on the date indicated below to the following:

Ann-Michele Higgins, Esquire
Charles W. McCammon, Esquire
Rawle & Henderson, LLP
The Widener Building
One South Penn Square
Philadelphia, Pa 19107

George R. Zacharkow, Esquire
Mattioni Ltd.
399 Market Street, 2nd Floor
Philadelphia, Pa 19106

Frederick E. Blakelock, Esquire
Carl H. Delacato, Jr., Esquire
Hecker, Brown, Sherry & Johnson
1700 Two Logan Square
18th & Arch Streets
Phila., Pa 19103

Richard W. Whalen, Esquire
William E. Ecenbarger, Jr., Esquire
Palmer, Biezup and Henderson
956 Public Ledger Building
620 Chestnut Street
Philadelphia, Pa 19106

DUFFY & KEENAN

BY:      _____
      PATRICK J. KEENAN, ESQUIRE
      Attorney for Third-Party Defendant
      The Curtis Center, Suite 1150
      Independence Square West
      Philadelphia, Pa. 19106
      (215) 238-8700

Date: 4-12-02