# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILLIPS-VAN HEUSEN CORP.,        :    CIVIL ACTION NO.: :CV00-0665
        Plaintiff,        :
    vs.        :
        :
MITSUI O.S.K. LINES LTD.,        :
        Defendant/Third-Party Plaintiff,  :
    v.        :
KELLAWAY INTERMODAL & DISTRIBUTION  :
SYSTEMS, INC.,        :
        Third-Party Defendant.  :

**FILED**
HARRISBURG, PA

SEP 2 4 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## THIRD-PARTY DEFENDANT, KELLAWAY INTERMODAL & DISTRIBUTION SYSTEMS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PETITIONS FOR ATTORNEY FEES OF THIRD-PARTY PLAINTIFFS

Pending before this Honorable Court are the petitions for attorney fees of third-party plaintiffs, Maersk Line, Inc. ("Maersk") and Mitsui O.S.K. Lines, Ltd. ("Mitsui"). Maersk seeks attorney fees and costs amounting to $71,572.35, and Mitsui seeks attorney fees and costs amounting to $66,809.36. The petitions should be denied. Both Maersk and Mitsui incurred these fees in defending the breach of contract claim of plaintiff, Phillips-Van Heusen ("PVH"), and in attempting to establish their claim for indemnity under the Uniform Intermodal Interchange Agreement. The third-party defendant, Kellaway Intermodal & Distribution Systems, Inc. ("Kellaway"), is not obligated to reimburse third-party plaintiffs for fees and costs incurred for such purposes.

### A. Kellaway Should Not Be Required To Indemnify The Third-Party Plaintiffs For Attorney Fees Incurred In Defending PVH's Breach of Contract Claims

PVH sued both third-party plaintiffs, Maersk and Mitsui, for breach of contract. In its Memorandum Findings of Facts Conclusions of Law, this Honorable Court concluded that the

liability of Maersk and Mitsui to PVH was contractual.  (Memorandum Findings of Fact Conclusions of Law at 11, 17-18, 31, attached as Exhibit "A").  By issuing bills of lading to PVH, both third-party plaintiffs contractually "promised to transport the containers from their points of origin all the way to PVH's warehouse in Reading."  (Memorandum Findings of Fact Conclusions of Law at 17-18, 31).  Moreover, the extension of the Carriage of Goods by Sea Act, 46 U.S.C. §1300 et seq, to the land transport of the containers was also contractual.  (Memorandum Findings of Fact Conclusions of Law at 11-12).  See also Hartford Fire Insurance Company v. Orient Overseas Containers Lines, 230 F.3d 549, 557 (2d Cir. 2000).

Under COGSA, third-party plaintiffs were strictly liable to PVH for the stolen goods.  PVH only had to prove that it delivered the cargo in good condition to the vessel and that the cargo was not delivered to the final destination.  See Theyssen, Inc. v. S/S Eurounity, 21 F.3d 533, 538 (2d Cir. 1994); Hartford Fire Insurance Company v. M/V OOCL Bravery, 79 F.Supp. 2d 316, 324 (S.D. N.Y. 1999).  Moreover, a clean bill of lading is prima facie evidence of delivery in good condition. Theyssen, Inc., 21 F.3d at 538.  The ocean carrier's liability is premised on contractual commitment, as set forth in the bill of lading, to deliver the shipper's cargo to the intended destination.  See Cavcar Co. v. M/V Suzdal, 723 F.2d 1096, 1101 (3d Cir. 1983).

Kellaway was not a party to the contracts that PVH had with Maersk and Mitsui.  (N.T., p. 65).  Unlike the third-party plaintiffs, Kellaway never contractually assumed a duty to PVH to deliver the containers to the Reading warehouse.  As the inland transporter and warehouseman of the cargo, Kellaway was "not liable ex contractu for the breach of the contract between the disclosed principal and a third party, even when the breach was the result of its own wrongful act."  M/V OOCL Bravery, 79 F.Supp. 2d at 325, quoting Leather Best, Inc. v .S/S Mormaclynx, 451 F.2d 800, 808 (2d Cir. 1971).  Kellaway's status was, at most, that of an agent of Maersk and Mitsui and as a bailee of the containers.  See Leather Best, Inc., 451 F.2d at 808.  As a bailee, Kellaway could

-3-

only be found liable for the stolen cargo if the theft resulted from its negligence. Moss v. Bailey Sales & Services, Inc., 123 A.2d 425, 426, 428 (Pa. 1956). Kellaway was only required to exercise ordinary diligence and was responsible for ordinary negligence. Lear, Inc. v. Eddy, 749 A.2d 971, 974 (Pa. Super. 2000); 13 Pa. C.S.A. §7204(a). Moreover, there could not be any presumption or inference that Kellaway was negligent arising from the fact that the cargo was stolen while in its possession. Moss, 123 A.2d at 428.

In seeking attorney fees, third-party plaintiffs rely upon the Uniform Intermodal Interchange Agreement ("UIIA"). That agreement provides inter alia:

> Indemnity Motor Carrier agrees to defend, hold harmless, and fully indemnify Provider, Equipment Owner, and/or Facility Operator, as their interests appear, against any and all loss, damage or liability... arising out of Motor Carrier's negligent or intentional acts or omissions during an Interchange Period and/or presence on Facility Operator's premises.

(Maersk trial Exhibit "T"; Mitsui trial Exhibit "D"). The agreement cannot be construed to impose a duty upon Kellaway to defend Maersk or Mitsui for PVH's breach of contract claims. To hold otherwise would be inconsistent with the terms of the agreement, and it would impermissibly impose an obligation upon Kellaway regardless of its fault.

Under Pennsylvania law,[1] liability under an indemnity agreement is determined by the intent of the parties, and the agreement is to be strictly construed against the party seeking its protection and is to be limited in scope to matters expressly covered therein. Fulmer v. Duquesne Light Company, 374 Pa. Super. 537, 546, 543 A.2d 1100, 1104 (1988), appeal denied 522 Pa. 576, 559 A.2d 38 (1989); Warren City Lines, Inc. v. United Refining Company, 220 Pa. Super. 308, 316, 287 A.2d 149, 153 (1971). "Indeed, because the nature and purpose of any indemnity agreement involves the shifting and voluntary assumption of legal obligations, they are to be narrowly construed. As a general rule, parties must use clear, unambiguous language to ensure their

---

[1]This Honorable Court has held that Pennsylvania law governs this action. (Memorandum Findings of Fact Conclusions of Law at 14).

enforcement." Jacobs Constructors, Inc. v. NPS Energy Services, Inc., 264 F.3d 365, 373 (3d Cir. 2001).

Moreover, an agreement to indemnify another for his contractual liability to a third-party "will not be inferred and must be stated expressly, clearly, and unequivocally in an indemnity clause." Jacobs Constructors, 264 F.3d at 371. This is because such an obligation imposes an "unusual" and "extraordinary" obligation to indemnify, regardless of the fault of the indemnitor. Id. To hold otherwise "would be to transform definitive indemnification agreements to open ended guarantees in the nature of insurance policies." Id. at 374.

In this case, the UIIA provides that Kellaway would defend Maersk and Mitsui "against any and all loss, damage or liability... arising out of Motor Carrier's negligent or intentional acts or omissions...." This language comports with the reasonable understanding that Kellaway would defend Maersk or Mitsui against tort claims arising from its negligence. Thus, if Kellaway were involved in a motor vehicle accident while using the equipment of Maersk or Mitsui, Kellaway would defend them against any claims of negligence by an injured third party. This makes sense since any potential liability of Maersk or Mitsui would be purely secondary to the potential liability of Kellaway, and Kellaway would not be increasing its potential liability by assuming the defense of Maersk or Mitsui.

However, the UIIA does not "clearly and unequivocally" express an understanding that Kellaway would defend third-party plaintiffs against claims for breach of contract. The UIIA indemnity clause fails to reference contractual liability claims in any meaningful way. The requirement for unequivocal language is particularly suited for this situation. Kellaway was not even a party to the contracts (bills of lading) that PVH had with Maersk and Mitsui. (N.T., p. 65). Thus, it could not and did not know the liability that Maersk or Mitsui had contractually assumed. (N.T., p. 63, 433). For example, Kellaway would not know whether Maersk or Mitsui had extended

-5-

the provisions of COGSA to the land transport of the cargo.    Kellaway naturally assumes
responsibility for its own negligence, but it did not assume an obligation to defend Maersk or Mitsui
for claims of breach of contract that would impose liability upon Kellaway regardless of whether it
was negligent.    Such a shifting of responsibility is the type of "unusual" and "extraordinary"
occurrence that cannot be accomplished with the vague language set forth in the UIIA indemnity
clause.    Accordingly, Kellaway did not have a duty to defend third-party plaintiffs against PVH's
claims for breach of contract, nor should Kellaway be required to reimburse them for such attorney
fees and costs.

