IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILIPS-VAN HEUSEN, CORP.,   :
          Plaintiff     :
                   :
          v.       :  CIVIL ACTION NO. 1:CV-00-0665
MITSUI O.S.K. LINES LTD.,   :
et al.,               :
          Defendants   :

FILED
HARRISBURG, PA

JAN 15 2003

MARY E. D'ANDREA, Cl
Per _____

TRANSCRIPT OF PROCEEDINGS

ORAL ARGUMENT

BEFORE:  HON. SYLVIA H. RAMBO, Judge

DATE:    November 19, 2002

PLACE:   Courtroom Number Three
          Federal Building
          Harrisburg, Pennsylvania

COUNSEL PRESENT:
PATRICK J. KEENAN, Esquire
    For - Kellaway Intermodal & Distribution Systems, Inc.

ANN-MICHELE G. HIGGINS, Esquire
CHARLES MCCAMMON, Esquire
    For - Mitsui O.S.K. Lines, Limited

RICHARD WHELAN, Esquire
WILLIAM ECENBARGER, Esquire
    For - DAMPSKIBSSELSKABET AF 1912

Vicki L. Fox, RMR
Official Reporter

2

1          THE COURT:  Good morning, everyone.  I have a

2    question I need to have answered.  I have a lot of questions

3    that need to be answered.  Is Kellaway responsible for

4    attorney's fees in Van Heusen's contract claim against Maersk

5    and Mitsui?

6          MR. KEENAN:  The answer is no, Your Honor.

7          THE COURT:  Is Kellaway responsible under the UIIA

8    for indemnity for attorney's fees?

9          MR. KEENAN:  Again, Your Honor, the answer would

10   be no.

11         THE COURT:  Why?  What is the difference?

12         MR. KEENAN:  You are talking about the third party

13   claims by Maersk and Mitsui?

14         THE COURT:  Correct.  Let's start with Van Heusen

15   against Maersk and then Mitsui on the contract action.

16         MR. KEENAN:  Your Honor, first of all, as it is

17   set forth in the brief with respect to the contract action,

18   the liability of the third party plaintiffs was based upon

19   contract.

20         They are liable to PVH -- basically strictly

21   liable by virtue of the fact they did not deliver the

22   containers.  The liability that was imposed upon Kellaway was

23   based upon bailment principles and negligence.

24         It is clear as it was set forth in the brief, Your

25   Honor, that the law does not provide for indemnity in

3

1    contract actions.  The only indemnity is when it is based

2    upon principles of negligence.

3         And the liability that the third party plaintiffs

4    had to PVH that Your Honor found was based upon contract

5    principles.  They entered a contract with PVH that Kellaway

6    was not a party to.  The liability that they had under that

7    contract was to -- as Your Honor ruled was to reimburse PVH

8    for the cost of the containers.

9         The claim that PVH had against Kellaway was a

10   separate legal principle which is a principle of bailment and

11   negligence.  So because there was no finding of negligence

12   against the third party plaintiffs, there should not be any

13   flow of indemnity that would go from Kellaway to the third

14   party plaintiffs because they are different theories.

15        Why that is a reasonable premise, Your Honor is

16   because to find otherwise would basically turn Kellaway from

17   being a defendant whose liability had to be based upon

18   principles of negligence into a party that would be strictly

19   liable under a contract that they were not a party to, nor

20   were they privy to.

21        That would pretty much turn Kellaway's

22   responsibility on its head.  It would all of a sudden change

23   their position from being one that just had to use reasonable

24   care to one that would be a guarantor.  When in fact the only

25   one that ever agreed to be a guarantor were the third party

4

1    plaintiffs to PVH.

2          It would be very unfair to require Kellaway to

3    indemnify them for attorney's fees for defending a contract

4    claim that they weren't a party to, Your Honor.

5          Now under indemnity principles, of course, since

6    ultimately Your Honor found Kellaway was responsible, they

7    would be liable for the actual monetary damages, but not

8    attorney's fees.

9          THE COURT:  Why?

10         MR. KEENAN:  As I said before, Your Honor, because

11    under the law, the duty for someone to indemnify for

12    attorney's fees does not flow when the liability of the

13    person seeking indemnity is based upon a breach of contract.

14         And we cited in our brief, Your Honor, a series of

15    cases including the Theyssen, Inc. V. S/S Eurounity, 21 F.3d

16    533.

17         THE COURT:  What page are you reading?

18         MR. KEENAN:  It is page three, Your Honor.

19         THE COURT:  What was the name again?

20         MR. KEENAN:  There are several cases, Your Honor.

21    One is the Theyssen case.  The other case is M/V OOCL Bravery

22    which quotes from the Leather Best case which is a Second

23    Circuit case which is at 451 F.2d 800.

24         And also, Your Honor, if I could just read from

25    the brief.  An agreement to indemnify another for his

5

1    contractual liability to a third party will not be inferred

2    and must be stated expressly, clearly and unequivocally in an

3    indemnity clause.

4         It says indeed because the nature and purpose of

5    any indemnity agreement involves a shifting and voluntary

6    assumption of legal obligations, they are to be narrowly

7    construed.  As a general rule, parties must use clear,

8    unambiguous language to insure their enforcement.

9         Under the UIIA, the only liability that Kellaway

10   agreed to under the indemnity provision was for negligence.

11   The liability that the third party plaintiffs had to PVH was

12   not based upon principles of negligence.  It was based upon

13   principles of contract, Your Honor.

14        Again, the importance is that if Kellaway

15   ultimately is found to be required to indemnify them for

16   attorney's fees, it essentially places Kellaway from one that

17   would be responsible under the principles of negligence into

18   a party that would be responsible for basically strict

19   liability under a contract that they weren't a party to, Your

20   Honor.

21        Basically, that would be extremely unfair to any

22   bailee in a situation where they have not entered into a

23   contract with the person that was the shipper.

