*TPu mailed*
*see Pl*

(118)
1/17/03
vh

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILLIPS-VAN HEUSEN CORP.,   :   **CIVIL ACTION**
                    *Plaintiff*   :
       -against-          :   NO: 1:CV00-0665
J.V.E. Co., Inc.              :
(a/k/a Japan Vehicle Equipment Co.,   :   (Judge Sylvia H. Rambo)
U.S.A., Inc.)               :
           *Defendant*   :
        and             :   **THIRD CIRCUIT COURT OF**
MITSUI O.S.K. LINES, LTD., and   :   **APPEALS DOCKET NO. 02-3708 (dmm)**
DAMPSKIBSSELSKABET AF 1912   :   Related Appeal Docket Nos.:
AKTIESELSKAB and AKTIESELSKABET:    02-3577 (dmm)
DAMPSKIBSSELSKABET SVENDBORG :    02-3707 (dmm)
   *Defendants/Third Party Plaintiffs*   :    02-3709 (dmm)
       -against-          :
KELLAWAY TRANSPORTATION, INC.   :
KELLAWAY INTERMODAL &       :    **FILED**
DISTRIBUTION SYSTEMS, KELLAWAY:    **HARRISBURG, PA**
INTERMODAL SERVICES, INC. and   :
KELLAWAY TERMINAL SERVICES, INC:    JAN 1 5 2003
   *Third Party Defendants*       :

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

## PHILLIPS-VAN HEUSEN CORP.'S NOTICE OF AMENDED CROSS-APPEAL AND APPEAL, OR NOTICE OF CROSS-APPEAL AND APPEAL

Third-Party Defendant, Kellaway Transportation, Inc., filed a Notice of Appeal in the captioned matter on September 13, 2002, docketed at 02-3577. Thereafter, Plaintiff, Phillips-Van Heusen Corp., filed a Notice of Cross-Appeal and Appeal (docketed at 02-3708), as did Defendants (docketed at 02-3707 and 02-3709).

On November 7, 2002, the parties filed a stipulated Motion to Extend Time, in view of the fact that the District Court still had to decide an issue regarding attorney's fees. The Motion was treated as a Motion to Stay the Appeals and was granted, although a question was raised concerning whether the Circuit Court had jurisdiction, as the District Court had issued an Order

U:\DOCS\gmt\ATL-Kellaway\Notice of Appeal - 1-13-03.wpd

vacating the original judgment for purposes of addressing the attorney's fee issue. On December 10, 2002, judgment was entered in favor of Defendants on their indemnity claims against Third Party Defendant, including the awarding of attorney's fees. On December 13, 2002, judgment was entered in favor of Plaintiff against Defendants; this judgment was the same as the original judgment entered on August 14, 2002.

On January 3, 2003, Third-Party Defendant, Kellaway Transportation, Inc., filed an Amended Notice of Appeal.

Notice is hereby given that Plaintiff, Phillips-Van Heusen Corp., cross-appeals and appeals to the United States Court of Appeals for the Third Circuit from the Memorandum Findings of Fact and Conclusions of Law originally entered in this action by the Honorable Sylvia Rambo on the 14th day of August 2002 (attached hereto as Exhibit 1), and the associated judgments entered on August 14, 2002 and December 13, 2002 (attached hereto as Exhibit2) to the extent that appropriate damages for market value were not awarded and because the amount of pre-judgment interest awarded is no longer correct.

Respectfully submitted,

HECKER BROWN SHERRY AND JOHNSON LLP

BY: _Carl H. Delacato_ with permission

CARL H. DELACATO, JR.
1700 Two Logan Square - 17th & Arch Streets
Philadelphia, PA 19103-2769
(215) 665-0400
Attorney for Plaintiff,
Phillips-Van Heusen Corporation

MATTIONI, LTD.


BY: _____
GEORGE R. ZACHARKOW
399 Market Street, Second Floor
Philadelphia, PA 19106
(215) 629-1600
Attorney for Plaintiff,
Phillips-Van Heusen Corporation


Dated: January 14, 2003

## CERTIFICATE OF SERVICE

I, GEORGE R. ZACHARKOW, ESQUIRE, do hereby certify that a true and correct copy

of Plaintiff's Notice of Cross-Appeal and Appeal were served via first class mail on January 14,

2003 upon the following attorneys:

Carl H. Delacato, Esquire
Hecker, Brown, Sherry & Johnson
1700 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103-2769

Richard Q. Whelan, Esquire
Palmer, Biezup & Henderson
620 Chestnut Street, Suite 956
Public Ledger Building
Philadelphia, PA 19106-3409

Ann-Michelle Higgins, Esquire
Rawle & Henderson
Widener Building
One South Penn Square
Philadelphia, PA 19107

Patrick J. Keenan, Esquire
Duffy & Keenan
The Curtis Center, Suite 1150
Independence Square West
Philadelphia, PA 19106

Paul R. Walker, Esquire
THOMAS, THOMAS & HAFER LLP
305 North Front Street
P.O. Box 999
Harrisburg, PA 17107

GEORGE R. ZACHARKOW

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PHILIPS-VAN HEUSEN CORP.,          CIVIL ACTION NO. 1:CV-00-0665

Plaintiff

v.

MITSUI O.S.K. LINES LTD., *et al*,

Defendants

FILED
HARRISBURG, PA
AUG 1 4 2002
MARY E. D'ANDREA, CLERK
Per

M E M O R A N D U M

FINDINGS OF FACT AND CONCLUSIONS OF LAW

On February 12, and 13, 2002, the court conducted a non-jury trial in the captioned matter. The following constitute the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I.      Findings of Fact

A.      The Parties

Plaintiff, Philips-Van Heusen Corporation ("PVH"), is a Delaware corporation with its principal place of business in New York City, New York. PVH is a clothing wholesaler who distributes, amongst other products, Izod brand men's shirts. PVH generally purchases its products from manufacturers overseas. In the normal course of its business, PVH receives purchase orders from retailers in the United States. PVH then instructs one of its overseas manufacturers to begin the work. Once PVH receives an order, it usually takes its manufacturer about four months to deliver the finished products. Because the United States Government places limits on the amount of imports that can come into the country from a

particular foreign nation, PVH has relationships with manufacturing entities in several foreign countries including Indonesia and Pakistan.

Defendant and Third-Party Plaintiff Mitsui O.S.K. Lines, Ltd. is a foreign corporation primarily engaged in shipping cargo by ocean liner steamships from one continent to another. Defendant and Third-Party Plaintiff Dampskibssekskabet Af 1912 Aktieseskab and Aktieseskabet Dampskibssekskabet Svenborg d/b/a Maersk Line, Inc. ("Maersk") is a foreign corporation engaged in the same business as Mitsui. From time to time throughout this memorandum, the court will refer to Mitsui and Maersk collectively as "the Ocean Liner Defendants."

Third-Party Defendant Kellaway Transportation, Inc. ("Kellaway") is a Massachusetts corporation with its principal place of business in Randolph, Massachusetts. Kellaway is the successor in interest to Kellaway Intermodal and Distribution Systems, Inc. and a variety of other entities bearing the Kellaway name. Kellaway's primary business operation is shipping cargo by truck between various points in the continental United States.

B.    The Mitsui Shipments

On March 15, 1999, PVH placed several orders with the P.T. Busana Rama Textile & Garment Company ("Busana Rama") of Tangerang, Indonesia. Those orders requested that Busana Rama manufacture approximately 29,000 men's Izod sport shirts. Pursuant to an agreement between Mitsui and PVH, Mitsui shipped three of its forty foot intermodal shipping containers and three Mitsui security seals to Busana Rama to be used in packing the shirts.[1]

---

[1]Intermodal shipping containers are structural boxes that adapt easily to multiple modes of
(continued . . .)