All of the third-party plaintiffs attorney fees and costs were incurred in either defending the
breach of contract claims of PVH or attempting to establish Kellaway's liability for the loss.    The
third-party plaintiffs did not incur those fees and costs by defending tort claims based upon
Kellaway's alleged negligence.    In fact, apparently recognizing that they were strictly liable under
their contracts with PVH, the third-party plaintiffs retained experts and argued throughout this case
that the theft of the containers resulted from Kellaway's negligence.    Thus, third-party plaintiffs'
petitions should be denied.

**B.    Kellaway Is Not Required To Indemnify The Third-Party Plain-
tiffs For Attorney Fees And Expenses Incurred In Attempting To
Establish Kellaway's Liability**

Other than defending the breach of contract claims of PVH, all of the attorney fees and
expenses of Maersk and Mitsui were incurred in their effort to establish their indemnity claim
against Kellaway. Under Pennsylvania law, an indemnitee may not recover attorney fees or costs
from an indemnitor that were incurred in the indemnification litigation.  Boiler Engineering & Supply
Company, Inc. v. General Controls, Inc., 443 Pa. 44, 47, 277 A.2d 812, 814 (1971); see also
Theyssen, Inc. v. S/S Eurounity, 21 F.3d 533, 541 (2d Cir. 1994).  "The reason for this rule is that

such expenses are not part of defending the indemnified claim, but instead fall within the ordinary rule that each party bears its own expenses." 21 F.3d at 541.

This case is quite similar to Theyssen, Inc., 21 F.3d 533 (2d Cir. 1994), in which the charterer of a vessel sought indemnity from the vessel owner for damages for the shipper's cargo that resulted from the infiltration of seawater into the cargo hauls. The shipper claimed that the seawater contamination resulted from the improper maintenance of the vessel's cargo hatches and seals, and the vessel charterer claimed that the vessel owner was solely responsible for the cargo damage due to unseaworthiness under the terms of an Inter-Club Agreement between the charterer and owner. Id. at 536. The district court found that the vessel owner was "the ultimately responsible party," but the court did not rule on the charterer's claim for attorney fees and costs. Id. at 537. The court of appeals affirmed the judgment and held that the charterer was not entitled to indemnity for costs and attorney fees. In doing so, the court stated:

> [W]e conclude that no fees or costs are owing to Atlantic Lines under the circumstances here. It is well established that, "while an indemnitee may recover from his indemnitor attorneys' fees and expenses incurred in defending a claim as to which he is indemnified, he may not recover fees and expenses incurred to establish his right against the indemnitor." Id. at 315 (collecting cases). The reason for this rule is that such expenses are not part of defending the indemnified claim, but instead fall within the ordinary rule that each party bears its own expenses. Id. at 316.

> Upon a review of the record, it is evident that counsel for Atlantic Lines did not defend against the plaintiffs' seawater contamination claims at trial. His opening statement clearly indicates that the only issue of concern to Atlantic Lines was indemnification and that Atlantic Lines would not be required to respond to damages no matter what side prevailed. Moreover, counsel called no witnesses and conducted only a very limited cross-examination of two of plaintiffs' witnesses. Finally, the only exhibit submitted by Atlantic Lines was the Inter-Club Agreement, which governs indemnification between Atlantic Lines and Licetus. Because Atlantic Lines' costs thus were incurred solely with respect to resolution of the indemnity issue between it and Licetus, it is not entitled to indemnification for attorneys' fees and costs.

Id. at 541.

As in <u>Theyssen, Inc.</u>, both Maersk and Mitsui took the position at trial that they would not be required to respond to PVH's damages regardless of whether PVH could prove that Kellaway was negligent. (N.T., p. 13, 15-16, 19). Maersk did not call a single witness at trial. Mitsui called only Manohar Patwardhan as a witness at trial, and he was called to testify regarding the UIIA and alleged deficiencies in the security at Kellaway's container yard. (N.T., p. 465-470). Mitsui introduced only three exhibits at trial, and two of them related to its indemnity claim against Kellaway. (Mitsui trial Exhibits "D" and "N"; N.T., p. 499). Maersk introduced eleven exhibits at trial, and at least six of those exhibits related to its indemnity claim. (Maersk trial Exhibits "G", "N", "P", "S", "T" & "U"; N.T. p. 498).

At trial, Maersk and Mitsui never took the position that Kellaway had provided adequate security at the container yard. Mitsui did not ask any questions of PVH's liability expert (Arthur Dunn), and Maersk asked only three questions, two of which attempted to challenge the adequacy of the security at the container yard. (N.T., p. 294). Both Maersk and Mitsui spent more time cross-examining Kellaway's witness, David McLaughlin, than any other witness. (N.T., p. 362-414). Third-party plaintiffs should not be permitted to recover the attorney fees and costs incurred in their indemnification litigation. Accordingly, the petitions of the third-party plaintiffs should be denied.

**C.** **<u>Kellaway Should Not Be Required To Indemnify Third-Party Plaintiffs For Attorney Fees And Costs Based Upon The Insurance Provision In The UIIA</u>**

Maersk erroneously argues that Kellaway should be required to indemnify it for attorney fees and costs based upon the insurance provisions in the UIIA. Those provisions provide <u>inter alia</u>:

> f.    Insurance: To the extent permitted by law, Motor Carrier shall provide the following insurance coverages in fulfillment of its legal liability and contractual indemnitees:

-8-

(1)    A commercial Automobile Liability with a Combined Single Limit of $1,000,000 or greater, insuring all Equipment involved in Interchange including vehicles of its agents or contractors: said insurance policy shall name the Equipment Provider as additional insured.

(2)    A commercial General Liability with a Combined Single Limit of $1,000,000 per occurrence or greater;

(3)    Motor Carrier shall have in effect, and attached to its policy of commercial automobile liability, as described in IIIB7f(1), a Truckers Uniform Intermodal Interchange Endorsement.  Until such time as the standard endorsement form is amended to cover the indemnity assumed under IIIB7d, Motor Carrier shall use UIIE-1 dated December 1993, which is the current form.  At such time as an amended form is adopted, Motor Carrier shall, at the time of its first subsequent insurance renewal, have in effect the amended UIIE-1 form.  Evidence of the endorsement of the policy and the coverage required by this provision shall be provided to IANA by the insurance company.

(4)    IANA shall receive a minimum of thirty (30) days advance notice of any cancellation of such coverages.

(Maersk trial Exhibit "D", UIIA ¶7(f)(1)-(4)).  As was previously discussed, this provision must be strictly construed against the third-party plaintiffs.  See Fulmer v. Ducane Light Company, 374 Pa. Super. 537, 546, 543 A.2d 1100, 1104 (1988), appeal denied 522 Pa. 576, 559 A.2d 38 (1989).  By its expressed terms, the UIIA only required Kellaway to name Maersk and Mitsui as an "additional insured" in a commercial automobile liability policy.  (UIIA ¶7(f)(1)).  See Jacobs Constructors, Inc. v. NPS Energy Services, Inc., 264 F.3d 365, 375 (3d Cir. 2001) (court held that indemnitor was not required to obtain insurance for the benefit of the indemnitee's contractual liability when the indemnity agreement did not expressly require it).

The third-party plaintiffs failed to present any evidence that Kellaway did not comply with this claimed obligation.  Furthermore, there is no evidence that the claims of PVH would be covered by a commercial automobile liability policy.  Mr. David McLaughlin (Kellaway's chief operation officer) testified that both Mitsui and Maersk were named as additional insureds in its insurance policies.  (N.T., p. 392).  The insurance included cargo insurance.  (N.T., p. 447).  However, cargo

insurance only covers cargo during hauling, and Kellaway was no longer hauling the cargo at the time of its theft. (N.T., p. 447).

Moreover, an automobile liability insurance policy would not be expected to cover the container thefts. At the time of the thefts, the containers were no longer being hauled, nor were they even attached to a tractor. Instead, they were being stored at the container yard awaiting their pick up by GPS Transport. (N.T., p. 356, 358, 92, 97).

Finally, the third-party plaintiffs failed to present any evidence that Kellaway failed to report these claims to its insurers. Mr. McLaughlin testified that it was Kellaway's normal procedure to notify its insurers any time there is a loss. (N.T., p. 394). Obviously, Kellaway cannot control whether the insurers decide to accept or decline coverage. Accordingly, third-party plaintiffs are not entitled to be indemnified for their attorney fees and costs based upon the insurance provisions in the UIIA.

### D.   The Attorneys' Fees And Costs Of Third-Party Plaintiffs Are Unreasonable

The third-party plaintiffs have the burden of proving that any attorneys' fees are reasonable. McClure v. Deerland Corp., 401 Pa. Super. 226, 233, 585 A.2d 19, 23 (1991). They have failed to meet this burden. The third-party plaintiffs' own billing records show that their fees and expenses are excessive in light of the experience of the attorneys and the nature of the case. The case did not involve any novel issues of law, nor is it factually complex.

Examples of excessive billing by counsel for Maersk include the following:

- Between December 27, 2000 and April 4, 2001, Maersk counsel spent 5.7 hours researching an address for Kellaway as well as the rules for service of process. Maersk and Kellaway had a business relationship that predated this loss, and it is unreasonable to believe that Maersk did not already know Kellaway's address.