24             THE COURT:  Can I have a response?

25

6

1        MS. HIGGINS:  Yes, Your Honor, Ann-Michele Higgins

2    on behalf of Mitsui.  Your Honor, I would state first that

3    this was not a matter of a strict liability contract.  As the

4    bill of lading indicates, the goods loaded in the container

5    and then not delivered would be a prima facie case of

6    liability, and then the burden shifts to the defendants to

7    rebut that liability.

8        The Court noted in your opinion at page 19 that in

9    fact the defendants have rebutted that burden, and therefore

10   under the liability scheme, a negligence standard had to be

11   established.

12       So in fact, it was negligence that there was a

13   finding of liability on the carriers.  And I would concede

14   then if Mr. Keenan suggests that Kellaway would be

15   responsible for negligence, that they would under those

16   circumstances because there was a finding of negligence that

17   this Court found against the carriers.  And then we in turn

18   had the third party agreement with Kellaway.

19       So it is not a strictly liable argument, but

20   rather it was one based on negligence.

21       THE COURT:  Mr. Whelan?

22       MR. WHELAN:  Your Honor, what I think Kellaway is

23   attempting to do here is to reargue liability which has

24   already been decided by the Court.

25       The liability as the Court noted, as Ms. Higgins

7

1    mentioned, on page 19 is based upon the negligence of the

2    motor carrier Kellaway.  And due to the finding of

3    negligence, it falls squarely within the language of the

4    indemnity clause that is contained in the UIIA agreement.

5              There is no strict liability.  There is no

6    absolute liability under the contract claim.  It boiled down

7    to a finding of negligence.

8              I also disagree with Kellaway's argument

9    concerning the clause itself.  It is very clear.  It does not

10   say liability based upon negligence in the indemnity clause.

11   The language is arising out of the motor carrier's

12   negligence.

13             It is simply -- if negligence is involved by the

14   motor carrier and liability arises out of that negligence, be

15   it contract or otherwise, the indemnity clause would come

16   into effect and would require Kellaway to fully indemnify

17   Maersk as a part of the UIIA agreement.

18             So it is a two-fold argument.  A, that the whole

19   decision -- Your Honor's decision was based on Kellaway's

20   negligence, not strict liability.

21             Secondly, the clause is not ambiguous.  It is very

22   clear arising out of the motor carrier's negligence, and

23   clearly with Your Honor's findings clearly falls within that

24   clear language of the agreement.

25

8

1          THE COURT:  So you two don't see any difference

2     between PVH's claim against Maersk and Mitsui's and then

3     Mitsui's claim against Kellaway for indemnification?  You

4     don't see any difference?

5          MS. HIGGINS:  That's correct, Your Honor.  I

6     don't.

7          MR. WHELAN:  Your Honor, I think what it boils

8     down to is if you go back to the original claim by PVH, it

9     arises out of a contract, as does the liability.  The

10    contractual contract between THE UIIA agreement was the

11    contract between Kellaway and Maersk.

12          And just because the beginnings of the -- or the

13    relationship which causes the lawsuit involves a contract, I

14    don't think that then require there to be only contractual

15    liability between the parties.

16          Getting back to that, clearly as we said at the

17    trial, in order for us to be liable to the plaintiffs,

18    Kellaway has to be proved to have been negligent and

19    therefore we are a pass-through.  That is Maersk's position

20    on it.

21          Under the terms of -- under the plaintiff's

22    liability case against us, it would necessarily fail if

23    Kellaway was not found to have been negligent.  So if the

24    plaintiff's loss on that point could not prove the negligence

25    of Kellaway, then Maersk and Kellaway would both not be

9

1    liable.

2              THE COURT:  Do you want to respond?

3              MR. KEENAN:  Yes, Your Honor.  There is a

4    difference between a duty to defend someone versus being

5    ultimately responsible for a loss.  Under the law if the loss

6    is ultimately determined by one party, that party should bear

7    the expense of compensating the person suffering the monetary

8    loss.

9              The issue here is whether or not Kellaway had a

10   duty to defend the third party plaintiffs against the claims

11   of PVH, which is separate and distinct.  Again, the

12   importance here is that the liability of the third party

13   plaintiffs was based upon contract.

14             They may want to say you take the contract, and

15   there are certain burdens that shift under the contract.  But

16   basically, it's a contract.  There was a bill of lading that

17   was issued by third party plaintiffs to PVH that Kellaway was

18   not privy to, was not a party to.

19             And the law makes clear that -- and I will just

20   reading this section from my brief on page three -- that

21   Kellaway was -- quote -- not liable ex contractu for the

22   breach of the contract between the disclosed principal and a

23   third party even when the breach was a result of its own

24   wrongful act.

25

10

1   So the law recognizes the distinction between the

2   liability of the third party plaintiffs to PVH which is based

3   upon contract.  It is based upon the bill of lading.  That is

4   why they were held responsible, Your Honor, because they took

5   the position that they did nothing wrong.  They physically

6   didn't have possession of the containers when they were

7   lost.

8   But Your Honor found under the law that they

9   breached the contract with the bill of lading which required

10  them to return the containers to PVH.  Because they didn't

11  deliver it, they contractually breached the bill of lading.

12  Now the liability on the part of Kellaway is quite

13  distinct.  It's based upon common laws of negligence because

14  of a bailment.  That is quite different than the contractual

15  duty that was assumed by PVH.

16  It is clear that when you have two different

17  theories of liability -- one being negligence against

18  Kellaway, the other being contract on PVH -- that the person

19  claimed to be negligent doesn't have a duty to defend the

20  third party plaintiff in this instance.

21  If it were, Your Honor, it would all of a sudden

22  elevate Kellaway from a person in a bailment position that

23  has all of the defenses in the common law negligence

24  principles to one that would have had the liability that was

25  assumed by the third party plaintiffs under their contract.

11

1    It would elevate their liability to being strictly liable for

2    the loss as the third party plaintiffs were.