2

08/28/2002   10:06AM

Romel Pasaribu, Busana Rama's Assistant Warehouse Manager, supervised employees as they stuffed the three Mitsui intermodal containers with shirts manufactured by Busana Rama and consigned to PVH pursuant to the purchase orders. On May 14 and 15, 1999, Busana Rama employees stuffed: (1) Mitsui container number MOLU0112686 with 387 cartons containing 9,187 shirts and then applied Mitsui security seal number M 577397; (2) Mitsui container number MOLU0102585 with 388 cartons containing 9,268 shirts and then applied Mitsui security seal number M 577398; and (3) Mitsui container number MOLU004465 with 442 cartons containing 10,603 shirts and then applied Mitsui security seal number 577396. Pursuant to Indonesian law, a government surveyor observed the stuffing. Once the Busana Rama employees completed the task, the surveyor applied his own security seals to the container. As to container MOLU0112686, he applied seal number 1483128. As to container MOLU0102585, he applied seal number 14831805. As to container MOLU0004465, he applied seal number 14697985.

The three containers were then transported to Mitsui for shipment. On May 16, 1999, Mitsui issued the following Bills of Lading: (1) No. 460156264 pertaining to container MOLU0112686; (2) No. 460155893 pertaining to container MOLU0102585; and (3) No. 460156258 pertaining to container MOLU004465. All three documents noted the appropriate Mitsui security seal number. All three Bills of Lading indicated that the containers were delivered to Mitsui in Jakarta,

---

¹(. . .continued)

transportation, such as ocean vessel, rail, and motor carriage. Once the cargo is loaded into the container at its point of origin, it may be transported by sea, rail, or truck to its point of destination without having to be loaded again. This saves shippers and manufacturers the extra cost of having to re-load the cargo each time it switches mode of transportation.

Indonesia and subsequently loaded onto the ocean vessel APL Garnet in Singapore for transportation to Long Beach, California. From there, the containers would be transported, eventually, to PVH's warehouse in Reading, Pennsylvania.

All three Bills of Lading contained a page of terms and conditions. Paragraph 6(3) of these terms disclaimed Mitsui's liability for consequential damages resulting from damage to, or loss of, the goods within the container. Paragraph 11(1), also states that "freight charges shall be deemed fully earned on receipt of the Goods by the Carrier, whether Goods are lost or not, and shall be paid and non-returnable in any event" (Pl. Ex. 31 at ¶ 11(1).) According to the Bills of Lading, PVH paid $5,870 in freight for transportation of each Mitsui container from Indonesia to Reading. Additionally, PVH paid $13,245.51 in customs and duty charges to transport container number MOLU0112686 to the United States and $13,392.48 for the same charges as to container number MOLU0102585. Pursuant to commercial invoices issued by Busana Rama, PVH paid $63,234 for the shirts packed in container MOLU0112686 and $63,935.84 for the shirts packed in container MOLU0102585.

The Mitsui containers arrived in Long Beach on June 5, 1999. Subsequently, Mitsui had the containers transported by rail to South Kearny, New Jersey. They arrived in New Jersey on June 13, 1999.

C.    The Maersk Shipment

On February 23, 1999, PVH placed several purchase orders with D.S. Clothing, a garment manufacturer located in Lahore, Pakistan. One of those orders requested that D.S. Clothing manufacture approximately 12,000 men's cotton Izod shirts. On May 15, 1999, pursuant to the PVH shirt order, employees of D.S.

4

08/28/2002  10:06AM

Clothing stuffed Maersk intermodal shipping container GTSU28486767 with 378 cartons containing 12,096 men's shirts. According to the commercial invoice, PVH paid D.S. Clothing $56,851.20 for the shirts.

In accordance with custom and usage for Pakistani exports, Muhammad Iqbal, an employee of Quality Services, oversaw the stuffing of the container which took place at the Qasim International Container Terminal in Karachi, Pakistan. The container was then sealed with Maersk security seal number 0110356 and delivered to Maersk for ocean shipping.

On May 18, 1999, Maersk issued Bill of Lading number MAEUYCGJ05408 for container number GSTU28486767. The document noted that security seal number 0110356 was still in place. The document further indicated that the container would be transported from Karachi, Pakistan to PVH's warehouse in Reading.

Like the Mitsui Bills, the Maersk Bill of Lading contained a page of terms and conditions governing the transportation contract. Paragraphs 7(1) and (2) of that document disclaimed Maersk's liability for consequential damages resulting from damages to, or loss of, the goods within its container. Additionally, Paragraph 14(1) indicated that the freight was deemed earned in full upon delivery of the goods to Maersk at the point of origin. PVH paid $3,755 in freight for transportation of the Maersk container from Pakistan to Reading. Additionally, PVH paid $11,973.50 in customs and duty charges to transport the Maersk container.

The Maersk container arrived at a shipyard terminal in Newark, New Jersey on June 15, 1999. When it arrived, the container still bore Maersk security seal number 0110356.

03/28/2002   10:06AM

### D.    Kellaway's Performance

United States Department of Treasury regulations require that imported cargo clear customs inspection at a U.S. Customs bonded facility located within fifty miles of the cargo's ultimate destination. *See* 19 C.F.R. § 142 *et seq.* (2002). Because Kellaway owned such a facility in Harrisburg, Pennsylvania, both Maersk and Mitsui arranged to have the containers clear customs at Kellaway's Harrisburg facility prior to final delivery. On June 9, 1999, Mitsui issued a work order to Kellaway requesting that it transport the Mitsui containers, by truck, from New Jersey to Harrisburg. On June 15, 1999, Maersk issued a similar order. The plan was that Kellaway would transport the containers from New Jersey to Harrisburg, where, upon clearing customs, GPS Transport, a non-party to this suit hired by Maersk and Mitsui, would take possession of the containers for the final leg of the journey from the container yard in Harrisburg to PVH's warehouse in Reading.

On June 15, 1999, Kellaway drivers picked up the three Mitsui containers and delivered them to the Kellaway facility in Harrisburg. Upon arrival, Keith Walborn, a Kellaway employee issued an interchange receipt for each container. That document indicated that the seals issued by Mitsui and the Indonesian government were still in place. On June 17, 1999, a Kellaway driver picked up the Maersk container in New Jersey and delivered it to the Kellaway facility in Harrisburg. Once again, upon arrival, Walborn issued an interchange receipt which indicated that the seal placed on the container in Pakistan was still in place. On June 16 and 17, 1999, the three containers cleared customs at the Kellaway facility.

08/28/2002  10:06AM

On Friday, June 18, 1999, at approximately 6:00 p.m., Walborn closed the Kellaway facility for the weekend. He was the last person to leave the yard. He closed the gate to the container yard and secured it with a chain and key lock. Mike McKillup, who owned the business located next to the Kellaway facility, drove by the Kellaway facility the next day and noticed that the gate to the container yard was open at that time. On Sunday, June 20, 1999, William Gross, a Kellaway truck driver, arrived at the Harrisburg facility to pick up a container for transport. At that time, he observed that approximately nine containers had been broken into, including the container that he was assigned to transport. He immediately called Kellaway's dispatcher, Scott Decker, who in turn notified Walborn of the situation.