- July 4 and 5, 2001:  4.7 hours preparing a third-party complaint against J.V.E. Company, which was the landlord of the container yard.  The complaint was unreasonable and unnecessary, as was later demonstrated by Maersk's voluntary dismissal of that party.

- July 30, 2001 to August 3, 2001: Maersk's counsel spent approximately 10 hours locating and having preliminary discussions with a liability expert. Maersk never even called the liability expert to trial.

- September 7, 2001:  Maersk counsel spent approximately 3.2 hours preparing a "draft summary" of a deposition that lasted less than 6 hours, and having an interoffice meeting regarding proposed request for admissions.

- October 3, 2001: Maersk counsel spent 1.7 hours drafting a summary of a deposition that lasted less than 8 hours.

- November 21, 2001: Maersk counsel spent 1.8 hours drafting a summary of a deposition that lasted less than 8 hours.

- Between November 30, 2001 and December 7, 2001:  Maersk counsel spent approximately 16 hours conducting legal research and drafting a memorandum regarding basic issues of bailment and warehouseman's liability.

- Between December 19, 2001 and January 4, 2002, Maersk counsel spent approximately 32 hours preparing its pretrial memorandum, findings of preliminary fact and conclusions of law and its exhibit list.  This was longer than the actual trial.

- January 11, 2002:  Maersk counsel spent an 1.9 hours in additional legal research.

- January 25, 2002:  Maersk counsel billed 2.3 hours to provide a telephone status of a settlement conference that lasted less than three hours.

- February 6, 2002:  Maersk counsel performed additional legal research on basic bailment issues.

Examples of excessive billing by counsel for Mitsui include the following:

- July 12, 2001: Mitsui counsel spent 2.9 hours reviewing documents produced by Kellaway.  The document production was not in any way extensive, and Mitsui would have already been in possession of many of the documents.

-11-

- August 27 to 30, 2001:  Over 6 hours of legal research on basic issues including limitations under COGSA.  As experienced practitioners in this area of the law, the extent of research is unreasonable.

- January 6, 2001:  Mitsui's counsel billed 6.8 hours for the deposition of a representative of J.V.E. Corporation.  For the same deposition, counsel for Maersk only billed 5.9 hours.  There is no reasonable explanation for the difference except that Mitsui's counsel has excessively billed for the deposition.

- January 12, 2001:  Mitsui's counsel billed approximately 2.3 hours for preparing a summary of the deposition of J.V.E. Corporation designee.  As the deposition was less than 6 hours, the length of time spent on the summary is unreasonable.

- January 1, 2001:  Mitsui's counsel billed 4.9 hours for reviewing request for admission answers and preparing a status report to its client.  A status report was prepared (and billed 1.7 hours) just four days before.

- January 2, 2001:  Mitsui's counsel billed 11.3 hours for a deposition.  Maersk counsel billed 8.4 hours for that same deposition.  Thus, Mitsui's counsel over billed the deposition by about 3 hours.

- October 16, 2001:  Mitsui's counsel billed 3.2 hours for reviewing mostly correspondence.

- November 5, 2001:  Mitsui's counsel billed 2.3 hours for reviewing a letter and "updated discovery documents." These are administrative tasks that fail to substantiate the amount of that billing.

- November 20, 2001:  Mitsui's counsel billed 10 hours for the deposition of a witness for Kellaway.  Maersk counsel billed 8.3 hours for that same deposition.  Again, there is no justification for the additional 1.7 hours of billing.

- November 26, 2001:  Mitsui billed 3.7 hours for "investigation regarding Kellaway corporate identity."  Kellaway never made an issue of its identity in the case, and the billing is unjustified.

- December 11, 2001:  Mitsui's counsel billed 1.3 hours for reviewing correspondence and court orders.

- December 19, 2001:  Mitsui's counsel billed 3.2 hours for a phone call with plaintiff's counsel and reviewing court filings of other parties.

- December 17, 2001: Mitsui's counsel billed 5.8 hours on legal research on basic bailment issues.

- Between December 18 and January 7, 2002:  Mitsui billed nearly 56 hours for preparing its pretrial memorandum, proposed findings of fact and conclusions of law and exhibit list.  This was about twice the length of the actual trial.

- January 8, 2002:  Mitsui billed 6 hours for attending the pretrial conference. Maersk counsel billed 3.8 hours for attending the same conference.

- January 14, 2002:  Mitsui's counsel billed 6.3 hours for preparing a letter and reviewing another party's trial exhibits.

- January 25, 2002:   Mitsui billed 7.8 hours for attending a settlement conference.  Maersk counsel bill 3.1 hours for attending the same confer-ence.  There is no justification for the additional 4 hours of billing by Mitsui.

- February 4, 2002:  Mitsui's counsel billed 6.1 hours for preparing a letter and three phone calls.

- February 12, 2002:  Mitsui's counsel billed 12 hours for attending trial.  The trial lasted no more than 8 hours that day.

- February 13, 2002:  Mitsui's counsel billed 12 hours for attending trial that day, even though the trial lasted no more than 8 hours.

For the reasons previously discussed, the third-party plaintiffs are not entitled to recover their attorney fees and costs from Kellaway in this action.  Even assuming _arguendo_ that they were, they should be significantly reduced due to their unreasonableness.  Accordingly, this Honorable Court is respectfully requested to deny third-party plaintiffs' petitions for attorney fees, or in the alternative, reduce their request for attorney fees to a reasonable amount.

Respectfully submitted,

DUFFY & KEENAN

BY:_____
PATRICK J. KEENAN, ESQUIRE
Attorney for Third-Party Defendant
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, Pa. 19106
(215) 238-8700

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILLIPS-VAN HEUSEN CORP.,         :     CIVIL ACTION NO.: 3:CV00-0665
        Plaintiff,           :
    vs.                  :
                       :
MITSUI O.S.K. LINES LTD.,       :
      Defendant/Third-Party Plaintiff,  :
    v.                 :
KELLAWAY INTERMODAL & DISTRIBUTION  :
SYSTEMS, INC.,            :
        Third-Party Defendant.    :

## CERTIFICATE OF SERVICE

    I, PATRICK J. KEENAN, ESQUIRE, do hereby certify that I have served a copy of the attached Third-Party Defendant, Kellaway's , Answer and Memorandum of Law in Opposition to Third-Party Plaintiffs' Petition for Attorney Fees by first class mail, on the date indicated below to the following:

Ann-Michele Higgins, Esquire          Frederick E. Blakelock, Esquire
Charles W. McCammon, Esquire       Carl H. Delacato, Jr., Esquire
Rawle & Henderson, LLP            Hecker, Brown, Sherry & Johnson
The Widener Building              1700 Two Logan Square
One South Penn Square           18th & Arch Streets
Philadelphia, Pa 19107           Phila., Pa 19103

George R. Zacharkow, Esquire        Richard W. Whalen, Esquire
Mattioni Ltd.                   William E. Ecenbarger, Jr., Esquire
399 Market Street, 2nd Floor         Palmer, Biezup and Henderson
Philadelphia, Pa 19106           956 Public Ledger Building
                         620 Chestnut Street
                         Philadelphia, Pa 19106

               DUFFY & KEENAN

        BY: _____
             PATRICK J. KEENAN, ESQUIRE
             Attorney for Third-Party Defendant
             The Curtis Center, Suite 1150
             Independence Square West
             Philadelphia, Pa. 19106
             (215) 238-8700

Date: _9- 24-0 2_____

EX. A (79)
8/14/02
sc

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILIPS-VAN HEUSEN CORP.,  :  CIVIL ACTION NO. 1:CV-00-0665

      **Plaintiff**  :

     v.  :

MITSUI O.S.K. LINES LTD., *et al.*,  :

      **Defendants**  :

FILED
HARRISBURG, PA
AUG 1 4 2002
MARY E. D'ANDREA, CLERK
Per ___

**M E M O R A N D U M**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On February 12, and 13, 2002, the court conducted a non-jury trial in the captioned matter. The following constitute the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I.     **Findings of Fact**

    A.    **The Parties**

Plaintiff, Philips-Van Heusen Corporation ("PVH"), is a Delaware corporation with its principal place of business in New York City, New York. PVH is a clothing wholesaler who distributes, amongst other products, Izod brand men's shirts. PVH generally purchases its products from manufacturers overseas. In the normal course of its business, PVH receives purchase orders from retailers in the United States. PVH then instructs one of its overseas manufacturers to begin the work. Once PVH receives an order, it usually takes its manufacturer about four months to deliver the finished products. Because the United States Government places limits on the amount of imports that can come into the country from a

particular foreign nation, PVH has relationships with manufacturing entities in several foreign countries including Indonesia and Pakistan.

Defendant and Third-Party Plaintiff Mitsui O.S.K. Lines, Ltd. is a foreign corporation primarily engaged in shipping cargo by ocean liner steamships from one continent to another. Defendant and Third-Party Plaintiff Dampskibssekskabet Af 1912 Aktieseskab and Aktieseskabet Dampskibssekskabet Svenborg d/b/a Maersk Line, Inc. ("Maersk") is a foreign corporation engaged in the same business as Mitsui. From time to time throughout this memorandum, the court will refer to Mitsui and Maersk collectively as "the Ocean Liner Defendants."