3            That is incoherent with the general principle that

4    just as a negligent party, they are just responsible for

5    indemnifying the person who suffered the loss for their loss,

6    but they are not required to indemnify the third party

7    defendant for their cost to defend the case because they

8    don't have a duty to defend the case.

9            Again, Your Honor, if it were held that Kellaway

10   had to defend the third party plaintiffs, Kellaway basically

11   would not have had any of the defenses such as assumption of

12   risk, contributory negligence, all of the defenses it had in

13   a bailment situation, because all of a sudden, it would have

14   to step in the shoes of the third party plaintiffs contract,

15   which they don't have those defenses.  So that would be

16   certainly unfair.  It is not recognized by the law to do

17   that, Your Honor.

18           THE COURT:  Any response?

19           MR. WHELAN:  Your Honor, I think, again, we are

20   confusing the terms of the UIIA agreement which does not

21   indicate -- is not limited to a situation where there is only

22   a negligence case involved, where you are proving a tort of

23   negligence and basing liability on that.  It only speaks in

24   terms -- and I can quote --

25           THE COURT:  Where are you reading from?

12

1          MR. WHELAN:  This was under the indemnity section

2    of the UIIA.

3          THE COURT:  What are you reading from so I can

4    follow you?

5          MR. WHELAN:  If Your Honor could turn to our

6    original -- it's Maersk Line Exhibit T.  Would you like me to

7    refer you to a part of my brief?  Would that be easier?

8          THE COURT:  Yes, that would be easier.  Although I

9    do have -- I don't have Exhibit T.

10         MR. WHELAN:  It would be on page two of Maersk

11   Lines Petition for an Award of Attorney's Fees and Expenses

12   with Supporting Memorandum of Law.

13         THE COURT:  Hold on.

14         MR. WHELAN:  It has two large exhibits attached to

15   it.

16         THE COURT:  I have page two.

17         MR. WHELAN:  Okay.  Down at the bottom, there is a

18   quote of the indemnity section which is contained in Maersk

19   Exhibit T, which is a UIIA amendment.

20         It reads Indemnity:  Motor carrier -- and I have

21   in brackets Kellaway Transportation, Inc. -- agrees to

22   defend, hold harmless, and fully indemnify Provider Maersk

23   Line -- in brackets -- an equipment loaner and/or facility

24   operator as their interests appear against any and all loss,

25   damage or liability including reasonable attorney's fees and

13

1    costs incurred in the enforcement of this agreement suffered

2    by provider, equipment owner and/or facility operator arising

3    out of motor carrier's negligent or intentional acts or

4    omissions during an interchange period and/or presence on

5    facility operator's premises.

6         And the language refers to negligent or

7    intentional acts or omissions, and arising out of those

8    particular acts.  It doesn't indicate that the case has to be

9    based only upon negligence, or that a contract cannot be

10   involved.

11        In fact, it is evident from the UIIA that all of

12   these relationships are contractual, that being the

13   relationship between the shipper of the cargo and the ocean

14   carrier.  And then there is a contract between the ocean

15   carrier and the trucker.  And it would be basically rendering

16   the whole UIIA agreement meaningless if it would not include

17   negligence -- the negligent conduct of Kellaway as it is

18   involved in this sort of group of contractual relationships

19   that it necessarily exists when you are moving cargo from

20   point A to point B.

21        So I think that another point --

22        THE COURT:  Well, it does say arising out of motor

23   carrier's negligent or intentional acts or omission.

24        MR. WHELAN:  Which is exactly what Your Honor

25   found in your opinion.

14

1          THE COURT:  Right.

2          MR. WHELAN:  That Kellaway was negligent.

3          THE COURT:  I agree.

4          MR. WHELAN:  And that was a negligent act or

5    omission.  So this whole case is arising out of necessarily

6    based upon the decision already rendered, the negligent acts

7    of Kellaway.  And that triggers the indemnity provision which

8    allows Maersk and Mitsui to recover all the attorney's fees

9    incurred.  It also triggers the full defense and hold

10   harmless portion of the indemnity agreement.

11         I would also add that even assuming as Your Honor

12   has already held in a footnote in your opinion that even if

13   the UIIA would not apply, that there still would be full

14   indemnity under Pennsylvania bailment law which is footnote

15   10 on page 29 of Your Honor's decision.

16         And as we briefed in our various briefs --

17   unfortunately, I don't have the section available now.  But

18   under Pennsylvania law, you certainly when you get indemnity

19   under the bailment law as Your Honor pointed out in footnote

20   10 on page 29, necessarily you would get defense costs and

21   attorney's fees as part of the full indemnity even under the

22   Pennsylvania negligence law.

23         So under either scenario, the ocean carriers are

24   entitled to full indemnity for counsel fees and expenses for

25   defending the plaintiff's case.  And then there also is --

1    maybe Your Honor will get to later -- a specific provision in

2    the indemnity clause about costs incurred in enforcing the

3    agreement itself.

4              THE COURT:  Now there have been some --

5              MR. KEENAN:  May I briefly respond to that, Your

6    Honor?

7              THE COURT:  Very briefly.

8              MR. KEENAN:  Thank you, Your Honor.  Your Honor, I

9    would submit to you that this provision in the UIIA actually

10   supports Kellaway's position.

11             First of all, as the parties seeking to enforce a

12   provision, it is to be strictly construed against the third

13   party plaintiffs.  In order to enforce it, the language has

14   to be clear and unequivocal.

15             If this was intended to require Kellaway to

16   indemnify the third party plaintiffs for their contractual

17   duties to a party that Kellaway was not privy to, it should

18   have stated that.  It should have said that Kellaway was

19   agreeing to indemnify and hold them harmless for breach of

20   contract actions.  It doesn't say this.

21             What it says is that we will indemnify them for

22   tort actions, a tort action which is based upon Kellaway's

23   negligence.  For example, if Kellaway had the container on

24   the back of their truck and was driving down the highway and

25   caused a motor vehicle accident, clearly this would apply

16

1   with that situation because any claim against PVH would be on

2   tort principles for which Kellaway would assume an obligation

3   to defend and indemnify them.