Walborn arrived at the Kellaway facility a short time later. After conducting a brief investigation, he noted that two tractors and three intermodal containers were missing — Mitsui container numbers MOLU0112686 and MOLU0102585 and Maersk container number GSTU28486767. As previously discussed, these containers all contained cargo destined for PVH's warehouse in Reading. Additionally, Walborn noted that the chain and lock for the gate were missing. He also noticed that there was a hole in the side of the fence to the right of the fence's gate.[2] He surmised that thieves broke into the yard overnight and used the two stolen tractors, plus a third tractor missing from an adjacent lot, to haul away the three containers. Walborn then notified the Swatara Township, Pennsylvania Police and the Federal Bureau of Investigation ("FBI"). The FBI later learned that authorities in New York City discovered the three stolen tractors and intermodal containers in the Bronx between June 19 and July 2, 1999. All three

---

[2] The stolen containers were positioned between the front gate and the hole in the fence.

containers were discovered empty.[3]  After PVH brought suit against the Ocean Liner

Defendants, both Maersk and Mitsui tendered their defenses of the case to Kellaway

who refused to defend the case on their behalf.

E.    Kellaway's Harrisburg Facility

Kellaway's customs bonded facility was located at 4390 Chambers Hill

Road in Harrisburg.[4]  Kellaway began leasing the facility from Japan Vehicle

Equipment, Inc. ("JVE") in December 1995.  Prior to the lease, the facility was not

used as a container yard.  The terms of the lease required that Kellaway make all

improvements necessary for the operation of its container yard business.

Accordingly, Kellaway installed a chain link fence around the area that

it would later use as a container yard.  The fence was between six and eight feet high

with three strands of barbed wire on top.  It had a gate in front through which tractor

trailers could enter to drop off and pick up loads.  The gate was not controlled

electronically and when the facility was closed on nights and weekends, the gate

would be secured only by a pad lock and chain.  All Kellaway drivers had keys to

the lot and could access the yard outside of normal business hours.

In spite of the fact that the container yard remained unmanned on the

weekend, Kellaway did not install a detection and/or alarm system at the yard, nor

was the yard equipped with close-circuit security monitors.  Likewise, Kellaway did

not employ a security guard to man the facility during those periods or to make

periodic inspections to ensure that no one had surreptitiously entered the container

---

[3]The third Mitsui container loaded by Busana Rama in Indonesia, number MOLU0004465, was not stolen.  GPS delivered it to PVH's warehouse in Reading.

[4]Kellaway has since closed the facility.

8

yard. Moreover, two sets of small flood lights mounted on the rear of the building near the truck dock provided the container yard's sole source of illumination at night. Furthermore, Kellaway personnel directed truckers dropping off loads to place containers side-by-side near the chain link fence with the containers' doors exposed, and Kellaway did not place fifth wheel pin locks on any of the wheels of the trailers upon which the containers rested. There was a significant amount of brush located around the perimeter of the fence to the container yard. Finally, Kellaway had no formal procedure tracking the use of the keys that it gave to its employees.

## II.    Discussion

### A.    Subject Matter Jurisdiction

Although the parties disagree about the source of the court's subject matter jurisdiction, the true dispute involves what law should govern the parties' rights and liabilities in this matter. All parties, and the court, acknowledge that federal jurisdiction is proper in this case. At the very least, diversity jurisdiction is proper because all Plaintiffs and all Defendants in this case are from different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. Alternatively, several parties claim that the cause of action in this case raises a federal question regarding the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1300 *et seq.*, and/or federal common law. Therefore, regardless of the source of law, federal jurisdiction is proper.

9

08/28/2002  10:06AM

B.    Choice of Law

The parties, however, are in disagreement over what law is to apply in this case. According to PVH, the complaint implicates "the General Maritime Law of the United States, as supplemented by [COGSA] . . . the Harter Act of 1893, 46 U.S.C. § 190 *et seq.*, and federal common law." (PVH Prop. Concl. of Law at ¶4.) Mitsui contends that the contract between it and PVH requires that COGSA apply. Maersk contends that either Pennsylvania bailment law or COGSA governs PVH's claim against it. Both Mitsui and Maersk similarly contend that Pennsylvania contract and bailment law governs their claims against Kellaway.

1.    The Harter Act

The Harter Act imposes a duty of "proper, loading, stowage, custody, care [and] proper delivery." 42 U.S.C. app. § 190. COGSA partially superseded the Harter Act and now the Harter Act applies only to the period between discharge of the cargo from the vessel and "proper delivery." *Tapco Nigeria, Ltd. v. M/V WESTWIND*, 702 F.2d 1252, 1255 (5th Cir. 1983); *see also Ace Bag & Burlap Co. v. Sea-Land Serv. Inc.*, 40 F. Supp. 2d 233, 236 (D.N.J. 1999). Because the Harter Act does not define "proper delivery," courts have determined that this term means discharge upon an appropriate and fit wharf. *See, e.g., Metropolitan Wholesale Supply, Inc. v. M/V ROYAL RAINBOW*, 12 F.3d 58, 61 (5th Cir. 1994). Therefore, where a shipper issues a through bill of lading which contemplates that some portion of the transportation will occur over land, the Harter Act does not apply. *Mannesman Demag Corp. v. M/V CONCERT EXPRESS*, 225 F.3d 587, 595 (5th Cir. 2000).

10

08/28/2002  10:06AM

In this case, both Ocean Liner Defendants issued through bills of lading which contemplated that a portion of the delivery would require transportation over land. Obviously, there is no contiguous body of water connecting either Indonesia or Pakistan to Reading, Pennsylvania. *See Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute."). Moreover, the loss of the cargo occurred during the inland portion of the journey while the containers rested in Harrisburg. Accordingly, the Harter Act does not govern any claims in this case. *Accord Jagenberg, Inc. v. Georgia Ports Auth.*, 882 F. Supp. 1065, 1078-79 (S.D. Ga. 1995).

2.    COGSA

The Ocean Liner Defendants also suggest that COGSA supplies the substantive rule of law in this case. COGSA, however, only applies by its force during "the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. app. § 1301(e). In this case, the loss occurred during the inland portion of the journey. Therefore, by its own terms, COGSA does not apply.

However, a carrier and a shipper can extend COGSA so that it applies prior to loading and subsequent to discharge of goods from a ship. *See* 46 U.S.C. app. § 1307. However, "the extent of any application beyond the scope of the statute is a matter of contract." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines*, 230 F.3d 549, 557 (2d Cir. 2000). Because the loss in this case did not occur during ocean transit, to the extent COGSA applies in this case, that application results out of the parties' contracts and will be subject to modification by

11

08/28/2002  10:06AM

other terms in these documents. *See id.* (citing *Pannell v. United States Lines Co.*, 263 F.2d 497, 498 (2d Cir. 1959)).

3.   Federal Common Law

Maersk briefly contends that federal common law governs this matter. Federal common law provides the legal basis for claims: (1) where Congress has granted federal courts the authority to develop substantive law; or (2) where a federal rule of decision is necessary to protect uniquely federal interests. *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981). The court is unaware of any instance in which Congress has granted it the authority to develop substantive law concerning the interstate or international carriage of goods. *See Cleveland v. Beltman North American Co, Inc.*, 30 F.3d 373, 377-80 (2d Cir. 1994) (holding that Carmack Amendment does not grant federal courts authority to judicially create a remedy under that act). Moreover, this case does not present any compelling federal interest. The dispute involves private parties concerning contracts for carriage and subcontracts for trucking services. The dispute does not concern the United States, any individual State or the Federal Government's foreign relations. *See, e.g., Boyle v. United Tech. Corp.*, 487 U.S. 500, 505-06 (1988) (holding that determining the liability of manufacturers under federal procurement contracts requires the application of federal common law); *Westfall v. Erwin*, 484 U.S. 292, 295 (1988) (holding that civil liability of federal officials for actions taken in the course of their duty concerns a compelling federal interest requiring the creation of federal common law); *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 593-94 (1973) (noting that in the absence of an applicable Act of

Congress where the United States is a party, it is for federal courts to fashion the governing rule of law). Federal common law does not apply in this case.