Third-Party Defendant Kellaway Transportation, Inc. ("Kellaway") is a Massachusetts corporation with its principal place of business in Randolph, Massachusetts. Kellaway is the successor in interest to Kellaway Intermodal and Distribution Systems, Inc. and a variety of other entities bearing the Kellaway name. Kellaway's primary business operation is shipping cargo by truck between various points in the continental United States.

## B.    The Mitsui Shipments

On March 15, 1999, PVH placed several orders with the P.T. Busana Rama Textile & Garment Company ("Busana Rama") of Tangerang, Indonesia. Those orders requested that Busana Rama manufacture approximately 29,000 men's Izod sport shirts. Pursuant to an agreement between Mitsui and PVH, Mitsui shipped three of its forty foot intermodal shipping containers and three Mitsui security seals to Busana Rama to be used in packing the shirts.[1]

---

[1]Intermodal shipping containers are structural boxes that adapt easily to multiple modes o
(continued...)

2

Romel Pasaribu, Busana Rama's Assistant Warehouse Manager, supervised employees as they stuffed the three Mitsui intermodal containers with shirts manufactured by Busana Rama and consigned to PVH pursuant to the purchase orders. On May 14 and 15, 1999, Busana Rama employees stuffed: (1) Mitsui container number MOLU0112686 with 387 cartons containing 9,187 shirts and then applied Mitsui security seal number M 577397; (2) Mitsui container number MOLU0102585 with 388 cartons containing 9,268 shirts and then applied Mitsui security seal number M 577398; and (3) Mitsui container number MOLU004465 with 442 cartons containing 10,603 shirts and then applied Mitsui security seal number 577396. Pursuant to Indonesian law, a government surveyor observed the stuffing. Once the Busana Rama employees completed the task, the surveyor applied his own security seals to the container. As to container MOLU0112686, he applied seal number 1483128. As to container MOLU0102585, he applied seal number 14831805. As to container MOLU0004465, he applied seal number 14697985.

The three containers were then transported to Mitsui for shipment. On May 16, 1999, Mitsui issued the following Bills of Lading: (1) No. 460156264 pertaining to container MOLU0112686; (2) No. 460155893 pertaining to container MOLU0102585; and (3) No. 460156258 pertaining to container MOLU004465. All three documents noted the appropriate Mitsui security seal number. All three Bills of Lading indicated that the containers were delivered to Mitsui in Jakarta,

---

[1](...continued)

transportation, such as ocean vessel, rail, and motor carriage. Once the cargo is loaded into the conta[...] at its point of origin, it may be transported by sea, rail, or truck to its point of destination without hav[...] to be loaded again. This saves shippers and manufacturers the extra cost of having to re-load the carg[...] each time it switches mode of transportation.

Indonesia and subsequently loaded onto the ocean vessel APL Garnet in Singapore for transportation to Long Beach, California.  From there, the containers would be transported, eventually, to PVH's warehouse in Reading, Pennsylvania.

All three Bills of Lading contained a page of terms and conditions. Paragraph 6(3) of these terms disclaimed Mitsui's liability for consequential damages resulting from damage to, or loss of, the goods within the container. Paragraph 11(1), also states that "freight charges shall be deemed fully earned on receipt of the Goods by the Carrier, whether Goods are lost or not, and shall be paid and non-returnable in any event."  (Pl. Ex. 31 at ¶ 11(1).)  According to the Bills of Lading, PVH paid $5,870 in freight for transportation of each Mitsui container from Indonesia to Reading.  Additionally, PVH paid $13,245.51 in customs and duty charges to transport container number MOLU0112686 to the United States and $13,392.48 for the same charges as to container number MOLU0102585.  Pursuant to commercial invoices issued by Busana Rama, PVH paid $63,234 for the shirts packed in container MOLU0112686 and $63,935.84 for the shirts packed in container MOLU0102585.

The Mitsui containers arrived in Long Beach on June 5, 1999. Subsequently, Mitsui had the containers transported by rail to South Kearny, New Jersey.  They arrived in New Jersey on June 13, 1999.

C.    **The Maersk Shipment**

On February 23, 1999, PVH placed several purchase orders with D.S. Clothing, a garment manufacturer located in Lahore, Pakistan.  One of those orders requested that D.S. Clothing manufacture approximately 12,000 men's cotton Izod shirts.  On May 15, 1999, pursuant to the PVH shirt order, employees of D.S.

4

Clothing stuffed Maersk intermodal shipping container GTSU28486767 with 378 cartons containing 12,096 men's shirts. According to the commercial invoice, PVH paid D.S. Clothing $56,851.20 for the shirts.

In accordance with custom and usage for Pakistani exports, Muhammad Iqbal, an employee of Quality Services, oversaw the stuffing of the container which took place at the Qasim International Container Terminal in Karachi, Pakistan. The container was then sealed with Maersk security seal number 0110356 and delivered to Maersk for ocean shipping.

On May 18, 1999, Maersk issued Bill of Lading number MAEUYCGJ05408 for container number GSTU28486767. The document noted that security seal number 0110356 was still in place. The document further indicated that the container would be transported from Karachi, Pakistan to PVH's warehouse in Reading.

Like the Mitsui Bills, the Maersk Bill of Lading contained a page of terms and conditions governing the transportation contract. Paragraphs 7(1) and (2) of that document disclaimed Maersk's liability for consequential damages resulting from damages to, or loss of, the goods within its container. Additionally, Paragraph 14(1) indicated that the freight was deemed earned in full upon delivery of the goods to Maersk at the point of origin. PVH paid $3,755 in freight for transportation of the Maersk container from Pakistan to Reading. Additionally, PVH paid $11,973.50 in customs and duty charges to transport the Maersk container.

The Maersk container arrived at a shipyard terminal in Newark, New Jersey on June 15, 1999. When it arrived, the container still bore Maersk security seal number 0110356.

5

### D.    Kellaway's Performance

United States Department of Treasury regulations require that imported cargo clear customs inspection at a U.S. Customs bonded facility located within fifty miles of the cargo's ultimate destination. *See* 19 C.F.R. § 142 *et seq.* (2002). Because Kellaway owned such a facility in Harrisburg, Pennsylvania, both Maersk and Mitsui arranged to have the containers clear customs at Kellaway's Harrisburg facility prior to final delivery. On June 9, 1999, Mitsui issued a work order to Kellaway requesting that it transport the Mitsui containers, by truck, from New Jersey to Harrisburg. On June 15, 1999, Maersk issued a similar order. The plan was that Kellaway would transport the containers from New Jersey to Harrisburg, where, upon clearing customs, GPS Transport, a non-party to this suit hired by Maersk and Mitsui, would take possession of the containers for the final leg of the journey from the container yard in Harrisburg to PVH's warehouse in Reading.

On June 15, 1999, Kellaway drivers picked up the three Mitsui containers and delivered them to the Kellaway facility in Harrisburg. Upon arrival, Keith Walborn, a Kellaway employee issued an interchange receipt for each container. That document indicated that the seals issued by Mitsui and the Indonesian government were still in place. On June 17, 1999, a Kellaway driver picked up the Maersk container in New Jersey and delivered it to the Kellaway facility in Harrisburg. Once again, upon arrival, Walborn issued an interchange receipt which indicated that the seal placed on the container in Pakistan was still in place. On June 16 and 17, 1999, the three containers cleared customs at the Kellaway facility.

6

On Friday, June 18, 1999, at approximately 6:00 p.m., Walborn closed the Kellaway facility for the weekend. He was the last person to leave the yard. He closed the gate to the container yard and secured it with a chain and key lock. Mike McKillup, who owned the business located next to the Kellaway facility, drove by the Kellaway facility the next day and noticed that the gate to the container yard was open at that time. On Sunday, June 20, 1999, William Gross, a Kellaway truck driver, arrived at the Harrisburg facility to pick up a container for transport. At that time, he observed that approximately nine containers had been broken into, including the container that he was assigned to transport. He immediately called Kellaway's dispatcher, Scott Decker, who in turn notified Walborn of the situation.

Walborn arrived at the Kellaway facility a short time later. After conducting a brief investigation, he noted that two tractors and three intermodal containers were missing – Mitsui container numbers MOLU0112686 and MOLU0102585 and Maersk container number GSTU28486767. As previously discussed, these containers all contained cargo destined for PVH's warehouse in Reading. Additionally, Walborn noted that the chain and lock for the gate were missing. He also noticed that there was a hole in the side of the fence to the right of the fence's gate.[2] He surmised that thieves broke into the yard overnight and used the two stolen tractors, plus a third tractor missing from an adjacent lot, to haul away the three containers. Walborn then notified the Swatara Township, Pennsylvania Police and the Federal Bureau of Investigation ("FBI"). The FBI later learned that authorities in New York City discovered the three stolen tractors and intermodal containers in the Bronx between June 19 and July 2, 1999. All three

---

[2] The stolen containers were positioned between the front gate and the hole in the fence.

7

containers were discovered empty.[3]  After PVH brought suit against the Ocean Liner Defendants, both Maersk and Mitsui tendered their defenses of the case to Kellaway who refused to defend the case on their behalf.