4           That makes sense because that would not change the

5   liability characteristics of Kellaway.  Kellaway's liability

6   would have been negligence.  The claims against the third

7   party plaintiffs would have been negligence merely because

8   Kellaway is acting as her agent, and they would be sued as a

9   principal.

10          However, this is quite different because they are

11  being sued under contract.  There is nothing in this

12  indemnity provision that references a contract liability of

13  the third party plaintiffs.

14          I stress that the importance of this is that if

15  Kellaway is required to defend them, it all of a sudden

16  elevates their duty of being one of common law negligence to

17  contractual liability under a contract that they never signed

18  or never even saw.

19          To read this as saying clearly and unequivocally

20  it requires that they would have to take the next step and

21  say that all of a sudden Kellaway is agreeing to be bound by

22  any contract the third party plaintiffs should ever enter

23  into with any other party that Kellaway will be blind to,

24  will not know what type of obligations they are assuming to

25  defend.

17

1        However if you read it the way I suggest it should

2   be read, which is the reasonable reading, there's no problem

3   with it if it is based upon tort theories.  Because the tort

4   theories are just based upon common law.

5        Kellaway understands what duties it is assuming

6   under the common law, under negligence.  It has no idea what

7   duties is trying to be imposed upon it by the third party

8   plaintiffs under a contract theory.

9        And I would stress, Your Honor, that if they

10  intended to make Kellaway obligated to defend and indemnify

11  them from contract claims, it should have specifically and

12  expressly and unequivocally stated that in this indemnity

13  provision.  It is absent.

14       The only words in there are negligence.  That

15  comports with tort principles.  So if there is a tort claim

16  against the third party plaintiffs and they join Kellaway

17  because ultimately Kellaway was responsible for the tort, and

18  they are being sued vicariously, then Kellaway should step up

19  and defend them under the agreement.

20       That is not what happened here.  There were sued

21  under contract principles, Your Honor, not tort principles.

22  So under the UIIA, they had no duty to defend and indemnify.

23       MR. WHELAN:  Your Honor, if I may briefly respond

24  to that.  I think there is language in the agreement that

25  completely takes care of this issue.  It is what I read

1  earlier after the words as their interests appear against any

2  and all loss, damage or liability.

3          Any and all liability clearly means every type of

4  liability -- contractual, tort, strict liability, whatever it

5  may be.  It is any and all liability.

6          Kellaway bargained for this agreement, signed it.

7  And any and all includes contracts, tort and whatever type of

8  liability that is involved in the case.

9          And to say that Kellaway didn't have a chance to

10  look at the contract or it was unfair, the fairness here is

11  Kellaway was the sole entity that had possession of the

12  equipment involved in the case.  It makes sense that they

13  then added, or softened the language, rather than having

14  absolute indemnity limiting to liability arising out of that

15   -- that is any and all liability arising out of the

16  negligent acts, omissions or intentional conduct of

17  Kellaway.

18          So there is a qualifying word to that.  But the

19  liability part, whether it is contract, tort or any other

20  theory, is handled by any and all liability, any and all

21  loss, damage or liability.  Then the subsequent words are

22  qualifying words to that language.  And that necessarily

23  would have to include contract claims, tort claims and any

24  other claims that the parties could be involved in to which

25  the UIIA would become involved.

19

1        MS. HIGGINS:  And just simply, Your Honor, the

2   liability in this case was founded on the negligence of

3   Kellaway.  This Court held but for their negligence, we would

4   not have had the breach of contract under the bill of

5   lading.

6        Again, it was negligence principles that applied

7   in determining the initial liability.

8        MR. KEENAN:  Your Honor, just two quick things.

9   One, Your Honor did not find that their liability was based

10  upon negligence.  You found separately that their liability

11  was found upon breach of contract because they didn't deliver

12  the containers which was separate and apart from any claims

13  of Kellaway.

14       Kellaway could not have even been in the case, and

15  they would have still been found liable for breach of

16  contract.  And that is what Your Honor found.

17       The suggestion somehow that Kellaway softened the

18  language is a little bit absurd as was testified to by

19  Mr. McLaughlin who was the CEO of Kellaway.  This is really a

20  contract of adhesions, a take it or leave it as prepared by

21  those who have the power in the industry, which is the ocean

22  carriers, not the trucking companies.

23       Basically if you want to be in this industry, you

24  have to sign off on this agreement.  And certainly, Kellaway

25  had no input in this language.  The input was created by the

20

1    third party plaintiffs.

2         If they wanted their contractual liability to be

3    indemnified and defended, they should have expressly stated

4    that.  Instead, it talks in terms of negligence, arising out

5    of the negligence of Kellaway and other trucking firms, Your

6    Honor.  That is not clear, and that is not unequivocal

7    language.  And therefore, it should not be enforced against

8    Kellaway.

9         THE COURT:  Let's take a look at the objections to

10   the billing.  This was in a document in the form of a

11   letter.  And attached to it were some objections to the

12   unreasonableness of the fees sought.

13        There is a footnote one on the first page.  In

14   many instances, multiple activities were jointly billed as

15   one entry on an invoice.  Since counsel for Maersk and/or

16   Mitsui did not break down the time in a more detailed

17   fashion, Kellaway is unable to do so.

18        What am I to do with that?

19        MR. KEENAN:  Your Honor, I think because the

20   burden is upon the third party plaintiffs to prove the

21   reasonableness of their attorney fees, I think it was their

22   burden to break down those entries.  Since they didn't, that

23   is to be construed against them, Your Honor.

24        THE COURT:  Are you referring to the entries that

25   are listed under 1(a), or are these entries that --

1      MR. KEENAN:  Basically if you look at their actual

2  bills, block billing, they will have a paragraph they will

3  name multiple tasks for one day and just have one number.  It

4  will say wrote letters, spoke to so and so, did this, did

5  that.  As opposed to having a breakdown of each of those

6  tasks, they just have one unit number for that entire block.