### 4.    State Law

Because this case essentially involves breach of contract claims and no federal law applies by its own terms, the court will apply state law contract principles. In order to determine which state's substantive law applies, federal courts entertaining diversity cases apply the choice of law rules of the state in which the court sits. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). Accordingly, the court will apply Pennsylvania's choice of law rules to determine what jurisdiction's contract principles will apply in this case.

Under both Pennsylvania law and the Restatement of Conflict of Laws, the first step in a choice of law analysis is determining whether the parties explicitly or implicitly elected to apply a certain forum's law. *See Assicurazoni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999); *see also Smith v. Commonwealth Nat'l Bank*, 557 A.2d 775, 777 (Pa. Super. Ct. 1989).[5] Restatement (Second) Conflict of Laws § 187 (1971). Although both the Mitsui and Maersk Bills of Lading contain provisions stating that the law of Japan and New York should govern their respective suits with PVH, no party has advocated that the court apply these provisions. (Pl. Ex. 31 at ¶ 25; Maersk Ex. B at ¶ 27.) Additionally, both of these documents contain other provisions indicating that United States law should govern any dispute between the Ocean Liner Defendants and PVH. (*See* Pl. Ex. 31

---

[5]"Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise." *Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 273-74 (3d Cir. 1985).

at ¶ 29; Maersk Ex. B at ¶ 5(2).) Because these documents contain contradictory statements, the court refuses to find that they manifest an intention to be bound by the law of a particular jurisdiction. Because the parties have not indicated a preference that the law of a particular jurisdiction apply in this case, the court must now turn to the interest-based analysis.

Absent an intent to be bound by the law of a particular jurisdiction, Pennsylvania's conflicts of law analysis requires application of the law of the state having the most significant contacts or relationships with the particular issue in the case. *See Griffith v. United Airlines*, 203 A.2d 796 (Pa. 1964). In this case, Pennsylvania is the jurisdiction with the most significant contacts with this dispute because the cause of action arises out of the theft of the cargo which occurred in Pennsylvania. Additionally, all of the Bills of Lading indicate that the containers would be delivered to PVH's warehouse in Pennsylvania, and the containers were stolen while resting in Pennsylvania prior to final delivery. Given that resolution of the claim will involve an analysis of whether the bailor was negligent, the court finds that Pennsylvania's connection to this case is sufficient to warrant application of its law.

C.    Merits

Having determined that Pennsylvania law will govern this dispute, the court will now discuss the parties' liability under that law. Because all the contracts in this case involved agreements to transfer personal property on behalf of another, the law of bailment applies. *See Smalich v. Westfall*, 269 A.2d 476, 480 (Pa. 1970) (defining bailment as "a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled,

14

it shall be redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it").

Under Pennsylvania law, "a cause of action for breach of a bailment agreement arises if the bailor can establish that personalty has been delivered to the bailee, a demand for return of the bailed goods has been made, and the bailee has failed to return the personalty." *Price v. Brown*, 680 A.2d 1149, 1152 (Pa. 1996). If the plaintiff establishes the elements of the prima facie case, the burden switches to the defendant to present evidence "accounting for the loss." *Id.* If the defendant fails to do so, he will be held liable for the plaintiff's loss. If, however, the defendant produces evidence indicating that the loss occurred by fire, theft, or other casualty which is not the defendant's fault, the burden switches back to the plaintiff to demonstrate that the defendant was negligent. *Moss v. Bailey Sales & Servs., Inc.*, 123 A.2d 425, 426 (Pa. 1956) (citing *Schell v. Miller North Broad Storage Company*, 16 A.2d 680, 681 (Pa. Super. Ct. 1940)). Moreover, different types of bailment require the bailee to conform with varying degrees of care with respect to the bailed goods. *Ferrick Excavating v. Senger Trucking*, 484 A.2d 744, 747-48 (Pa. 1984). Where, as here, the allegations of a bailment indicate one mutually beneficial to both parties, the bailee must exercise ordinary diligence and is responsible for ordinary neglect. *Id.* With these standards in mind, the court will now examine the claims involved in this case.

i.    Liability of the Ocean Liner Defendants

The Ocean Liner Defendants argue that PVH's claim against them must fail because PVH did not establish its prima facie case. As previously stated, in order for PVH to satisfy its prima facie case, it must prove that it delivered

15

personalty to the Ocean Liner Defendants, that it demanded return of the personalty and that the Ocean Liner Defendants failed to tender the personalty upon a reasonable demand. *See Price*, 680 A.2d at 1152. The Ocean Liner Defendants contend that PVH did not present evidence proving that it provided the merchandise in question to them in good order at the port of loading. The court disagrees.

As to the Maersk Container, PVH presented the affidavit testimony of Muhammad Iqbal, a PVH agent who oversaw the stuffing of the container. He testified that his employees stuffed 378 cartons of cotton shirts into the container on May 15, 1999. Additionally, he also provided copies of the Terminal Receipt and Export Tally Sheet from the Qasim International Container Terminal in Karachi, Pakistan.[6] He also testified that after stuffing the container, he placed a previously provided Maersk security seal on the container. When Maersk issued the Bill of Lading corresponding to its container unit, that document listed the seal placed on the container by Mr. Iqbal. Maersk did not note that any of its seals had been broken at that time. Furthermore, Walborn did not note any exception with regard to the security seals when the Maersk container arrived at the Kellaway facility in Harrisburg.

Similarly, as to the Mitsui Containers, PVH presented the affidavit of Romel Pasaribu, a Busana Rama employee. He indicated that he oversaw the stuffing of three Mitsui containers. According to his company's documents, also kept in the ordinary course of business, Busana Rama employees stuffed: (1) container MOLU0112686 with 384 cartons containing 9,187 shirts; (2) container MOLU0102585 with 388 cartons containing 9,268 shirts; and (3) container

---

[6] These are documents that Quality Services keeps in the normal course of its business.

Aug 28 02 09:52a    Alan Mycek    6105718700

MOLU0004465 with 442 cartons containing 10,603 shirts. Additionally, Pasaribu's affidavit indicates that Busana Rama employees applied Mitsui security seals to these containers. When Mitsui issued the Bills of Lading corresponding to these containers, it did not indicate that any of the seals had been broken. In fact, its Bills of Lading indicated that the original security seals were in place. Similarly, Trailer Receipt Delivery Inspection Reports – issued by the Kellaway drivers when they picked up the containers from the terminal in South Kearny, New Jersey – indicated that the original Mitsui seals were in place. When the container arrived at the Kellaway facility in Harrisburg, no exception was made regarding the security seals.

Based on this evidence, the court finds that PVH has satisfied its prima facie burden of proving that it delivered goods to the Ocean Liner Defendants and that the goods were not returned to it. Thus, the burden shifts to the Ocean Liner Defendants to present evidence "accounting for the loss." *Price*, 680 A.2d at 1152.

In response, the Ocean Liner Defendants contend that the loss occurred while the containers were in Kellaway's possession, and, therefore, they cannot be held liable for actions beyond their control. They contend that COGSA, made applicable in this case as a matter of contract, exempts the Ocean Liner Defendants' liability because the loss occurred while the property was out of their possession and control.