### E.    Kellaway's Harrisburg Facility

Kellaway's customs bonded facility was located at 4390 Chambers Hill Road in Harrisburg.[4]  Kellaway began leasing the facility from Japan Vehicle Equipment, Inc. ("JVE") in December 1995.  Prior to the lease, the facility was not used as a container yard.  The terms of the lease required that Kellaway make all improvements necessary for the operation of its container yard business.

Accordingly, Kellaway installed a chain link fence around the area that it would later use as a container yard.  The fence was between six and eight feet high with three strands of barbed wire on top.  It had a gate in front through which tractor trailers could enter to drop off and pick up loads.  The gate was not controlled electronically and when the facility was closed on nights and weekends, the gate would be secured only by a pad lock and chain.  All Kellaway drivers had keys to the lot and could access the yard outside of normal business hours.

In spite of the fact that the container yard remained unmanned on the weekend, Kellaway did not install a detection and/or alarm system at the yard, nor was the yard equipped with close-circuit security monitors.  Likewise, Kellaway did not employ a security guard to man the facility during those periods or to make periodic inspections to ensure that no one had surreptitiously entered the container

---

[3]The third Mitsui container loaded by Busana Rama in Indonesia, number MOLU000446 was not stolen.  GPS delivered it to PVH's warehouse in Reading.

[4]Kellaway has since closed the facility.

8

yard. Moreover, two sets of small flood lights mounted on the rear of the building near the truck dock provided the container yard's sole source of illumination at night. Furthermore, Kellaway personnel directed truckers dropping off loads to place containers side-by-side near the chain link fence with the containers' doors exposed, and Kellaway did not place fifth wheel pin locks on any of the wheels of the trailers upon which the containers rested. There was a significant amount of brush located around the perimeter of the fence to the container yard. Finally, Kellaway had no formal procedure tracking the use of the keys that it gave to its employees.

## II.    Discussion

### A.    Subject Matter Jurisdiction

Although the parties disagree about the source of the court's subject matter jurisdiction, the true dispute involves what law should govern the parties' rights and liabilities in this matter. All parties, and the court, acknowledge that federal jurisdiction is proper in this case. At the very least, diversity jurisdiction is proper because all Plaintiffs and all Defendants in this case are from different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. Alternatively, several parties claim that the cause of action in this case raises a federal question regarding the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1300 *et seq.*, and/or federal common law. Therefore, regardless of the source of law, federal jurisdiction is proper.

9

### B.   Choice of Law

The parties, however, are in disagreement over what law is to apply in this case.  According to PVH, the complaint implicates "the General Maritime Law of the United States, as supplemented by [COGSA] . . . the Harter Act of 1893, 46 U.S.C. § 190 *et seq.*, and federal common law."  (PVH Prop. Concl. of Law at ¶4.) Mitsui contends that the contract between it and PVH requires that COGSA apply. Maersk contends that either Pennsylvania bailment law or COGSA governs PVH's claim against it.  Both Mitsui and Maersk similarly contend that Pennsylvania contract and bailment law governs their claims against Kellaway.

### 1.   The Harter Act

The Harter Act imposes a duty of "proper, loading, stowage, custody, care [and] proper delivery."  42 U.S.C. app. § 190.  COGSA partially superseded the Harter Act and now the Harter Act applies only to the period between discharge of the cargo from the vessel and "proper delivery."  *Tapco Nigeria, Ltd. v. M/V WESTWIND*, 702 F.2d 1252, 1255 (5th Cir. 1983); *see also Ace Bag & Burlap Co. v. Sea-Land Serv. Inc.*, 40 F. Supp. 2d 233, 236 (D.N.J. 1999).  Because the Harter Act does not define "proper delivery," courts have determined that this term means discharge upon an appropriate and fit wharf.  *See, e.g., Metropolitan Wholesale Supply, Inc. v. M/V ROYAL RAINBOW*, 12 F.3d 58, 61 (5th Cir. 1994).  Therefore, where a shipper issues a through bill of lading which contemplates that some portion of the transportation will occur over land, the Harter Act does not apply. *Mannesman Demag Corp. v. M/V CONCERT EXPRESS*, 225 F.3d 587, 595 (5th Cir. 2000).

10

In this case, both Ocean Liner Defendants issued through bills of lading which contemplated that a portion of the delivery would require transportation over land. Obviously, there is no contiguous body of water connecting either Indonesia or Pakistan to Reading, Pennsylvania. *See Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute."). Moreover, the loss of the cargo occurred during the inland portion of the journey while the containers rested in Harrisburg. Accordingly, the Harter Act does not govern any claims in this case. *Accord Jagenberg, Inc. v. Georgia Ports Auth.*, 882 F. Supp. 1065, 1078-79 (S.D. Ga. 1995).

### 2.   COGSA

The Ocean Liner Defendants also suggest that COGSA supplies the substantive rule of law in this case. COGSA, however, only applies by its force during "the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. app. § 1301(e). In this case, the loss occurred during the inland portion of the journey. Therefore, by its own terms, COGSA does not apply.

However, a carrier and a shipper can extend COGSA so that it applies prior to loading and subsequent to discharge of goods from a ship. *See* 46 U.S.C. app. § 1307. However, "the extent of any application beyond the scope of the statute is a matter of contract." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines,* 230 F.3d 549, 557 (2d Cir. 2000). Because the loss in this case did not occur during ocean transit, to the extent COGSA applies in this case, that application results out of the parties' contracts and will be subject to modification by

11

other terms in these documents. *See id.* (citing *Pannell v. United States Lines Co.*, 263 F.2d 497, 498 (2d Cir. 1959)).

### 3.    Federal Common Law

Maersk briefly contends that federal common law governs this matter. Federal common law provides the legal basis for claims: (1) where Congress has granted federal courts the authority to develop substantive law; or (2) where a federal rule of decision is necessary to protect uniquely federal interests. *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). The court is unaware of any instance in which Congress has granted it the authority to develop substantive law concerning the interstate or international carriage of goods. *See Cleveland v. Beltman North American Co, Inc.*, 30 F.3d 373, 377-80 (2d Cir. 1994) (holding that Carmack Amendment does not grant federal courts authority to judicially create a remedy under that act). Moreover, this case does not present any compelling federal interest. The dispute involves private parties concerning contracts for carriage and subcontracts for trucking services. The dispute does not concern the United States, any individual State or the Federal Government's foreign relations. *See, e.g., Boyle v. United Tech. Corp.*, 487 U.S. 500, 505-06 (1988) (holding that determining the liability of manufacturers under federal procurement contracts requires the application of federal common law); *Westfall v. Erwin*, 484 U.S. 292, 295 (1988) (holding that civil liability of federal officials for actions taken in the course of their duty concerns a compelling federal interest requiring the creation of federal common law); *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 593-94 (1973) (noting that in the absence of an applicable Act of

12

Congress where the United States is a party, it is for federal courts to fashion the governing rule of law). Federal common law does not apply in this case.

### 4.    State Law

Because this case essentially involves breach of contract claims and no federal law applies by its own terms, the court will apply state law contract principles. In order to determine which state's substantive law applies, federal courts entertaining diversity cases apply the choice of law rules of the state in which the court sits. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Accordingly, the court will apply Pennsylvania's choice of law rules to determine what jurisdiction's contract principles will apply in this case.

Under both Pennsylvania law and the Restatement of Conflict of Laws, the first step in a choice of law analysis is determining whether the parties explicitly or implicitly elected to apply a certain forum's law. *See Assicurazoni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999); *see also Smith v. Commonwealth Nat'l Bank*, 557 A.2d 775, 777 (Pa. Super. Ct. 1989);[5] Restatement (Second) Conflict of Laws § 187 (1971). Although both the Mitsui and Maersk Bills of Lading contain provisions stating that the law of Japan and New York should govern their respective suits with PVH, no party has advocated that the court apply these provisions. (Pl. Ex. 31 at ¶ 25; Maersk Ex. B at ¶ 27.) Additionally, both of these documents contain other provisions indicating that United States law should govern any dispute between the Ocean Liner Defendants and PVH. (*See* Pl. Ex. 31

---

[5]"Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise." *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273-74 (3d Cir. 1985).

at ¶ 29; Maersk Ex. B at ¶ 5(2).)  Because these documents contain contradictory statements, the court refuses to find that they manifest an intention to be bound by the law of a particular jurisdiction.  Because the parties have not indicated a preference that the law of a particular jurisdiction apply in this case, the court must now turn to the interest-based analysis.

Absent an intent to be bound by the law of a particular jurisdiction, Pennsylvania's conflicts of law analysis requires application of the law of the state having the most significant contacts or relationships with the particular issue in the case.  *See Griffith v. United Airlines*, 203 A.2d 796 (Pa. 1964).  In this case, Pennsylvania is the jurisdiction with the most significant contacts with this dispute because the cause of action arises out of the theft of the cargo which occurred in Pennsylvania.  Additionally, all of the Bills of Lading indicate that the containers would be delivered to PVH's warehouse in Pennsylvania, and the containers were stolen while resting in Pennsylvania prior to final delivery.  Given that resolution of the claim will involve an analysis of whether the bailor was negligent, the court finds that Pennsylvania's connection to this case is sufficient to warrant application of its law.