7      So we can't say how much they spent that day doing

8  a particular task.  So I think that in fairness because it is

9  their burden to prove the reasonableness of their attorney

10  fees, it can be assumed that that number applied to the tasks

11  that we identify in our letter, Your Honor.

12      THE COURT:  Do you want to respond to that one?

13      MR. WHELAN:  Well, Your Honor, at least from

14  Maersk's perspective, the policy of our firm is, and the

15  policy of this client that we bill to, is to allow block

16  billing.

17      In the long run, we have found some clients prefer

18  that to avoid being charged a minimum amount for a 30 second

19  phone call, for example.  The block billing allows multiple

20  tasks to be put in and could result in client savings.  That

21  is the reason why it is done.  This is the procedure of our

22  firm.

23      THE COURT:  It may be the procedure of your firm,

24  but I have the responsibility of determining whether the work

25  done was reasonable and necessary.  How can I decide that?

1          MR. WHELAN:  Your Honor, I think that the billing

2     that I produced with my memorandum as an exhibit is detailed

3     billing with specific numbers.  There are some block billing

4     examples.  However, I think Your Honor can look at the tasks

5     involved and determine whether it is a reasonable amount for

6     the tasks involved even if it is block billing.

7          If there is a phone call included with the

8     preparation of a research memorandum which is included with

9     another telephone call, I think someone can look at that and

10    determine whether it is a reasonable amount or it is not a

11    reasonable amount.

12         I think it is no different than looking at an

13    individual entry for a telephone call or an individual entry

14    for the preparation of a legal memorandum.  It involves a

15    little bit of subjective analysis.

16         THE COURT:  On page two, there is an objection

17    concerning the time spent for the liability expert.  Even if

18    the liability expert is not called for trial, if the

19    liability expert in some way assisted in the defense of a

20    trial or the prosecution of the trial, wouldn't counsel still

21    be entitled to that cost?

22         MR. KEENAN:  Certainly a reasonable amount, Your

23    Honor.  But this is like ten hours just to locate and have

24    preliminary discussions with the expert.  I believe that is

25    unreasonable, Your Honor, particularly in light of the fact

1    that the expert was never even used.

2            THE COURT:  Response, please.

3            MR. WHELAN:  Your Honor, I have gone through the

4    time entries that were specified there.  Kellaway in their

5    letter submission indicates that 10.2 hours having

6    preliminary discussions with the liability expert was

7    excessive.

8            I've gone through the individual entries.  The

9    July 30 entry, which is 2.3 hours, was not just for

10    discussions with the cargo security expert.  It also included

11    drafting discovery requests.  The same would be true for the

12    entry of July 31st which includes the drafting of discovery

13    requests.  And the entry for August 1st -- again, this is all

14    supported by my actual bills attached as an exhibit in the

15    descriptions.

16            August 1st includes various phone calls on other

17    matters involving the case.  And the August 2nd telephone

18    call was a call from myself to the client for .2 hours

19    concerning the expert, what he has said, how to use him, how

20    he can assist in the case.  And the final amount on August

21    3rd, 2001 is 2.2 hours.  This was part of getting the package

22    of documents and other materials together, reviewing it and

23    sending it out to the expert.

24            The liability expert -- engaging of a liability

25    expert, deciding whether one will be called as a witness at

24

1    trial is a matter of litigation strategy.  As Your Honor

2    pointed out, parties can often engage experts to provide them

3    advice and consult with the attorneys without testifying at

4    trial.

5            This expert Mr. DeBellis was present at trial.  I

6    made a litigation strategy decision not to call him.  He was

7    here on the last day of trial.  I made that decision not to

8    call him.  He did prepare a report which was produced and

9    attached to the pretrial order.

10           I submit that it is entirely reasonable to recover

11   10.2 hours that are associated with the expert engaging --

12   searching for an expert, engaging Mr. DeBellis and using him

13   to consult during this matter.

14           THE COURT:  On the same page two, go up to the

15   complaint set forth in paragraph B, complaint against the JEV

16   Company.

17           MR. WHELAN:  Yes, Your Honor.  This is basically

18   at the outset -- or close to the outset of the case, Kellaway

19   produced a lease that indicated that JVE, Incorporated was

20   the owner and operator of this premises.

21           The suggestion was made that they might be or are

22   or were responsible for the security of the facility.  In

23   order to comply with a scheduling order that required the

24   joinder of third party defendants by July 5th, 2001, we

25   prepared the third party complaint on July 4th and 5th, 2001,

25

1   served it -- filed it and served it on July 5th within the

2   deadline.

3          We ended up taking -- noticing Maersk, ended up

4   noticing and taking the deposition of the President of that

5   company William Smith, which took place here in Harrisburg.

6   It was determined that the company was now basically defunct

7   and without insurance and without assets.

8          And eventually, Kellaway acknowledged as the case

9   went forward that they were the ones in fact responsible for

10  the security on the premises, and therefore JVE was dismissed

11  from the case.

12         The 4.7 hours which this adds up to it is our view

13  is reasonable under the circumstances for preparing, revising

14  and filing the third party complaint against JVE.  It did

15  result in the taking of testimony that was helpful to the

16  defense of Maersk in this case.

17         THE COURT:  Page three, H, 32 hours to prepare

18  pretrial memo, findings of fact, conclusions of law and

19  exhibit list, 32 hours.

20         There is a notation that this was longer than the

21  actual trial.  I am familiar with our pretrial memorandum.

22  The only thing I can conclude is that the majority of those

23  hours were findings of fact and conclusions of law.

24         MR. WHELAN:  Your Honor, I have gone through the

25  entries for December 19, 20 and 21st.  That involved the

26

1    initial Court order process for the parties to exchange

2    exhibits and try to reach an agreement on stipulated facts.