Under 46 U.S.C. app. § 1304(2)(q), carriers may exonerate themselves from liability by proving that cargo loss or damage occurred "without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier. . . ." The Ocean Liner Defendants, however, may not rely on this section as a complete defense to liability in this case because they issued PVH through Bills of Lading. This means that they promised to transport the containers

17

from their points of origin all the way to PVH's warehouse in Reading. In order to fulfill their obligations, the Ocean Liner Defendants engaged Kellaway to transport the containers by truck from New Jersey to Harrisburg. Because Kellaway acted as the Ocean Liner Defendants' agent or subcontractor, if Kellaway was negligent in performing its duties, then § 1304(2)(q) will not limit their liability. That section clearly contemplates carrier liability for the negligence of subcontractors and agents. *Id.* (stating that carrier seeking to assert § 1304(2)(q) defense bears the burden of proving that "neither the actual fault or privity of the carrier *nor the fault or neglect of the agents or servants of the carrier* contributed to the loss or damage" (emphasis added)); *accord Agrico Chem. Co. v. SS ATLANTIC FOREST*, 459 F. Supp. 638, 647 (E.D. La. 1978) (A carrier "may not insulate itself from liability by the use of independent contractors.").

As one court has noted, "though carriers may not limit their liability for negligence in the services they provide through their employees or agents, they may, by a valid contract with the owner of the goods, limit the services they agree to provide." *Sumitomo Corp. v. M/V SIE KIM*, 632 F. Supp. 824, 837 (S.D.N.Y. 1985). Had the Ocean Liner Defendants wished to limit their liability to the ocean carriage portion of the trip, then they should have agreed only to deliver the containers to an appropriate port of discharge. Instead, the Ocean Liner Defendants sought to obtain the additional monetary benefit associated with a contract for delivery from the point of origin to the ultimate destination at PVH's warehouse in Reading. They cannot now limit their liability to PVH based on the simple fact that the loss occurred when the containers were not in their direct physical possession. They arranged to have Kellaway transport the containers by truck and are responsible for

18

loss that occurred during the portion of the transportation that they delegated to Kellaway. *But see Tubacex, Inc. v. M/V RISAN*, 45 F.3d 951, 956 (5th Cir. 1995) (holding that carrier is entitled to § 1304(2)(q) defense where shipper, not carrier, arranged for services that caused damage to goods).

COGSA does not bestow upon the Ocean Liner Defendants a blanket limitation of liability for Kellaway's acts and omissions. However, due to the fact that the goods were lost as a result of theft, the Ocean Liner Defendants have accounted for the loss. *See Moss*, 123 A.2d at 426 (holding that theft accounts for the loss). Thus, the burden of proof shifts back to PVH to prove that the Ocean Liner Defendants were negligent. Because the goods were lost while in possession of the Ocean Liner Defendants' subcontractor, their liability to PVH will be determined by whether Kellaway's performance fell above or below the applicable standard of care. If Kellaway's performance complied with the standard of care, then the Ocean Liner Defendants will not be liable to PVH. If Kellaway's performance failed to comply with the standard of care, then the Ocean Liner Defendants are liable to PVH.

2. <u>Analysis of Kellaway's Performance</u>

Under Pennsylvania law, negligence "is the absence of ordinary care that a reasonably prudent person would exercise in the same or similar circumstances." *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998). The mere occurrence of an accident does not establish negligent conduct. *Butler v. City of Pittsburgh*, 537 A.2d 112, 114 (Pa. Commw. Ct. 1988). Instead, the plaintiff must establish, by a preponderance of the evidence, that the defendant engaged in conduct that deviated from the general standard of care expected under the circumstances,

and that this deviation proximately caused actual harm. *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978). Therefore, Kellaway acted negligently if it failed to use security precautions that a reasonable operator of a container yard would have used under the facts in this case.

Based on the evidence presented at trial, the court finds that security at the Kellaway facility was inadequate to protect cargos stored at its facility from the most elementary forms of theft. Kellaway had knowledge, based on its own experience, that container theft was a common problem for container yards. Therefore, Kellaway should have taken reasonable precautions to prevent such thefts. Yet, the evidence adduced at trial indicated that Kellaway did not do so.

The Kellaway facility was surrounded by a chain link fence no more than eight feet high with three strands of barbed wire at the top of the fence. No security guard manned the facility outside of operating hours or stopped by to make periodic checks. The facility did not have an alarm, electronic gate, motion detection system, or shock absorber system that would detect if any one tried to enter the container yard by hopping the fence or cutting a hole in it. Likewise, Kellaway did not do anything to the containers themselves that would have, at least, discouraged theft. For instance, they did not station the containers back-to-back so as to prevent thieves from shopping for valuable cargo once they had entered the gate. They did not place fifth wheel pin locks on the trailers holding the containers[7]

_____

[7] Kellaway's Chief Operating Officer, David McLaughlin, testified that Kellaway did not use fifth wheel pin locks at the Harrisburg facility because container thieves are sophisticated criminals who have learned that they can remove such pin locks with the swing of a sledgehammer. However, the court finds that this vitiates Kellaway's argument that its security measures were adequate. If container thieves are so efficacious, then Kellaway needed to install additional security measures to militate

(continued...)

03/28/2002  10:05AM

Aug 28 02 09:54a        Alan Mycek

and the tractors stationed at the facility were not equipped with anti-theft shut off devices that would automatically stall the engine should the ignition be hot wired. More fundamentally, the container yard did not have adequate lighting to deter potential thieves from entering under cover of night. In fact, the only security measure that Kellaway took was fencing the yard and securing the gate with a pad lock and chain. However, Kellaway even failed to implement this measure properly. All of its drivers, including the independent owner/operators, had keys to the lot. Kellaway, though, did not have a system in place to properly account for which drivers had keys.

Therefore, the court is confident in ruling that security measures at Kellaway's Harrisburg facility fell well below the standard of care for operating an intermodal container yard. Furthermore, the court is unpersuaded by Kellaway's argument that it complied with the standard of care by complying with the requirements for custom bonded facilities. Whether Kellaway complied with the requirements for customs bonded facilities is irrelevant in determining whether Kellaway's security fell below the standard of care for operation of an intermodal container yard. The court is similarly unconvinced by Kellaway's argument that it was not required to maintain any additional security measures because there was no history of container thefts in the Harrisburg area and Harrisburg was considered a suburban, and thus, low crime area. PVH presented evidence that container theft, a very common phenomenon at container yards near major ports, has been spreading

_____

[7](. . .continued)
against such creativity.

21

08/26/2002   10:06A

lug. 28 02 09:54a        Alan Mycek

to container yards located in suburban areas. Accordingly, Kellaway had a duty to provide at least a minimal level of security at its Harrisburg facility.[8]

While the court is convinced that Kellaway's security measures were inadequate, a more difficult inquiry involves determining whether the lack of adequate measures was the proximate cause of the container's theft. Generally, a negligent party will not be held liable for loss that occurs as a result of a third party's criminal acts because the criminal act is considered a superceding cause of the plaintiff's ultimate injury. *See Trude v. Martin*, 660 A.2d 626, 627 (Pa. Super Ct. 1995); *see also* Restatement (Second) of Torts § 440 (1965). However, if a subsequent act is a foreseeable result of the original tortfessor's negligence, then the subsequent criminal act will not relieve the original tortfessor's liability. *Vattimo v. Lower Bucks Hospital, Inc.*, 465 A.2d 1231, 1237 (Pa. 1983); *see also* Restatement (Second) of Torts § 442.

In this case, the evidence definitively indicates that Kellaway should have foreseen that its inadequate security measures would expose it to container theft. Kellaway is a sophisticated shipping entity that operates several container yards located throughout the northeastern United States. It has, on numerous occasions, been the victim of container thefts at its other facilities. Due to these thefts, Kellaway has implemented various security measures at all of these facilities. Yet, at the Harrisburg facility, it neglected to implement any security measures beyond the minimal requirements for obtaining the status of a customs bonded

---

[8]Kellaway also argues that it did not implement additional security measures because the cost of such measure would have prevented them from doing so. However, the court finds this proffered justification insincere because McLaughlin testified that Kellaway did not perform any cost analysis regarding additional security measures for the Harrisburg facility. (T. at 426.)