C.    **Merits**

Having determined that Pennsylvania law will govern this dispute, the court will now discuss the parties' liability under that law.  Because all the contracts in this case involved agreements to transfer personal property on behalf of another, the law of bailment applies.  *See Smalich v. Westfall*, 269 A.2d 476, 480 (Pa. 1970) (defining bailment as "a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled,

14

it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it").

Under Pennsylvania law, "a cause of action for breach of a bailment agreement arises if the bailor can establish that personalty has been delivered to the bailee, a demand for return of the bailed goods has been made, and the bailee has failed to return the personalty." *Price v. Brown*, 680 A.2d 1149, 1152 (Pa. 1996). If the plaintiff establishes the elements of the prima facie case, the burden switches to the defendant to present evidence "accounting for the loss." *Id.* If the defendant fails to do so, he will be held liable for the plaintiff's loss. If, however, the defendant produces evidence indicating that the loss occurred by fire, theft, or other casualty which is not the defendant's fault, the burden switches back to the plaintiff to demonstrate that the defendant was negligent. *Moss v. Bailey Sales & Servs., Inc.*, 123 A.2d 425, 426 (Pa. 1956) (citing *Schell v. Miller North Broad Storage Company*, 16 A.2d 680, 681 (Pa. Super. Ct. 1940)). Moreover, different types of bailment require the bailee to conform with varying degrees of care with respect to the bailed goods. *Ferrick Excavating v. Senger Trucking*, 484 A.2d 744, 747-48 (Pa. 1984). Where, as here, the allegations of a bailment indicate one mutually beneficial to both parties, the bailee must exercise ordinary diligence and is responsible for ordinary neglect. *Id.* With these standards in mind, the court will now examine the claims involved in this case.

## 1.   Liability of the Ocean Liner Defendants

The Ocean Liner Defendants argue that PVH's claim against them must fail because PVH did not establish its prima facie case. As previously stated, in order for PVH to satisfy its prima facie case, it must prove that it delivered

15

personalty to the Ocean Liner Defendants, that it demanded return of the personalty and that the Ocean Liner Defendants failed to tender the personalty upon a reasonable demand. *See Price*, 680 A.2d at 1152. The Ocean Liner Defendants contend that PVH did not present evidence proving that it provided the merchandise in question to them in good order at the port of loading. The court disagrees.

As to the Maersk Container, PVH presented the affidavit testimony of Muhammad Iqbal, a PVH agent who oversaw the stuffing of the container. He testified that his employees stuffed 378 cartons of cotton shirts into the container on May 15, 1999. Additionally, he also provided copies of the Terminal Receipt and Export Tally Sheet from the Qasim International Container Terminal in Karachi, Pakistan.[6] He also testified that after stuffing the container, he placed a previously provided Maersk security seal on the container. When Maersk issued the Bill of Lading corresponding to its container unit, that document listed the seal placed on the container by Mr. Iqbal. Maersk did not note that any of its seals had been broken at that time. Furthermore, Walborn did not note any exception with regard to the security seals when the Maersk container arrived at the Kellaway facility in Harrisburg.

Similarly, as to the Mitsui Containers, PVH presented the affidavit of Romel Pasaribu, a Busana Rama employee. He indicated that he oversaw the stuffing of three Mitsui containers. According to his company's documents, also kept in the ordinary course of business, Busana Rama employees stuffed: (1) container MOLU0112686 with 384 cartons containing 9,187 shirts; (2) container MOLU0102585 with 388 cartons containing 9,268 shirts; and (3) container

---

[6] These are documents that Quality Services keeps in the normal course of its business.

16

MOLU0004465 with 442 cartons containing 10,603 shirts. Additionally, Pasaribu's affidavit indicates that Busana Rama employees applied Mitsui security seals to these containers. When Mitsui issued the Bills of Lading corresponding to these containers, it did not indicate that any of the seals had been broken. In fact, its Bills of Lading indicated that the original security seals were in place. Similarly, Trailer Receipt Delivery Inspection Reports – issued by the Kellaway drivers when they picked up the containers from the terminal in South Kearny, New Jersey – indicated that the original Mitsui seals were in place. When the container arrived at the Kellaway facility in Harrisburg, no exception was made regarding the security seals.

Based on this evidence, the court finds that PVH has satisfied its prima facie burden of proving that it delivered goods to the Ocean Liner Defendants and that the goods were not returned to it. Thus, the burden shifts to the Ocean Liner Defendants to present evidence "accounting for the loss." *Price*, 680 A.2d at 1152. In response, the Ocean Liner Defendants contend that the loss occurred while the containers were in Kellaway's possession, and, therefore, they cannot be held liable for actions beyond their control. They contend that COGSA, made applicable in this case as a matter of contract, exempts the Ocean Liner Defendants' liability because the loss occurred while the property was out of their possession and control.

Under 46 U.S.C. app. § 1304(2)(q), carriers may exonerate themselves from liability by proving that cargo loss or damage occurred "without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier. . . ." The Ocean Liner Defendants, however, may not rely on this section as a complete defense to liability in this case because they issued PVH through Bills of Lading. This means that they promised to transport the containers

17

from their points of origin all the way to PVH's warehouse in Reading. In order to fulfill their obligations, the Ocean Liner Defendants engaged Kellaway to transport the containers by truck from New Jersey to Harrisburg. Because Kellaway acted as the Ocean Liner Defendants' agent or subcontractor, if Kellaway was negligent in performing its duties, then § 1304(2)(q) will not limit their liability. That section clearly contemplates carrier liability for the negligence of subcontractors and agents. *Id.* (stating that carrier seeking to assert § 1304(2)(q) defense bears the burden of proving that "neither the actual fault or privity of the carrier *nor the fault or neglect of the agents or servants of the carrier* contributed to the loss or damage" (emphasis added)); *accord Agrico Chem. Co. v. SS ATLANTIC FOREST*, 459 F. Supp. 638, 647 (E.D. La. 1978) (A carrier "may not insulate itself from liability by the use of independent contractors.").

As one court has noted, "though carriers may not limit their liability for negligence in the services they provide through their employees or agents, they may, by a valid contract with the owner of the goods, limit the services they agree to provide." *Sumitomo Corp. v. M/V SIE KIM*, 632 F. Supp. 824, 837 (S.D.N.Y. 1985). Had the Ocean Liner Defendants wished to limit their liability to the ocean carriage portion of the trip, then they should have agreed only to deliver the containers to an appropriate port of discharge. Instead, the Ocean Liner Defendants sought to obtain the additional monetary benefit associated with a contract for delivery from the point of origin to the ultimate destination at PVH's warehouse in Reading. They cannot now limit their liability to PVH based on the simple fact that the loss occurred when the containers were not in their direct physical possession. They arranged to have Kellaway transport the containers by truck and are responsible for

18

loss that occurred during the portion of the transportation that they delegated to Kellaway. *But see Tubacex, Inc. v. M/V RISAN*, 45 F.3d 951, 956 (5th Cir. 1995) (holding that carrier is entitled to § 1304(2)(q) defense where shipper, not carrier, arranged for services that caused damage to goods).

COGSA does not bestow upon the Ocean Liner Defendants a blanket limitation of liability for Kellaway's acts and omissions. However, due to the fact that the goods were lost as a result of theft, the Ocean Liner Defendants have accounted for the loss. *See Moss*, 123 A.2d at 426 (holding that theft accounts for the loss). Thus, the burden of proof shifts back to PVH to prove that the Ocean Liner Defendants were negligent. Because the goods were lost while in possession of the Ocean Liner Defendants' subcontractor, their liability to PVH will be determined by whether Kellaway's performance fell above or below the applicable standard of care. If Kellaway's performance complied with the standard of care, then the Ocean Liner Defendants will not be liable to PVH. If Kellaway's performance failed to comply with the standard of care, then the Ocean Liner Defendants are liable to PVH.

### 2. Analysis of Kellaway's Performance

Under Pennsylvania law, negligence "is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998). The mere occurrence of an accident does not establish negligent conduct. *Butler v. City of Pittsburgh*, 537 A.2d 112, 114 (Pa. Commw. Ct. 1988). Instead, the plaintiff must establish, by a preponderance of the evidence, that the defendant engaged in conduct that deviated from the general standard of care expected under the circumstances,

19

and that this deviation proximately caused actual harm. *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978). Therefore, Kellaway acted negligently if it failed to use security precautions that a reasonable operator of a container yard would have used under the facts in this case.

Based on the evidence presented at trial, the court finds that security at the Kellaway facility was inadequate to protect cargos stored at its facility from the most elementary forms of theft. Kellaway had knowledge, based on its own experience, that container theft was a common problem for container yards. Therefore, Kellaway should have taken reasonable precautions to prevent such thefts. Yet, the evidence adduced at trial indicated that Kellaway did not do so.