3         During that time period if Your Honor looks at the

4    exhibit bills that also have additional entries in and around

5    those time periods, there were meetings with counsel involved

6    in the case to try to get agreements on these items.  That

7    time was spent reviewing the various exhibits of other

8    parties and drafting our own exhibit list and making

9    decisions on exhibits and disclosing them and serving them.

10        Those are the entries for that time period.  The

11   January 2nd entry involved drafting conclusions of law and

12   then attending a telephone conference, which again was part

13   of the process with the other attorneys in the case trying to

14   reach an agreement on pretrial submissions.

15        There is another entry on the 2nd of January 2002

16   which involved the reviewing of the file for preparing the

17   pretrial order and memorandum and conducting limited

18   research.  That was by me.  It included both work on the

19   pretrial order and research on the new claims -- the new

20   claim submitted by the plaintiffs in this case for the

21   additional profits which was being hotly contested at the

22   time and then was contested at trial.

23        The entries starting on January 1st through

24   January -- I'm sorry -- January 3rd through January 4th, this

25   was work done for the pretrial submissions required by Your

1    Honor's order which included the pretrial order, the exhibit

2    list, proposed findings of fact and proposed conclusions of

3    law.

4         It is our position that what we submitted was very

5    comprehensive.  It required a lot of time.  It required

6    additional double checking on research and things like that.

7         It constituted a significant amount of attorney

8    time to get these filings ready, and it is our position that

9    they were charges -- the charges are reasonable and necessary

10   to comply with the Court's order.

11        THE COURT:  Page five, L and O, 3.75 hours for

12   investigation Kellaway corporate identity.

13        MS. HIGGINS:  Yes, Your Honor, I can speak to that

14   since it deals with Mitsui.  Originally in the litigation,

15   there had been a stipulation that was proposed -- and

16   frankly, I am not quite sure who did it -- but there was a

17   certain issue and the Maersk complaint listed various

18   Kellaway entities, and the Mitsui complaint had only listed

19   one Kellaway entity.

20        When the matters were merged, there were some

21   issues as to whether those claims would still be bound in a

22   joint litigation.  My understanding is that the stipulation

23   had been drafted and signed by some of the parties and not

24   all of them.  And my investigation was to see whether or not

25   that would prejudice us at trial if we had only the one

1    Kellaway entity in the matter, and if that would prejudice us

2    if they argued a separate theory or a separate company would

3    be liable for the actions.

4           So in my mind, it was a significant finding to the

5    third party liability claim.

6           THE COURT:  O, under that, the 3.2 hours for a

7    phone call and reviewing Court filings.

8           MS. HIGGINS:  This was also in the same time frame

9    that Mr. Whelan spoke of I think dealing with the phone

10   call.  It was when the parties were trying to get together

11   with the joint stipulations and the preparation.  It was not

12   a five minute phone call.

13          But in addition, in an attempt to reach the

14   stipulation, we went through the various Court filings

15   including the request for admission that the parties had

16   prepared to see what items could be agreed to with joint

17   stipulation and which ones were contested.

18          Frankly, many items were contested which resulted

19   in some extra preparation on our part.

20          THE COURT:  On that same page, I and J, 3.2 hours

21   for reviewing correspondence, 2.3 hours for reviewing a

22   letter and updated discovery document.

23          MS. HIGGINS:  The mostly correspondence relates

24   specifically for correspondence from Maersk'S counsel which

25   had included answers to requests for admissions and

1    correspondence was drafted to the client related to that.

2             Additionally, there were Customs Service issues

3    that were still outstanding, and a reminder notice and

4    correspondence was sent to an outstanding Freedom of

5    Information request.  Your Honor will recall that later on in

6    December, we did have a motion to compel filed related to

7    some of the Customs issues.  That was an item that we were

8    dealing with in October as well.

9             There was also a review conducted of objections to

10   discovery responses to determine whether to withdraw the

11   objections or answers to the interrogatories that had been

12   objected to.  So that was a review of the pleadings in that

13   area.

14            And as for -- did you say J?

15            THE COURT:  Yes.

16            MS. HIGGINS:  That also included the entry for J

17   related to discovery items and Customs issues there.

18            THE COURT:  Go to page six.  There are two issues

19   raised in that.  There are a number of objections to the fact

20   that Mitsui billed a certain number of hours for attending

21   conferences, and Maersk was about half the number of hours

22   for attending the same thing.

23            Is there an explanation for that difference?

24            MS. HIGGINS:  I think there is, Your Honor.  In

25   speaking with Mr. Whelan, I believe he mentioned on the one

1    conference, his travel time may have been billed separately.

2         I know that for my purposes, in the travel time

3    out here sometimes it was two hours out here minimum and two

4    hours back.  So for an eight hour trial, that is how we wound

5    up with twelve hours.

6         There was also a deposition where some extra time

7    was spent.  Frankly, it was in North Jersey.  We were

8    starting in the morning, and I really did not want to be late

9    for the deposition or for any of the Court conferences.  So

10   if I did leave early, I would have just spent the time maybe

11   if there was an extra half hour reviewing notes or making

12   phone calls or something like that.

13        THE COURT:  The differences you are indicating

14   primarily were the result of travel time?

15        MS. HIGGINS:  I think so.  In terms of the twelve

16   hours, I would say that it was eight hours for the trial and

17   then two hours each way driving.  In fact, frankly this

18   morning, I left more than two hours early because I

19   anticipated some traffic concerns.

20        THE COURT:  The paragraph right above Q on page

21   six, there's some objections concerning potential problem of

22   double billing.

23        MS. HIGGINS:  That is always a concern, Your

24   Honor, when more than one attorney works on a case.  In fact,

25   it is not double billing.  What I might do is segregate the

1    issues in the findings of fact and conclusions of law.  Say I

2    would handle bailment and then would give an assignment to

3    Mr. McCammon to deal with another area of it.

4         While I would review his work, I would not

5    necessarily bill the client for that.  I did mention in my

6    brief any time in reviewing the bills before these are sent

7    out to a client, I have the billing partner review them for

8    what I feel is the first level of reasonableness.