22

facility. Although the Harrisburg facility was much smaller than its other facilities, it still held about fifteen containers a day on average. The value of the containers themselves, without taking into account the value of their cargo, warranted that Kellaway implement greater security measures than it did. Although the court is unwilling to dictate, as a matter of law, what additional measures would have been sufficient, it is willing to say that Kellaway's complete lack of security was a foreseeable cause of the criminal activity that resulted in the loss of the three intermodal containers at issue in this case. At the very least, implementation of some additional measures would have deterred, or even prevented, a group of thieves from entering the container yard under cover of night; shopping through at least twelve containers; hot-wiring several tractors; hooking the tractors up to three containers; and hauling those loads out of the yard without detection for at least a day.

Because Kellaway's performance fell below the standard of care for container yard operators, the Ocean Liner Defendants are liable to PVH for breach of the bailment contracts for transportation of the three intermodal containers. Accordingly, the court will enter judgment in favor of PVH and against the Ocean Liner Defendants.

3. **Damages**

a.    PVH v. Mitsui

PVH claims total damages in the amount of $287,911.99 against Mitsui and $133,644.50 against Maersk. These numbers represent what PVH argues is the fair market value of the lost shirts, plus the freight and customs charges that PVH paid for the non-delivered cargo. PVH argues that it had already sold the shirts to

23

various retail outlets and, therefore, it is entitled to recover the profit it lost due the theft of the containers. The Ocean Liner Defendants, however, insist that PVH is not entitled to claim the lost profit because: (1) their evidence on the subject was insufficient to meet their burden of proof; and (2) the Bills of Lading specifically excluded the Ocean Liner Defendants' liability for consequential damages. Because the court finds that the Ocean Liner Defendants validly disclaimed their liability for consequential damages, the court need not address the evidentiary issue.

Lost profits are, by definition, consequential damages. *See AM/PM Franchise Ass'n v. Atlantic Richfield Co.*, 584 A.2d 915, 920 (Pa. 1990). All three Mitsui Bills of Lading contained a clause limiting Mitsui's liability for consequential damages. That clause reads as follows: "The Carrier . . . shall in no circumstances be liable for delay or for any indirect or special or consequential loss or damage incurred by Merchant." (Pl. Ex. 31 at ¶ 6(3).) The Mitsui Bills of Lading also included a clause paramount making COGSA § 1304(5) applicable to the Bills of Lading. That clause indicates that Mitsui is not liable "in any event . . . for loss or damage to or in connection with the Goods in an amount exceeding $500.00 per package . . . unless the value of the Goods has been declared and inserted in the declared value box on the face hereof, in which case Clause 6(2) shall apply." (*Id.* at ¶ 29(2).) Clause 6(2) states that where the shipper declares a value for the shipped goods, then that amount is substituted as the limitation of damages. (*Id.* at ¶ 6(2).) PVH, however, did not declare the value of the goods and, therefore, the $500 limitation per package applies. PVH, however, argues that the clause disclaiming liability for consequential values is prohibited by 46 U.S.C. app. §

24

Aug 26 02 09:55a        Alan Mycek                    6185710766

1303(8), which nullifies any limitation of liability that lessens the carrier's liability beyond the limitation established by § 1304(5).

The disclaimer of consequential damages does not lessen Mitsui's liability under the Bills of Lading. Mitsui transported 775 cartons of shirts in the stolen container. These cartons each constitute a package pursuant to COGSA. *See Fireman Fund Ins. Co. v. Tropical Shipping & Constr. Co.*, 254 F.3d 987, 996-97 (11th Cir. 2001) (defining package as "a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods") (quotations omitted). Accordingly, the ceiling for Mitsui's liability pursuant to the COGSA limitation is $387,500. Yet, including its claim for consequential damages, PVH only claims $287,911.99 in damages from Mitsui. Therefore, the clause limiting Mitsui's liability does not lessen its claim to PVH because PVH's claim, itself, already fell almost $100,000.00 short of this minimal limitation. In this situation, § 1303(8) will not operate so as to invalidate the clause disclaiming Mitsui's liability for consequential damages. Moreover, as previously discussed, COGSA does not apply of its own force in this case, but rather as a function of the contract between the parties. *See supra* at Part II.B.2. As such, COGSA's terms are modifiable by other terms in the contract. *Hartford Fire Ins. Co.*, 230 F.3d at 557. Thus, when read in conjunction, the two limitations state that Mitsui will not be liable for consequential damages and, in any event, its liability will not exceed $500 per package.

Additionally, under Pennsylvania contract law, parties of equal bargaining power may contractually limit their liability for special, indirect, or

08/28/2002    10:06AM

consequential damages. *Factory Market, Inc. v. Schuller Int'l, Inc.*, 987 F. Supp. 387, 399 (E.D. Pa. 1997); *Borden v. Advent Ink Co.*, 701 A.2d 255, 262 (Pa. Super. Ct. 1997); *National Cash Register Co. v. Modern Transfer Co.*, 302 A.2d 486, 491 (Pa. Super. Ct. 1973). Such limitations on liability will be enforced absent a showing that the breaching party engaged in willful or wanton conduct. *Behrend v. Bell Tel. Co.*, 363 A.2d 1152, 1166 (Pa. Super. Ct. 1976). Given that both PVH and Mitsui have much experience in these types of transactions and their is no allegation of foul play, the court will enforce their contractual agreement to limit Mitsui's liability for consequential damages. Accordingly, PVH may not recover for its lost profits that resulted from Mitsui's failure to deliver the goods.

The Mitsui contract also contains a clause stating that its freight charges are earned in full upon delivery of the goods to the carrier and is non-returnable under any circumstances. This clause, which appears to disclaim Mitsui's liability for the value of the service it failed to perform, is likewise enforceable because it is reasonable and does not totally exculpate Mitsui's liability under its Bills of Lading. Therefore, Mitsui's liability is limited to the price that PVH paid for the shirts (the invoice price) plus customs fees and prejudgment interest. *See* 41 Pa. Const. Stat. § 202 (stating that six percent per annum is prejudgment interest rate in breach of contract claims); *American Enka Co. v. Wicaco*, 686 F.2d 1050, 1057 (3d Cir. 1982) (holding that prejudgment interest is "e awarded at the statutory rate . . . from the date the cause of action arose"); *Rizzo v. Haines*, 555 A.2d 58, 69 (Pa. 1989) (same); *see also Fernandez v. Levin*, 548 A.2d 1191, 1193 (Pa. 1988) (holding that a plaintiff who succeeds on a breach of contract claim is entitled to prejudgment interest as a matter of right). In summation, Mitsui

26

Aug 28 02 09:56a    Alan Mycek

is liable to PVH for $182,990.85 ($127,259.84 paid for the undelivered shirts, $26,637.99 in customs and duty charges, and $29,093.02 in prejudgment interest).

### b.    PVH v. Maersk

Maersk's Bill of Lading similarly disclaims its liability for consequential damages arising out of the loss of the goods.  (Maersk Ex. B at ¶ 7(2).)  For the same reasons stated above, the court will not hold Maersk liable for PVH's lost profits.[9]  *See supra* at Part II.C.3.a.  Also, like the Mitsui Bills of Lading, the Maersk Bill of Lading includes a clause indicating that it earned its freight charges at the moment PVH delivered the goods to Maersk in Pakistan.  (*Id.* at ¶ 14(2).)  Accordingly, the court will hold Maersk liable to PVH in the amount of $81,835.39 ($56,851.20 for the loss of the shirts, $11,973.50 in customs and duty charges, and $13,010.69 in prejudgment interest).