The Kellaway facility was surrounded by a chain link fence no more than eight feet high with three strands of barbed wire at the top of the fence. No security guard manned the facility outside of operating hours or stopped by to make periodic checks. The facility did not have an alarm, electronic gate, motion detection system, or shock absorber system that would detect if any one tried to enter the container yard by hopping the fence or cutting a hole in it. Likewise, Kellaway did not do anything to the containers themselves that would have, at least, discouraged theft. For instance, they did not station the containers back-to-back so as to prevent thieves from shopping for valuable cargo once they had entered the gate. They did not place fifth wheel pin locks on the trailers holding the containers[7]

---

[7]Kellaway's Chief Operating Officer, David McLaughlin, testified that Kellaway did not fifth wheel pin locks at the Harrisburg facility because container thieves are sophisticated criminals w have learned that they can remove such pin locks with the swing of a sledgehammer. However, the court finds that this vitiates Kellaway's argument that its security measures were adequate. If contain thieves are so efficacious, then Kellaway needed to install additional security measures to militate

(continued...)

20

and the tractors stationed at the facility were not equipped with anti-theft shut off devices that would automatically stall the engine should the ignition be hot wired. More fundamentally, the container yard did not have adequate lighting to deter potential thieves from entering under cover of night. In fact, the only security measure that Kellaway took was fencing the yard and securing the gate with a pad lock and chain. However, Kellaway even failed to implement this measure properly. All of its drivers, including the independent owner/operators, had keys to the lot. Kellaway, though, did not have a system in place to properly account for which drivers had keys.

Therefore, the court is confident in ruling that security measures at Kellaway's Harrisburg facility fell well below the standard of care for operating an intermodal container yard. Furthermore, the court is unpersuaded by Kellaway's argument that it complied with the standard of care by complying with the requirements for custom bonded facilities. Whether Kellaway complied with the requirements for customs bonded facilities is irrelevant in determining whether Kellaway's security fell below the standard of care for operation of an intermodal container yard. The court is similarly unconvinced by Kellaway's argument that it was not required to maintain any additional security measures because there was no history of container thefts in the Harrisburg area and Harrisburg was considered a suburban, and thus, low crime area. PVH presented evidence that container theft, a very common phenomenon at container yards near major ports, has been spreading

---

[7](...continued)
against such creativity.

21

to container yards located in suburban areas. Accordingly, Kellaway had a duty to provide at least a minimal level of security at its Harrisburg facility.[8]

While the court is convinced that Kellaway's security measures were inadequate, a more difficult inquiry involves determining whether the lack of adequate measures was the proximate cause of the container's theft. Generally, a negligent party will not be held liable for loss that occurs as a result of a third party's criminal acts because the criminal act is considered a superceding cause of the plaintiff's ultimate injury. *See Trude v. Martin*, 660 A.2d 626, 627 (Pa. Super Ct. 1995); *see also* Restatement (Second) of Torts § 440 (1965). However, if a subsequent act is a foreseeable result of the original tortfessor's negligence, then the subsequent criminal act will not relieve the original tortfessor's liability. *Vattimo v. Lower Bucks Hospital, Inc.*, 465 A.2d 1231, 1237 (Pa. 1983); *see also* Restatement (Second) of Torts § 442.

In this case, the evidence definitively indicates that Kellaway should have foreseen that its inadequate security measures would expose it to container theft. Kellaway is a sophisticated shipping entity that operates several container yards located throughout the northeastern United States. It has, on numerous occasions, been the victim of container thefts at its other facilities. Due to these thefts, Kellaway has implemented various security measures at all of these facilities. Yet, at the Harrisburg facility, it neglected to implement any security measures beyond the minimal requirements for obtaining the status of a customs bonded

---

[8]Kellaway also argues that it did not implement additional security measures because the cost of such measure would have prevented them from doing so. However, the court finds this profit justification insincere because McLaughlin testified that Kellaway did not perform any cost analysis regarding additional security measures for the Harrisburg facility. (T. at 426.)

22

facility. Although the Harrisburg facility was much smaller than its other facilities, it still held about fifteen containers a day on average. The value of the containers themselves, without taking into account the value of their cargo, warranted that Kellaway implement greater security measures than it did. Although the court is unwilling to dictate, as a matter of law, what additional measures would have been sufficient, it is willing to say that Kellaway's complete lack of security was a foreseeable cause of the criminal activity that resulted in the loss of the three intermodal containers at issue in this case. At the very least, implementation of some additional measures would have deterred, or even prevented, a group of thieves from entering the container yard under cover of night; shopping through at least twelve containers; hot-wiring several tractors; hooking the tractors up to three containers; and hauling those loads out of the yard without detection for at least a day.

Because Kellaway's performance fell below the standard of care for container yard operators, the Ocean Liner Defendants are liable to PVH for breach of the bailment contracts for transportation of the three intemodal containers. Accordingly, the court will enter judgment in favor of PVH and against the Ocean Liner Defendants.

### 3.   Damages

#### a.   PVH v. Mitsui

PVH claims total damages in the amount of $287,911.99 against Mitsui and $133,644.50 against Maersk. These numbers represent what PVH argues is the fair market value of the lost shirts, plus the freight and customs charges that PVH paid for the non-delivered cargo. PVH argues that it had already sold the shirts to

various retail outlets and, therefore, it is entitled to recover the profit it lost due the theft of the containers.  The Ocean Liner Defendants, however, insist that PVH is not entitled to claim the lost profit because: (1) their evidence on the subject was insufficient to meet their burden of proof; and (2) the Bills of Lading specifically excluded the Ocean Liner Defendants' liability for consequential damages.  Because the court finds that the Ocean Liner Defendants validly disclaimed their liability for consequential damages, the court need not address the evidentiary issue.

Lost profits are, by definition, consequential damages.  *See AM/PM Franchise Ass'n v. Atlantic Richfield Co.*, 584 A.2d 915, 920 (Pa. 1990).  All three Mitsui Bills of Lading contained a clause limiting Mitsui's liability for consequential damages.  That clause reads as follows: "The Carrier . . . shall in no circumstances be liable for delay or for any indirect or special or consequential loss or damage incurred by Merchant." (Pl. Ex. 31 at ¶ 6(3).)  The Mitsui Bills of Lading also included a clause paramount making COGSA § 1304(5) applicable to the Bills of Lading.  That clause indicates that Mitsui is not liable "in any event . . . for loss or damage to or in connection with the Goods in an amount exceeding $500.00 per package . . . unless the value of the Goods has been declared and inserted in the declared value box on the face hereof, in which case Clause 6(2) shall apply." (*Id.* at ¶ 29(2).)  Clause 6(2) states that where the shipper declares a value for the shipped goods, then that amount is substituted as the limitation of damages. (*Id.* at ¶ 6(2).)  PVH, however, did not declare the value of the goods and, therefore, the $500 limitation per package applies.  PVH, however, argues that the clause disclaiming liability for consequential values is prohibited by 46 U.S.C. app. §

24

1303(8), which nullifies any limitation of liability that lessens the carrier's liability beyond the limitation established by § 1304(5).

The disclaimer of consequential damages does not lessen Mitsui's liability under the Bills of Lading. Mitsui transported 775 cartons of shirts in the stolen container. These cartons each constitute a package pursuant to COGSA. *See Fireman Fund Ins. Co. v. Tropical Shipping & Constr. Co.*, 254 F.3d 987, 996-97 (11th Cir. 2001) (defining package as "a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods") (quotations omitted). Accordingly, the ceiling for Mitsui's liability pursuant to the COGSA limitation is $387,500. Yet, including its claim for consequential damages, PVH only claims $287,911.99 in damages from Mitsui. Therefore, the clause limiting Mitsui's liability does not lessen its claim to PVH because PVH's claim, itself, already fell almost $100,000.00 short of this minimal limitation. In this situation, § 1303(8) will not operate so as to invalidate the clause disclaiming Mitsui's liability for consequential damages. Moreover, as previously discussed, COGSA does not apply of its own force in this case, but rather as a function of the contract between the parties. *See supra* at Part II.B.2. As such, COGSA's terms are modifiable by other terms in the contract. *Hartford Fire Ins. Co.*, 230 F.3d at 557. Thus, when read in conjunction, the two limitations state that Mitsui will not be liable for consequential damages and, in any event, its liability will not exceed $500 per package.

Additionally, under Pennsylvania contract law, parties of equal bargaining power may contractually limit their liability for special, indirect, or

consequential damages. *Factory Market, Inc. v. Schuller Int'l, Inc.*, 987 F. Supp. 387, 399 (E.D. Pa. 1997); *Borden v. Advent Ink Co.*, 701 A.2d 255, 262 (Pa. Super. Ct. 1997); *National Cash Register Co. v. Modern Transfer Co.*, 302 A.2d 486, 491 (Pa. Super. Ct. 1973). Such limitations on liability will be enforced absent a showing that the breaching party engaged in willful or wanton conduct. *Behrend v. Bell Tel. Co.*, 363 A.2d 1152, 1166 (Pa. Super. Ct. 1976). Given that both PVH and Mitsui have much experience in these types of transactions and their is no allegation of foul play, the court will enforce their contractual agreement to limit Mitsui's liability for consequential damages. Accordingly, PVH may not recover for its lost profits that resulted from Mitsui's failure to deliver the goods.