9         And in this case, I did write off several thousand

10   dollars worth of time that would have been time that Mr.

11   McCammon or myself might have spent on the file that I did

12   not think was reasonable.

13        I think in the overall looking at it as an entire

14   action, that's certainly one factor that I would argue is

15   that as the billing partner, the first level of

16   reasonableness is what I feel was reasonable doing the work.

17   And in that case, I did feel some of our work was excessive,

18   and the client was not billed for that.

19        And obviously, then Mr. Keenan's client would not

20   be billed for that either on the indemnity action.

21        There are a couple of other issues, if I could,

22   just in general with reasonableness.  I think, first, we

23   tried very hard to reach stipulations, but we weren't always

24   successful in them.

25        But frankly, in a maritime case, you always have a

1    concern of overseas traveling, try and reach --

2             THE COURT:  Excuse me.

3             MS. HIGGINS:  We try and avoid expenses and costs

4    where appropriate.  For example, if you recall, at the very

5    last moment there was an exhibit.  I think it was Plaintiff

6    Exhibit 103, which was an affidavit from the Indonesian

7    packer of the goods.

8             Generally, that is something that we may have had

9    to travel for.  We try and view these cases to keep the costs

10   manageable, and we were able to do it by stipulation in that

11   case.

12            One of the depositions in the case of a witness

13   that came up towards the end was a telephone deposition

14   instead of going up there again in an effort to try and keep

15   the cost manageable and still complete matters in the same

16   time frame.

17            I would suggest also that frankly, Mr. Whelan's

18   firm and my firm practice a lot of maritime cases.  And the

19   bills for the two firms did seem comparable which I think

20   would be a factor that the Court would consider in the

21   reasonableness standard.

22            The Third Circuit spoke to that in the Ming Moon

23   case.  And in fact, that was a maritime case.  And the total

24   claim for that case was $227,000.00.  It was over a five

25   hundred dollar package limitation.  The Court said there you

33

1    don't look to what the eventual liability is.  You look to

2    what the total claim is.

3            So in this case, there were two Mitsui

4    containers.  That was almost $300,000.00 worth of damages.

5    Not all of that was awarded at trial.  So I think our efforts

6    were very reasonable, first of all, in defending the claim on

7    the damages portion of it and then presenting the defenses

8    thereafter.

9            And in fact in the Ming Moon case, the attorney's

10   fees were $61,000.00.  The Third Circuit held that is

11   reasonable under the circumstances.  That was ten years ago.

12   Our fees for this case for a larger amount $300,000.00 were I

13   believe in the range of $66,000.00.  And that included costs

14   of some deposition transcripts as well.

15           So I would argue that that is a reasonableness

16   standard that should be considered as well.

17           THE COURT:  Mr. Keenan?

18           MR. KEENAN:  Thank you, Your Honor.  Let me

19   preface my remarks because I do have utmost respect for my

20   colleagues, but still under the circumstances, there is

21   billing that is excessive for the type of case here.

22           There can be times where good counsel can be

23   overly aggressive and overbill a file.  I think there were

24   instances of that here.

25

1          Just, for example, this was a relatively short

2     trial.  We had the pretrial memorandum exceeding the length

3     of the trial in the case of Mitsui.  It was double the length

4     of the trial.  I think it was 56 hours for their pretrial

5     memo; whereas it was 32 for Maersk.

6          Also, it is their burden to prove the

7     reasonableness of their fees.  And to say that I think the

8     excess billing was caused because of driving, that really

9     doesn't meet their burden.  They have to prove that that is

10    what the difference is.

11         There's other examples, Your Honor.  There is like

12    three hours for summarizing a deposition that took six

13    hours.  I mean these are things that are really not billing

14    that comports with the type of case we had here.

15         This was not a complex case.  This was a theft of

16    two containers from a container yard.  This wasn't real

17    tricky stuff.

18         And there is also even -- the other thing you have

19    to look at, Your Honor, is they do practice in this area.

20    They are expert in this area.  And to have the type of

21    billing they have, for example, for legal research cannot be

22    justified.

23         I mean these were basic bailment issues and basic

24    issues under the bill of lading and contract principles that

25    was not worthy of the type of legal research that was shown

1    in their bills.  Of course, I give them their due, and that

2    they are expert in this area.  That also goes with they

3    shouldn't have the type of billing that they had here because

4    it comports with their higher hourly rate that they are

5    justified in getting.  We haven't argued that they weren't

6    entitled to the rate that they are charging.

7              THE COURT:  Mr. Keenan, if you have a six hour

8    deposition and you are going to go through it page by page

9    and take notes as to certain areas in the deposition that

10   might be potential for use on cross-examination, and you do

11   it, and it takes a third of the actual deposition time, you

12   feel that is excessive for that kind --

13             MR. KEENAN:  I think so.  It's a six hour

14   deposition.  It is normal in the defense practice when you

15   come back from a deposition, you immediately do a deposition

16   summary.  It's not based upon the transcript because you

17   don't have the transcript yet.  You wouldn't have that for

18   several weeks.  It is based upon your notes.

19             I can say since I have done hundreds of them that

20   basically, all you are doing is you are reading the notes you

21   took at the deposition.  It really should never take -- you

22   are not reading anything.  You are just reading your notes

23   and giving a summary so your client can get a report on

24   basically the gist of what the person testified to, the

25   important parts of his testimony.

36

1        And that is what this billing is for.  This

2   billing was for deposition summaries that would be different

3   than a line by line summary which would be part of the trial

4   preparation.  Obviously, that takes more time because you are

5   reading through the transcript, and you are making

6   designations by page and line that you can then use for trial

7   for the purposes of cross-examination.