### 4.    Indemnification

The Ocean Liner Defendants contend that if they are liable to PVH then Kellaway is liable to them.  Kellaway, however, contends that it is not liable because: (1) the contract setting forth indemnity between Kellaway and the Ocean Liner Defendants did not apply once Kellaway delivered the containers to its Harrisburg facility; and (2) Kellaway disclaimed its liability to the Ocean Liner Defendants.  The court finds that neither of these justifications have merit.

The Uniform Intermodal Interchange Agreement ("UIIA") is an agreement between various shipping entities that sets out each entity's duties and liabilities when transporting and exchanging intermodal container units.  Mitsui,

---

[9] The Maersk Bill of Lading does not contain a clause paramount and, consequently, COGSA's $500 per package limitation does not apply at all.

08/28/2002    10:06A

ug 28 02 09:57s    Alan Mycek                        6109710789

Maersk, and Kellaway were all parties to this agreement at all times relevant to this litigation. Pursuant to the terms of that agreement, the "Motor Carrier agrees to defend, hold harmless, and fully indemnify . . . Equipment Owner . . . as [its] interests appear against any and all loss, damage or liability . . . suffered by . . . Provider . . . arising out of Motor Carrier's negligent or intentional acts or omissions during an Interchange Period and/or presence on Facility Operator's premises." (Mitsui Ex. D at ¶ III.B.7.d.) The court has previously found that Kellaway's failure to install additional safety measures constituted negligence. Therefore, the UIIA requires Kellaway to indemnify the Ocean Liner Defendants for the amount it will have to pay PVH for the loss of the cargo.

Kellaway, however, argues that the UIIA indemnification clause does not apply in this case. According to Kellaway, the interchange took place when its drivers dropped off the containers at the Harrisburg facility and the manager of that facility issued an equipment interchange report ("EIR"). This event, according to Kellaway, marked the end of the "interchange period" and thus its indemnification responsibility. Because the loss occurred subsequent to the issuance of the EIR, the loss did not occur during the "interchange period" and the indemnification clause is inapplicable.

Section II(H) of the UIIA defines "Interchange" as "the transfer of physical possession of Equipment under the Agreement." (Id. at ¶ II(H).) Section II(I) defines "Interchange Period" as "the period commencing upon Interchange to Motor Carrier and concluding upon Interchange to Provider." (Id. at ¶ II(I).) When read together these clauses clearly indicate that a motor carrier will be liable to a provider during the period commencing upon taking physical possession of the

Aug 28 02 09:57a      Alan Mycek                    6109710700

equipment until it transfers physical possession back to the provider. GPS, the Ocean Liner Defendants' appointed agent, never took physical possession of the containers. The loss, therefore, occurred during the interchange period as that term is defined under the UIIA, and Kellaway must indemnify the Ocean Liner Defendants. The UIIA is entirely silent as to the effect that the issuing an EIR will have on the shifting of the risk of loss. Given this silence, and the UIIA's explicit requirement that *physical* possession be transferred, the court will not endorse Kellaway's contention that it can unilaterally end the interchange period by having one of its employee's issue another of its employee's an EIR.[19]

Kellaway also argues that it is not liable to the Ocean Liner Defendants because the terms and conditions on the back of the EIR disclaim its liability. However, the court finds that Kellaway has not properly authenticated page two and three of this document. The terms and conditions that Kellaway included as the second page of its Exhibit K-5 are actually terms and conditions on the reverse side of a different document and not a part of the first page of Exhibit K-5. An exemplar of the form from which those terms and conditions were copied appears at Exhibit K-1. The front of Exhibit K-1 indicates that it was issued by "Kellaway Intermodal & Distribution Services, Inc," and the box in the lower right-hand corner states that it is "ISSUED SUBJECT TO ALL TERMS AND CONDITIONS INCLUDING LIMITATION OF LIABILITY ON REVERSE SIDE HEREOF, SAID TERMS AND CONDITIONS CONSTITUTE A CONTRACT TO WHICH STORER

---

[19]Even if the court were to find that the UIIA does not apply in this case, Kellaway would still be liable to the Ocean Liner Defendants pursuant to a claim for breach of an implied bailment contract because Kellaway charged a fee to have the containers stored at its facility. Therefore, under this mutually beneficial bailment, Kellaway would be held liable for ordinary negligence. The court has already determined that Kellaway was negligent. *See supra*, at Part II.C.2.

08/28/2002    10:06AM

Aug. 28 02 09:58a       Alan Mycek

AGREES BY THE ACCEPTANCE OF THIS RECEIPT." (Ex. K-1.)  Additionally, K-1 is titled "Non-Negotiable Warehouse Receipt, Equipment Interchange Receipt and Safety Inspection Report." (Id.)  Yet, the face page of Exhibit K-5 refers to "Kellaway Terminal Services Incorporated" and does not refer to any terms and conditions on the reverse side.  Moreover, the face page of Exhibit K-5 is titled "Equipment Interchange Receipt and Safety Inspection Report."  Kellaway failed to produce either the original Exhibit K-5 or an exemplar that matched up entities on both the first and second pages.  Kellaway has failed to satisfactorily explain these discrepancies or justify its failure to produce the original K-5 in its entirety.  The court, therefore, will sustain the Ocean Liner Defendants' objection and will not allow the pages two and three of Kellaway Exhibit K-5 into evidence.  See Fed. R. Evid. 901(a).[11]

In accordance with the preceding discussion, the court finds that Kellaway is liable to the Ocean Liner Defendants for its breach of the UIIA. Kellaway is liable to Mitsui for $182,990.85 and to Maersk for $81,835.39.

III.    Conclusions of Law

1. The court has subject matter jurisdiction over this matter based on the parties' diverse state citizenship. See 28 U.S.C. § 1332.

---

[11]Even if the court had admitted this document, this would not have altered the outcome. Under Pennsylvania law, storage receipts may limit the liability of a warehouse, but only if the bailor is given an opportunity to declare the value of the stored goods. Adams v. Ryan & Christie Storage, Inc., 563 F. Supp. 409, 410-11 (E.D. Pa. 1983). In this case, one Kellaway employee issued another Kellaway employee the EIR allegedly containing terms disclaiming its liability to the Ocean Liner Defendants. The disclaimer in this case would be invalid because the Ocean Liner Defendants were not given an opportunity to declare the value of its goods prior to Kellaway issuing the EIR.

03/28/2002    10:06AM

2.  The court will SUSTAIN the Ocean Liner Defendants' objection to Kellaway Exhibit K-5.  Only the first page of this document will be admitted into evidence.

3.  Mitsui breached its contract with PVH.

4.  Mitsui, as a consequence of its breach, is liable to PVH in the amount of $182,990.85.

5.  Maersk breached its contract with PVH.

6.  Maersk, as a result of its breach, is liable to PVH in the amount of $81,835.39.

7.  Kellaway breached its contract with Mitsui.

8.  As a result of that breach, Kellaway is liable to Mitsui for indemnification in the amount of $182,990.85.

9.  Kellaway breached its contract with Maersk.

10.  As a result of its breach, Kellaway is liable to Maersk for indemnification in the amount of $81,835.39.

SYLVIA H. RAMBO
United States District Judge

Dated: August  14 , 2002.

31

2

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

## MIDDLE DISTRICT OF PENNSYLVANIA

### JUDGMENT IN A CIVIL CASE

PHILIPS-VAN HEUSEN CORP.

v.