The Mitsui contract also contains a clause stating that its freight charges are earned in full upon delivery of the goods to the carrier and is non-returnable under any circumstances. This clause, which appears to disclaim Mitsui's liability for the value of the service it failed to perform, is likewise enforceable because it is reasonable and does not totally exculpate Mitsui's liability under its Bills of Lading. Therefore, Mitsui's liability is limited to the price that PVH paid for the shirts (the invoice price) plus customs fees and prejudgment interest. *See* 41 Pa. Const. Stat. § 202 (stating that six percent per annum is prejudgment interest rate in breach of contract claims); *American Enka Co. v. Wicaco*, 686 F.2d 1050, 1057 (3d Cir. 1982) (holding that prejudgment interest is "e awarded at the statutory rate . . . from the date the cause of action arose"); *Rizzo v. Haines*, 555 A.2d 58, 69 (Pa. 1989) (same); *see also Fernandez v. Levin*, 548 A.2d 1191, 1193 (Pa. 1988) (holding that a plaintiff who succeeds on a breach of contract claim is entitled to prejudgment interest as a matter of right). In summation, Mitsui

26

is liable to PVH for $182,990.85 ($127,259.84 paid for the undelivered shirts, $26,637.99 in customs and duty charges, and $29,093.02 in prejudgment interest).

### b.   PVH v. Maersk

Maersk's Bill of Lading similarly disclaims its liability for consequential damages arising out of the loss of the goods.  (Maersk Ex. B at ¶ 7(2).)  For the same reasons stated above, the court will not hold Maersk liable for PVH's lost profits.[9]  *See supra* at Part II.C.3.a.  Also, like the Mitsui Bills of Lading, the Maersk Bill of Lading includes a clause indicating that it earned its freight charges at the moment PVH delivered the goods to Maersk in Pakistan.  (*Id.* at ¶ 14(2).)  Accordingly, the court will hold Maersk liable to PVH in the amount of $81,835.39 ($56,851.20 for the loss of the shirts, $11,973.50 in customs and duty charges, and $13,010.69 in prejudgment interest).

### 4.   <u>Indemnification</u>

The Ocean Liner Defendants contend that if they are liable to PVH then Kellaway is liable to them.  Kellaway, however, contends that it is not liable because: (1) the contract setting forth indemnity between Kellaway and the Ocean Liner Defendants did not apply once Kellaway delivered the containers to its Harrisburg facility; and (2) Kellaway disclaimed its liability to the Ocean Liner Defendants.  The court finds that neither of these justifications have merit.

The Uniform Intermodal Interchange Agreement ("UIIA") is an agreement between various shipping entities that sets out each entity's duties and liabilities when transporting and exchanging intermodal container units.  Mitsui,

---

[9]The Maersk Bill of Lading does not contain a clause paramount and, consequently, COGSA's $500 per package limitation does not apply at all.

27

Maersk, and Kellaway were all parties to this agreement at all times relevant to this litigation. Pursuant to the terms of that agreement, the "Motor Carrier agrees to defend, hold harmless, and fully indemnify . . . Equipment Owner . . . as [its] interests appear against any and all loss, damage or liability . . . suffered by . . . Provider . . . arising out of Motor Carrier's negligent or intentional acts or omissions during an Interchange Period and/or presence on Facility Operator's premises." (Mitsui Ex. D at ¶ III.B.7.d.) The court has previously found that Kellaway's failure to install additional safety measures constituted negligence. Therefore, the UIIA requires Kellaway to indemnify the Ocean Liner Defendants for the amount it will have to pay PVH for the loss of the cargo.

Kellaway, however, argues that the UIIA indemnification clause does not apply in this case. According to Kellaway, the interchange took place when its drivers dropped off the containers at the Harrisburg facility and the manager of that facility issued an equipment interchange report ("EIR"). This event, according to Kellaway, marked the end of the "interchange period" and thus its indemnification responsibility. Because the loss occurred subsequent to the issuance of the EIR, the loss did not occur during the "interchange period" and the indemnification clause is inapplicable.

Section II(H) of the UIIA defines "Interchange" as "the transfer of physical possession of Equipment under the Agreement." (*Id.* at ¶ II(H).) Section II(I) defines "Interchange Period" as "the period commencing upon Interchange to Motor Carrier and concluding upon Interchange to Provider." (*Id.* at ¶ II(I).) When read together these clauses clearly indicate that a motor carrier will be liable to a provider during the period commencing upon taking physical possession of the

28

equipment until it transfers physical possession back to the provider.  GPS, the Ocean Liner Defendants' appointed agent, never took physical possession of the containers.  The loss, therefore, occurred during the interchange period as that term is defined under the UIIA, and Kellaway must indemnify the Ocean Liner Defendants.  The UIIA is entirely silent as to the effect that the issuing an EIR will have on the shifting of the risk of loss.  Given this silence, and the UIIA's explicit requirement that *physical* possession be transferred, the court will not endorse Kellaway's contention that it can unilaterally end the interchange period by having one of its employee's issue another of its employee's an EIR.[10]

Kellaway also argues that it is not liable to the Ocean Liner Defendants because the terms and conditions on the back of the EIR disclaim its liability.  However, the court finds that Kellaway has not properly authenticated page two and three of this document.  The terms and conditions that Kellaway included as  the second page of its Exhibit K-5 are actually terms and conditions on the reverse side of a different document and not a part of the first page of Exhibit K-5.  An exemplar of the form from which those terms and conditions were copied appears at Exhibit K-1.  The front of Exhibit K-1 indicates that it was issued by "Kellaway Intermodal & Distribution Services, Inc," and the box in the lower right-hand corner states that it is "ISSUED SUBJECT TO ALL TERMS AND CONDITIONS INCLUDING LIMITATION OF LIABILITY ON REVERSE SIDE HEREOF, SAID TERMS AND CONDITIONS CONSTITUTE A CONTRACT TO WHICH STORER

---

[10]Even if the court were to find that the UIIA does not apply in this case, Kellaway would still be liable to the Ocean Liner Defendants pursuant to a claim for breach of an implied bailment contract because Kellaway charged a fee to have the containers stored at its facility.  Therefore, under this mutually beneficial bailment, Kellaway would be held liable for ordinary negligence.  The court has already determined that Kellaway was negligent. *See supra.* at Part II.C.2.

29

AGREES BY THE ACCEPTANCE OF THIS RECEIPT." (Ex. K-1.) Additionally, K-1 is titled "Non-Negotiable Warehouse Receipt, Equipment Interchange Receipt and Safety Inspection Report." (*Id.*) Yet, the face page of Exhibit K-5 refers to "Kellaway Terminal Services Incorporated" and does not refer to any terms and conditions on the reverse side. Moreover, the face page of Exhibit K-5 is titled "Equipment Interchange Receipt and Safety Inspection Report." Kellaway failed to produce either the original Exhibit K-5 or an exemplar that matched up entities on both the first and second pages. Kellaway has failed to satisfactorily explain these discrepancies or justify its failure to produce the original K-5 in its entirety. The court, therefore, will sustain the Ocean Liner Defendants' objection and will not allow the pages two and three of Kellaway Exhibit K-5 into evidence. *See* Fed. R. Evid. 901(a).[11]

    In accordance with the preceding discussion, the court finds that Kellaway is liable to the Ocean Liner Defendants for its breach of the UIIA. Kellaway is liable to Mitsui for $182,990.85 and to Maersk for $81,835.39.

**III.**    <u>Conclusions of Law</u>

    1. The court has subject matter jurisdiction over this matter based on the parties' diverse state citizenship. *See* 28 U.S.C. § 1332.

---

[11]Even if the court had admitted this document, this would not have altered the outcome. Under Pennsylvania law, storage receipts may limit the liability of a warehouse, but only if the bailor is given an opportunity to declare the value of the stored goods. *Adams v. Ryan & Christie Storage, Inc.* 563 F. Supp. 409, 410-11 (E.D. Pa. 1983). In this case, one Kellaway employee issued another Kellaway employee the EIR allegedly containing terms disclaiming its liability to the Ocean Liner Defendants. The disclaimer in this case would be invalid because the Ocean Liner Defendants were not given an opportunity to declare the value of its goods prior to Kellaway issuing the EIR.

2. The court will **SUSTAIN** the Ocean Liner Defendants' objection to Kellaway Exhibit K-5. Only the first page of this document will be admitted into evidence.

3. Mitsui breached its contract with PVH.

4. Mitsui, as a consequence of its breach, is liable to PVH in the amount of $182,990.85.

5. Maersk breached its contract with PVH.

6. Maersk, as a result of its breach, is liable to PVH in the amount of $81,835.39.

7. Kellaway breached its contract with Mitsui.

8. As a result of that breach, Kellaway is liable to Mitsui for indemnification in the amount of $182,990.85.

9. Kellaway breached its contract with Maersk.

10. As a result of its breach, Kellaway is liable to Maersk for indemnification in the amount of $81,835.39.

SYLVIA H. RAMBO
United States District Judge

Dated: August *14*, 2002.