8        These entries aren't for that.  These are

9   deposition summaries which don't to take half the length of

10  the deposition to do.  At least, that's my experience, Your

11  Honor.

12       Also with respect to -- for example, the joinder

13  complaint of JVE which was the landlord, and Kellaway never

14  took the position in the case that they didn't possess that

15  property and weren't responsible for the security there.

16       There was no reasonable need to join JVE, which I

17  think was ultimately proven by the fact that they were

18  voluntarily dismissed.  I think that was just being overly

19  aggressive and not warranted by the case or the evidence.

20       I don't think that that should be part of the

21  attorney's fees claimed, Your Honor.

22       MS. HIGGINS:  It was a Mitsui entry, Your Honor,

23  on the drafting the deposition summary.  Frankly, I should

24  clarify that.

25       We will generally not have an attorney do that

37

1    line and page summary that he would.  That would be a task in

2    our firm that would be more suited to a paralegal who would

3    charge it out at a lower rate.

4            In fact, the full entry for that day which is

5    September 12, 2001 --

6            THE COURT:  What page are you on?

7            MS. HIGGINS:  It is Exhibit --

8            THE COURT:  I am looking at the letter.

9            MS. HIGGINS:  Forgive me, Your Honor.  It would be

10   --

11           THE COURT:  Page four, excessive billing by

12   Mitsui, II, Subsection A?

13           MS. HIGGINS:  Page five, letter F.

14           THE COURT:  Okay.

15           MS. HIGGINS:  The entry is revising a summary of

16   the deposition.  However, the time entry actually reads:

17   There was an additional drafting of a status report to the

18   client, and that was also billed at that time.  It was not a

19   line and page entry.

20           First of all, we would have a paralegal do that.

21   Second of all, the more complete entry is additional drafting

22   of status report to client including cause of defenses and

23   limitations with burden of proof.  Those two tasks jointly

24   account for the 2.3 hours.

25           THE COURT:  Anyone else have anything for the good

38

1    of the cause?

2              MR. WHELAN:  Your Honor, on behalf of Maersk,

3    there has been reference by Mr. Keenan to the effect that

4    there was overkill on research and preparation of pretrial

5    materials.

6              My position and experience after this trial and

7    going through this case is it was a challenging case because

8    there were a lot of alternative possible theories of

9    liability.  If the Court didn't accept one, there's a

10   possibility for the bailment, or it could be COGSA.  And we

11   found it to be at least at our firm challenging in that

12   regard.

13             I submit, Your Honor, that it required substantial

14   amounts of work on the legal side in terms of research and

15   putting together the pretrial materials and the briefing.

16             I think Your Honor's memorandum of findings of

17   fact, conclusions of law, which are 31 pages long, are

18   evidence of this isn't a case that can be disposed of in a

19   one line order or a two page opinion.

20             There are a substantial number of issues, both

21   factual and legal.  It was little more complicated than

22   saying three containers were stolen from a facility, and we

23   are going to apply a one decision on Pennsylvania bailment

24   law.  I think it was more complicated than what is being

25   argued here today.

1            On another point, I know that in terms of -- there

2    is in Mr. Keenan's letter to the Court reference to again

3    these deposition summaries at page two and three on D, E and

4    F.

5            I would submit that it has been my experience as a

6    defense lawyer that when clients are paying us to defend

7    cases, that they require deposition summaries.  If you are

8    spending six to eight hours at a deposition, they want to

9    know why you spent that time, what happened, how does it

10   impact the case.

11           A deposition summary -- because you are going to

12   send a bill out, and they want to know where the case stands

13   after you take meaningful discovery.  And it is absolutely

14   necessary -- at least from a defense counsel's point of view

15    -- to summarize those deposition reports to your client, to

16   advise them where the case stands and how it impacts the

17   liability situation.

18           THE COURT:  Mr. Keenan, what is your position

19   again with the complaint against JVE Company?

20           MR. KEENAN:  Your Honor, that it was overkill.

21   The theory I guess for why they joined JVE was they were the

22   landlord of the container yard.  Kellaway has never taken the

23   position that they didn't control and possess that property

24   or that they weren't responsible for security.  There was no

25   need to join JVE.

40

1          They ultimately spent the money to prepare a

2   complaint, serve it, bring it into the case and then

3   voluntarily dismissed them.

4          THE COURT:  Was there a deposition taken after

5   that?

6          MR. KEENAN:  I believe there was a deposition

7   taken beforehand, Your Honor.

8          THE COURT:  Before what?

9          MR. KEENAN:  Before they dismissed them, Your

10  Honor.  There was a deposition, and then they dismissed the

11  JVE.  There was no reasonable purpose for bringing JVE into

12  the case.

13         This wasn't a case where Kellaway said we didn't

14  have that property; we weren't there.  We didn't possess it.

15  We didn't control it.  We weren't responsible.

16         For security, Kellaway had always taken the

17  position that the containers were under our control.  Our

18  defense was that we acted reasonably, and we weren't

19  negligent.

20         I would just also add, Your Honor, there are some

21  striking contrasts between the billing by Maersk and Mitsui.

22  Their counsel are very comparable, experienced, and they are

23  geographically in the same location.  There really isn't any

24  justification for some of the striking contrasts between the

25  billing, Your Honor.

41

1          THE COURT:  Well, ladies and gentlemen -- lady and

2    gentlemen, I will take the matter under advisement.  Thank

3    you for your appearance for today.

4          MS. HIGGINS: Thank you.

5          MR. WHELAN:  Thank you.

6          THE CLERK: Court is adjourned.

7          (Whereupon, the proceedings were concluded.)

8

9

10         I hereby certify that the proceedings and evidence

11   are contained fully and accurately in the notes taken by me

12   on the trial of the above cause, and that this copy is a

13   correct transcript of the same.

14

15                         *Vicki L. Fox RMR*

16                         Vicki L. Fox, RMR

17                         Official Reporter

18

19         The foregoing certification of this transcript

20   does not apply to any reproduction by any means unless under

21   the direct control and/or supervision of the certifying

22   reporter.

23

24

25