CASE NUMBER: 1:CV-00-0665

MITSUI O.S.K. LINES LTD., et al.

FILED
HARRISBURG, P.

AUG 1 4 2002

MARY E. D'ANDREA, CLERK
Per _____

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.** This action came to trial or hearing before the court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that judgment be and is hereby entered in favor of Plaintiff Philips-Van Heusen and against Defendant Mitsuit O.S.K. Lines Ltd in the amount of $182,990.85.

**IT IS FURTHER ORDERED AND ADJUDGED** that judgment be and is hereby entered in favor of Plaintiff Philips-Van Heusen and against Defendant Dampskibssekskabet Af 1912 Aktieseskab and Aktieseskabet Dampskibssekskabet Svenborg in the amount of $81,835.39.

**IT IS FURTHER ORDERED AND ADJUDGED** that judgment be and is hereby entered in favor of Mitsui O.S.K. Lines Ltd. and against 3rd-Party Defendant Kellaway in the amount $182,990.85.

**IT IS FURTHER ORDERED AND ADJUDGED** that judgment be and is hereby entered in favor of Dampskibssekskabet Af 1912 Aktieseskab and Aktieseskabet Dampskibssekskabet Svenborg and against Kellaway in the amount of $81,835.39.

Date: AUGUST 14, 2002

Mary E. D'Andrea, Clerk of Court

Certified from the record
Date ___8-14-02___
Mary E. D'Andrea, Clerk
Per _____

(By) SHAWNA L. CIHAK, Deputy Clerk

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

### ——————— MIDDLE DISTRICT OF PENNSYLVANIA ———————
## JUDGMENT IN A CIVIL CASE

Phillips-Van Heusen Corporation
      Plaintiff

Case No: 1:00-CV-0665
Judge Sylvia H. Rambo

### V.

Mitsui O.S.K. Lines Ltd.;
Dampskibsselskabet AF 1912 Aktieselskab;
Aktieselskab Dampskibsselskabet Svendborg,
      Defendants/3rd Party Plaintiffs/Cross Defendants

Mitsui O.S.K. Lines Ltd.;
Dampskibsselskabet AF 1912 Aktieselskab;
Aktieselskab Dampskibsselskabet Svendborg
d/b/a Maersk Line, Inc., d/b/a Maersk Line
      3rd Party Plaintiffs/Cross Defendants

Kellaway Intermodal & Distribution Systems, Inc.,
Kellaway Intermodal Services, Inc.
Kellaway Terminal Services, Inc.,
      3rd Party Defendants/Cross Claimants



FILED

DEC 1 3 2002

PER
HARRISBURG, PA  DEPUTY CLERK

☐    **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒    **Decision by Court.** This action came to trial or hearing before the court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** that judgment be and is hereby entered as follows:

1) In favor of Plaintiff Philips-Van Heusen Corporation and against Defendant Mitsui O.S.K. Lines Ltd. in the amount of $182,990.85.

2) In favor of Philips-Van Heusen Corporation and against Defendant Dampskibssekskabet Af 1912 Aktieseskab and Aktieseskabet Dampskibssekskabet Svenborg in the amount of $81,835.39

3) In favor of Mitsui O.S.K. Lines Ltd. and against Third-Party Defendant Kellaway in the amount of $182,990.85.

4) In favor of Dampskibssekskabet Af 1912 Aktieseskab and Aktieseskabet Dampskibssekskabet Svenborg and against Kellaway in the amount of $81,835.39.

**Date:** December 13, 2002              **Mary E. D'Andrea, Clerk of Court**

**(By)** Mark J. Armbruster, Deputy Clerk

INFORMATION STATEMENT TO BE COMPLETED BY U.S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

HARRISBURG, PA

CAPTION:                                              DISTRICT COURT NO.  1:CV-00-0665

PHILLIPS-VAN HEUSEN CORP.                            CT. OF APPEALS NO. _____
         Vs
MITSUI O.S.K. LINES, LTD., et al.

AMENDED CROSS APPEAL AND APPEAL OR CROSS APPEAL AND APPEAL
NOTICE OF APPEAL FILED January 15, 2003 COURT REPORTER(S) _____ Vicki Fox _____

FILING FEE:

NOTICE OF APPEAL __X__PAID ____NOT PAID ___SEAMAN

DOCKET FEE ___X__PAID ____NOT PAID ___USA

CJA APPOINTMENT: (Attach Copy of Order)

__ PRIVATE ATTORNEY
__ DEFENDER ASSOCIATION OR FEDERAL PUBLIC DEFENDER
__ MOTION PENDING

LEAVE TO PROCEED IN FORMA PAUPERIS STATUS, IF APPLICABLE:
         (Attach Copy of Order)
___MOTION GRANTED(IN FIRST INSTANCE)
__ MOTION DENIED (IN FIRST INSTANCE)
__ MOTION PENDING BEFORE DISTRICT JUDGE

CERTIFICATE OF PROBABLE CAUSE (STATE HABEAS CORPUS):
         (Attach copy of Order)
__ GRANTED
__ DENIED
__ PENDING

COPIES TO:
Judge Sylvia H. Rambo                      Ann-Michele G. Higgins, Esquire
Carl H. Delacato, Jr., Esquire             James A. Wescoe, Esquire
George R. Zacharkow, Esquire               Eileen C. Tannenbaum, Esquire
David P. Thompson, Esquire                 Patrick J. Keenan, Esquie
Charles W. McCammon, Esquire               Douglas B. Marcello, Esquire
File Copy                                  Richard Q. Whelan, Esauire
Vicki Fox, RMR                             William E. Ecenbarger, Jr., Esquire


                              PREPARED BY ____Virginia Gilmroe_____
                                              Deputy Clerk

Date: January17, 2003



**UNITED STATES DISTRICT COURT**
*for the*
**MIDDLE DISTRICT OF PENNSYLVANIA**
William J. Nealon Federal Bldg & U.S. Courthouse
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501-1148

*Divisional Offices:*

MARY E. D'ANDREA
*Clerk of Court*

(570) 207-5600   FAX (570) 207-5650
Internet Address: *www.pamd.uscourts.gov*

Harrisburg:   (717) 221-3920
Williamsport: (570) 323-6380

Office of the Clerk
United States Court of Appeals
for the Third Circuit
21400 United States Courthouse
601 Market Street
Philadelphia, PA   19106-1790

**RE:        PHILLIPS-VAN HEUSEN CORP. Vs
MITSUI O.S.K. LINES, LTD., et al.
USDC NO: 1:CV-00-0665
USCA NO:
E-mail Account: All correspondence should be sent to the e-mail account:
PAMDAPPEAL1**

Dear Ms. Waldron:

A *Notice of Appeal* was filed in the above-referenced case.

_____        **Civil Prisoner Case: Case file and docket sheet available through
RACER.**

_____        **Non-Prisoner *Pro Se* Civil Case: Notice of Appeal and Docket Sheet
available through RACER.**

___X___        **Non-Prisoner Civil Case or Criminal Case:  Notice of Appeal and
Docket Sheet available through RACER.**

_____        **Civil Prisoner Case: _____ Supplemental Record filed.  Documents
and docket sheet available through RACER.**

_____        **Non-Prisoner Civil Case or Criminal Case:
_____ Supplemental Record filed.  Docket Sheet available through
RACER.**

        **The Clerk's Office hereby certifies the record and the docket sheet available
through RACER to be the certified list in lieu of the record and/or the certified copy of the
docket entries.**

Very truly yours,

s/ **Virginia Gilmore**
Deputy Clerk

Date: ___01/17/03_____